**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
ARNOLD SCHANFIELD, individually and on     :
behalf of others similarly situated,     :
    :   No. 07 Civ. 9716 (CM) (JCF)
               Plaintiff,     :
    :
        - against -     :
    :
SOJITZ CORPORATION OF AMERICA, JUN     :
MATSUMOTO in his official and individual     :
capacities, and TAKASHI TSUKADA in his     :
official and individual capacities,     :
    :
              Defendants.     :
    :
------------------------------------------------------------X


### MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT


THOMPSON WIGDOR & GILLY LLP
Kenneth P. Thompson (KT-6026)
Patricia E. Ronan (PR-0345)
85 Fifth Avenue, Fifth Floor
New York, NY 10003
(212) 257-6800 (telephone)
(212) 257-6845 (facsimile)

*Attorneys for Plaintiff and Proposed Class Counsel*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT .................................................................................1

STATEMENT OF FACTS .........................................................................................2

ARGUMENT .............................................................................................................9

    I.    PLAINTIFF HAS MADE A *PRIMA FACIE* CASE
         FOR UNLAWFUL DISCRIMINATION .........................................................10

         A.    Plaintiff is a Member of a Protected Group .........................................10

         B.    Plaintiff Was Qualified for the CIA Position......................................12

         C.    Plaintiff Suffered Adverse Employment Actions ...............................12

         D.    The Circumstances of Plaintiff's Termination
                Give Rise to an Inference of Discrimination ......................................13

         E.    Defendants' Proffered Reason for Plaintiff's
                Termination is a Pretext ......................................................................16

    II.    THE SAME-ACTOR INFERENCE IS INAPPLICABLE TO THIS CASE .....19

    III.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
         ON PLAINTIFF'S RETALIATION CLAIM SHOULD BE DENIED .............21

         A.    Plaintiff Engaged In Protected Activity...............................................22

         B.    Defendants' Action was Likely to Deter a Reasonable
                 Employee from Making Complaints of Discrimination .....................24

         C.    Plaintiff Has Established a Causal Connection Between
                 His Complaints of Discrimination and His Termination ....................27

         D.    Defendants Reasons for the Retaliation Are Pretext............................29

    IV.    DEFENDANTS MATSUMOTO AND TSUKADA ARE
         INDIVIDUALLY LIABLE FOR THE UNLAWFUL CONDUCT
         PLAINTIFF EXPERIENCED ........................................................................29

CONCLUSION........................................................................................................30

i

## <u>TABLE OF AUTHORITIES</u>

*Allen v. Advanced Digital Info. Corp.*
500 F. Supp. 2d 93 (N.D.N.Y 2007) ............................................................................28

*Ames v. Cartier*, 193 F. Supp. 2d 762 (S.D.N.Y. 2002) .................................................17

*Antonmarchi v. Consol. Edison Co., Inc.*
03 Civ. 7735, 2008 U.S. Dist. LEXIS 75458 (S.D.N.Y. Sept. 29, 2008) ......................28

*Bennett v. Total Minatome Corp.*, 138 F.3d 1053 (5th Cir. 1998) ...................................11

*Bill Johnson's Rest. v. NLRB*, 461 U.S. 731, 103 S. Ct. 2161 (1983) ............................26

*Borrero v. America Express Bank, Ltd.*, 533 F. Supp. 2d 429 (S.D.N.Y. 2008) ...........13

*Bryant v. Begin Manage Program*, 281 F. Supp. 2d 561 (E.D.N.Y. 2003) ...................13

*Burlington N. & Santa Fe Ry. Co. v. White*
548 U.S. 53, 126 S. Ct. 2405 (2006) .......................................................................24, 25

*Bush v. Fordham Univ.*, 452 F. Supp. 2d 394 (S.D.N.Y. 2006) ....................................25

*Chan v. N.Y.U. Downtown Hosp.*
03 Civ. 3003, 2005 U.S. Dist. LEXIS 40243 (S.D.N.Y. Feb. 14, 2005) ......................25

*Chertkova v. Conn. General Life Insur. Co.*, 92 F.3d 81 (2d Cir. 1996) ................10, 13

*Coleman v. Wayne State Univ.*, 664 F. Supp. 1082 (E.D. Mich. 1987) ........................22

*Copeland v. Rosen*, 38 F. Supp. 2d 298 (S.D.N.Y. 1999) ............................................20

*Crawford v. Metro. Gov't of Nashville*, 129 S.Ct. 846, 172 L. Ed. 2d 650 (2009) .................23, 24

*Curry v. City of Syracuse*, 316 F.3d 324 (2d Cir. 2003) ...............................................18

*Danzer v. Norden Systs., Inc.*, 151 F.3d 50 (2d Cir. 1998) ...........................................10

*Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S. Ct. 2148 (2003) ...............................14

*Dinkins v. Suffolk Transp. Servs.*
07 Civ. 3567, 2009 U.S. Dist. LEXIS 9146 (E.D.N.Y. Feb. 9, 2009) ..........................16

*Dixon v. City of N.Y.*
03 Civ. 343, 2008 U.S. Dist. LEXIS 75721 (E.D.N.Y. Sept. 30, 2008) .......................25

*Douglas v. M. Swift & Sons, Inc.*
371 F. Supp. 2d 137 (D. Conn. 2005).................................................................... *passim*

*Eschelbach v. CCF Charterhouse Credit Commer. De Fr.*
01 Civ. 1778, 2006 U.S. Dist. LEXIS (S.D.N.Y. July 25, 2006) ...................................14

*Feingold v. N.Y.*, 366 F.3d 138 (2d Cir. 2004) .................................................... *passim*

*Fortino v. Quasar Co.*, 950 F.2d 389 (7th Cir. 1991)..................................................11

*Goyette v. DCA Adver. Inc.*, 828 F. Supp. 227 (S.D.N.Y. 1993)............................ *passim*

*Goyette v. DCA* 830 F. Supp. 737 (S.D.N.Y. 1993) ...................................................14

*Grady v. Affiliated Cent., Inc.*, 130 F.3d 553 (2d Cir. 1997)........................................21

*Hargett v. Metro. Transit Auth.*, 552 F. Supp. 2d 393 (S.D.N.Y. 2008) .......................30

*Hargett v. Nat'l Westminster Bank*, 78 F.3d 836 (2d Cir. 1996)..................................14

*Hawkins v. County of Oneida*, 497 F. Supp. 2d 362 (N.D.N.Y. 2007)..........................16

*Heinemann v. Howe & Rusling*, 529 F. Supp. 2d 396 (W.D.N.Y. 2008) .................19, 21

*Hinton v. City Coll. of N.Y.*,
05 Civ. 8951 (GEL), 2008 U.S. Dist. LEXIS 16058 (S.D.N.Y. Feb. 29, 2008)............................24

*Holtz v. Rockefeller & Co.*, 258 F.3d 62 (2d Cir. 2001) ..............................................22

*Jacques v. DiMarzio, Inc.*, 200 F. Supp. 2d 151 (E.D.N.Y. 2002)................................26

*Jetter v. Knothe Corp.*, 324 F.3d 73 (2d Cir. 2003)....................................................21

*Kreinik v. Showbran Photo, Inc.*,
02 Civ. 1172, 2003 U.S. Dist. LEXIS 18276 (S.D.N.Y. Oct. 10, 2003) ......................................26

*Lamere v. N.Y. State Office for the Aging*,
03 Civ. 356, 2005 U.S. Dist. LEXIS 41904 (N.D.N.Y. Apr. 27, 2005) .......................................25

*Long v. Marubeni Am. Corp.*,
05 Civ. 0639 (GEL), 2006 U.S. Dist. LEXIS 8932 (S.D.N.Y Mar. 6, 2006)...............................29

*Mandell v. Suffolk County*, 316 F.3d 368 (2d Cir. 2003)............................................15

*Masters v. F.W. Webb Co.*,
03 Civ. 6280, 2008 U.S. Dist. LEXIS 73585 (W.D.N.Y. Sept. 8, 2008) ....................................20

*McDonald v. Santa Fe Trail Transp. Co.*,
427 U.S. 273, 96 S. Ct. 2574 (1976)..........................................................................................10

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792, 93 S.Ct. 1817 (1973)......................................................................................10, 16

*McNair v. N.Y.C. Health & Hosp. Co.*, 160 F. Supp. 2d 601 (S.D.N.Y. 2001)...........................27

*Nieves v. Angelo, Gordon & Co.*,
05 Civ. 7782, 2007 U.S. Dist. LEXIS 27006 (S.D.N.Y. Apr. 10, 2007).....................................25

*Owens v. N.Y. City Housing Auth.*, 934 F.2d 405 (2d Cir. 1991) ..................................................12

*Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S. Ct. 2363 (1989) .................................10

*Powell v. Syracuse Univ.*, 580 F.2d 1150 (2d Cir. 1978) ..............................................................12

*Raniola v. Bratton*, 243 F.3d 610 (2d Cir. 2001) .........................................................................29

*Richards v. Calvet*,
99 Civ. 12172, 2005 U.S. Dist. LEXIS 5365 (S.D.N.Y. Mar. 30, 2005) ....................................21

*Shane v. Tokai Bank, Ltd.*,
96 Civ. 5187 (HB), 1997 U.S. Dist. LEXIS 16000 (S.D.N.Y. Oct. 15, 1997) ..................... *passim*

*Stratton v. Dep't for the Aging for N.Y.*, 132 F.3d 869 (2d Cir.1997) ..........................................14

*Snyder v. Advest, Inc.*,
06 Civ. 1426 (RMB)(FM), 2008 U.S. Dist. LEXIS 80862 (S.D.N.Y. Oct. 8, 2008) ...................17

*Sumitomo v. Avigliano*, 457 U.S. 176, 102 S. Ct. 2374 (1982) .....................................................11

*Sumner v. U.S. Postal Serv.*, 899 F.2d 203 (2d Cir. 1990) ...........................................................28

*Torres v. Gristede's Operating Corp.*,
04 Civ. 3316, 2008 U.S. Dist. LEXIS 66066 (S.D.N.Y. Aug. 28, 2008) ....................................26

*Thomas v. iStar Fin., Inc.*, 438 F. Supp. 2d 348 (S.D.N.Y. 2000)................................................22

*Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir. 1995) ....................................................................29

*Wanamaker v. Columbian Rope Co.*, 108 F.3d 462 (2d Cir. 1997)................................................13

*Weinstock v. Columbia Univ.*, 224 F.3d 33 (2d Cir. 2000)........................................................10

*Whaley v. City Univ. of N.Y.*, 555 F. Supp. 2d 381 (S.D.N.Y. 2008) ............................................28

*Wright v. Stern*, 450 F. Supp. 2d 335 (S.D.N.Y. 2006) ................................................................25

**FEDERAL STATUTES**

Fed. R. Civ. P. 56(c) ......................................................................................................................9

Plaintiff Arnold Schanfield ("Plaintiff" or "Mr. Schanfield") respectfully submits this Memorandum of Law in Opposition to the Motion for Summary Judgment by Defendants Sojitz Corporation of America ("Sojitz" or the "Company"), Jun Matsumoto ("Defendant Matsumoto") and Takashi Tsukada ("Defendant Tsukada") (collectively, "Defendants).

## PRELIMINARY STATEMENT

This action seeks to remedy the systemic and pervasive discrimination committed against non-Japanese/non-Asian employees of Sojitz, including Plaintiff Arnold Schanfield.  It also seeks to address the unlawful retaliation committed against Mr. Schanfield for his continued opposition to discrimination at the Company.  Plaintiff, the former Chief Internal Auditor ("CIA") of Sojitz, is a Caucasian male and naturalized U.S. citizen, who began working for the Company in July 2006.  During his job interview, Mr. Schanfield proposed a specific methodology to assess and then audit the risks facing the Company.  While Defendants Matsumoto and Tsukada initially approved Mr. Schanfield's hire and his risk assessment approach, they thereafter discriminated and retaliated against him on the basis of his race and/or national origin and retaliated against him because he repeatedly opposed discrimination at Sojitz.

Additionally, as the Chief Internal Auditor, Mr. Schanfield persistently reported on human resource and compliance risks to the Company, despite Defendants Matsumoto and Tsukada's instructions to the contrary.  Among the issues Mr. Schanfield raised were exclusion of non-Japanese/non-Asians among management staff in favor of Japanese/Asian employees without regard to experience or competence, lower compensation of non-Japanese/non-Asian national staff, age discrimination, sexual harassment and other discriminatory and retaliatory conduct.  When Mr. Schanfield refused to comply with Defendants' instructions to ignore these risks to the Company but instead continued to oppose the rampant discrimination, Defendants unlawfully terminated his employment in May 2007.  Mr. Schanfield's termination was

1

discriminatory and retaliatory and was intended to silence his continued opposition to the rampant discrimination committed against non-Japanese/non-Asian employees.

The discrimination against non-Japanese/non-Asian employees at Sojitz is systemic and widespread.  Specifically, Sojitz maintains a two-tiered employment system of exclusively Japanese/Asian rotational staff, who occupy the upper ranks of management, and a mostly non-Japanese/non-Asian national staff, virtually all of whom are relegated to lower positions and precluded from advancement in the Company because the top positions are reserved solely for Japanese/Asian employees.  The privileged Japanese/Asian rotational staff are subject to different, more lucrative compensation and benefits, have better access to management opportunities and are evaluated and disciplined pursuant to different, more lenient standards than those that apply to the national staff.  As Defendants readily concede, "It is undisputed that rotationals are subject to different compensation, evaluation and promotional systems than the national staff" at Sojitz.  Mov. Br. at 3.  Japanese/Asian rotational staff are also assigned positions for which no non-Japanese/non-Asian person may apply, with little regard for the Japanese/Asian employees' qualifications or experience.  Moreover, unlike non-Japanese/non-Asian employees, Sojitz cannot and does not terminate or discipline the Japanese/Asian rotational staff.

## STATEMENT OF FACTS

Mr. Schanfield was hired as Chief Internal Auditor of Sojitz, a General Manager position that was technically ranked below the CEO, CFO and COO of the Company, titles at Sojitz held exclusively by Japanese/Asians, in June 2006.  (Defendants' Statement of Material Undisputed Facts Pursuant to Local Rule 56.1 ("Defs. 56.1 St.") ¶¶ 20, 24.)  He began working at the Company on July 10, 2006.  (Exhibit 19 to the Declaration of Kenneth P. Thompson ("Thompson Ex. __").)  Mr. Schanfield's expertise in the field of internal audit was recognized

2

by his colleagues at Sojitz.  (Plaintiff's Counterstatement of Material Facts in Dispute in Response to Defendants' Rule 56.1 Statement ("Cst.") ¶ 18.)  Still, before Mr. Schanfield commenced his position, Defendant Tsukada, then CFO of Sojitz, sought a Japanese/Asian rotational staff member, Hisashi Akita, who was less experienced and less qualified as an auditor than Mr. Schanfield, to oversee Mr. Schanfield.  (Cst. ¶ 6.)  Mr. Akita worked at Sojitz from August to November 2006 and was regarded by Sojitz management and conducted himself in a supervisory capacity over Plaintiff by, among other things, reporting on Plaintiff's activities to Defendant Matsumoto, the CEO of the Company, and Defendant Tsukada.  (Cst. ¶ 23.)

Before Mr. Schanfield was hired by Sojitz, he presented them with a draft internal audit charter, intended as a road map for his responsibilities.  (Cst. ¶ 87.)  Despite repeated efforts over the course of his tenure with the Company to gain consensus about the charter, Defendants Matsumoto and Tsukada never approved or provided Mr. Schanfield with specific feedback regarding it.  (*Id.*)  Indeed, Mr. Schanfield worked without a job description and there were no other documents specifying his duties.  (Cst. ¶ 27.)  Nonetheless, he had been clear with Defendants about his vision for the CIA position even before he was offered the job.  For example, during his interview, Mr. Schanfield was presented with a document written by Richard Paice, Chief Legal Counsel for the Company, entitled the "Status of Internal Controls and Proposed Action Plan" ("Proposed Action Plan").  (Cst. ¶¶ 26-27.)  Mr. Schanfield was asked to review this Proposed Action Plan and create a methodology of how he would approach the CIA role at Sojitz.  (Cst. ¶ 28.)  In this methodology, Mr. Schanfield made clear that he would apply the COSO framework to carry out a thorough risk assessment which would then be the basis for a Company-wide internal audit plan.  (Cst. ¶¶ 28-29.)  Defendants approved Mr. Schanfield's approach and instructed him to apply U.S. standards to his position.  (Cst. ¶ 44.)

As the CIA, Mr. Schanfield attempted to assist Sojitz management to further understand his risk assessment approach by distributing a Japanese translation of the COSO framework he was applying and communicated with management about the difference between the Japanese and the U.S. approaches to audits, including why Japanese audit standards were inappropriate and contradicted U.S. methodologies.  (Cst. ¶¶ 29, 44.)  He also used a methodology to perform a risk assessment for Sojitz that was very practical, accepted throughout the United States and took into account Sojitz's external auditors and the requirements of JSOX, for which Sojitz was preparing.  (Cst. ¶ 36; Thompson Ex. 30.)  Moreover, Mr. Schanfield provided regular updates on his activities to both of his superiors, Defendants Tsukada and Matsumoto.  (Cst. ¶ 31.) Nonetheless, the Chief Legal Officer of the Company, Richard Paice, acknowledged that Plaintiff "wants to do the right thing but Matsumoto-san has no understanding of internal audit or the methodology behind it."  (Cst. ¶ 37; Thompson Ex. 36.)

Soon after joining Sojitz, Mr. Schanfield began to observe discrimination committed at the Company against non-Japanese/non-Asian employees.  For example, Mr. Schanfield was given a desk near Defendant Matsumoto, yet Defendant Matsumoto never included Mr. Schanfield in any informal interactions, such as lunch, which he took exclusively with other Japanese/Asian employees.  (Cst. ¶¶ 31, 93.)  In fact, Defendant Matsumoto communicated with Mr. Akita, rather than with Mr. Schanfield, about the progress of the risk assessment Mr. Schanfield was preparing.  (Cst. ¶ 23, 31.)  Defendant Matsumoto also held regular meetings with senior management about the internal audit function, but excluded Mr. Schanfield from those meetings.  (Cst. ¶ 23, 93.)

At Sojitz, Mr. Schanfield also observed that there were insufficient promotional opportunities for national managers, since the General Manager positions – the highest position

in any department or business unit – were held only by Japanese/Asian rotational staff, with the exception of audit, human resources and legal.  (Cst. ¶¶ 33, 51; *see, e.g.,* Thompson Ex. 29 at SCA 028472.)  In fact, 95% of the General Manager positions at Sojitz were filled by Japanese/Asian rotational staff.  (Cst. ¶ 14.)  He also began to oppose the discrimination against non-Japanese/non-Asian employees in his periodic reports to management, including the below-market compensation of a number of non-Japanese/non-Asian national managers, and recorded morale problems among the national staff, who felt like "second class citizens" because of the preferential treatment given to Japanese/Asian rotational employees.  (Cst. ¶¶ 33, 31, 51; *see, e.g.,* Thompson Ex. 29 at SCA 028475.)  Mr. Schanfield also criticized the fact that critical documents such as business plans were in Japanese, which neither he nor other non-Japanese/non-Asian employees understood well enough to read or speak.  (Cst. ¶ 31; *see, e.g.,* Thompson Ex. 29 at SCA 028472.)  As he carried out his risk assessment, Mr. Schanfield learned of and opposed more discriminatory activity, such as incidents of sexual harassment at Sojitz's Los Angeles branch, and efforts to recruit "young staff."  (Cst. ¶¶ 72-73.)

Defendants Matsumoto and Tsukada were displeased with Mr. Schanfield's persistent opposition to the Company's rotational system and its discrimination against non-Japanese/non-Asian employees.  (Cst. ¶¶ 33, 34, 36.)  They instructed him to ignore the human resources and compliance risks to the Company and simply focus on financial risks and specific audits.  (Cst. ¶¶ 36, 52.)  Mr. Schanfield complied with their instructions insofar as he delineated a number of financial risks and recommended several audits, but he continued to oppose the discriminatory practices and policies of the Company.  (Cst. ¶¶ 36, 38.)  Throughout his tenure, Mr. Schanfield criticized Defendants' discrimination in most of his reports, including his final risk assessment on March 30, 2007.  (Thompson Exs. 11, 29, 31, 32, 34, 39, 41, 42.)

As he attempted to perform his duties and to encourage Sojitz to end its discriminatory practices, Mr. Schanfield encountered resistance and was subjected to unfair criticisms and false accusations.  For example, when Mr. Schanfield attempted to collect information he needed to perform his risk assessment, Japanese staff failed to respond to inquiries or responded in incomplete or incomprehensible ways.  (Cst. ¶ 30.)  Defendant Matsumoto thereafter supported the Japanese/Asian staff's accusations that Mr. Schanfield should be more flexible in his approach to gathering information.  Yet, when Mr. Schanfield complied, resorting to interviews and email correspondence with other Sojitz employees, the Japanese/Asian employees then falsely complained that he had not sought information from them.  (Cst. ¶¶ 30, 50, 93.)

Mr. Schanfield's ability to carry out his duties was further undermined by, among other things, the lack of any additional internal audit employees, whom Defendant Matsumoto forbade him to hire, demands for time-consuming updates and many critical documents being in Japanese.  (Cst. ¶¶ 30, 46.)  Moreover, Defendant Matsumoto was furious with Mr. Schanfield for disobeying his specific instructions not to involve himself with human resource risks and would, in retaliation, yell at Mr. Schanfield for his persistent reports criticizing the preferential treatment afforded the Japanese/Asian rotational staff at Sojitz.  (Cst. ¶¶ 52-54.)  He also placed Mr. Schanfield in a position that was always subordinate to any Japanese/Asian rotational employee, even though Mr. Schanfield's title as CIA should have afforded him authority over most rotational staff.  (Cst. ¶¶ 23, 93.)  To make matters worse, Defendant Matsumoto held a number of meetings with Japanese/Asian staff, intentionally excluding Mr. Schanfield because he was not Japanese/Asian.  (Cst. ¶¶ 23, 74, 93.)  Defendant Matsumoto also treated Mr. Schanfield far worse than he treated even incompetent Japanese/Asian rotational staff, who placed the Company at risk or caused the Company to suffer losses.  (Cst. ¶¶ 14, 38, 93.)  For

example, he never sought to terminate or otherwise reprimand the Treasurer or General Manager of the Information Technology Group, although both of them performed poorly and were incompetent at their positions, because both were Japanese/Asian and rotational employees. (Cst. ¶ 14, 93.)  Defendant Matsumoto also repeatedly berated Mr. Schanfield in front of colleagues and privately, while consistently being more respectful of all Japanese/Asian employees, including secretarial staff.  (Cst. ¶¶ 12, 53, 93, 94.)

Likewise, Defendant Tsukada discriminated against Mr. Schanfield on the basis of his race and/or national origin and retaliated against him in similar ways.  Specifically, Defendant Tsukada repeatedly excluded Mr. Schanfield from management committee meetings and those where he discussed Mr. Schanfield's work product and impeded his integration into the Company because he was not Japanese or Asian.  (Cst. ¶¶ 23, 74, 95.)  Defendant Tsukada also failed to provide Mr. Schanfield with the basic resources necessary to do his job.  (Cst. ¶ 93.)

The discrimination and retaliation against Mr. Schanfield detrimentally affected his ability to perform his job as CIA.  By way of example only, he was prevented from completing his Company-wide risk assessment within the timeframe he initially proposed.  (Cst. ¶¶ 30, 40.) Yet Mr. Schanfield worked ceaselessly to meet the demands of his superiors.  When Defendant Matsumoto sought reports and updates, Mr. Schanfield complied.  (Cst. ¶¶ 31, 40.)  Defendant Matsumoto also instructed him to conduct meetings with managers to address the risks that he identified on an ongoing basis.  Mr. Schanfield again complied with this request, as Defendants concede, holding two such meetings.  (Cst. ¶ 43; Mov. Br. at 8.)  The meetings were a failure, however, primarily because Japanese managers refused to recognize Mr. Schanfield's authority and either did not attend or refused to defer to him as meeting leader.  (*Id.*)  To prevent further delay, Mr. Schanfield discontinued the meetings and concentrated on the risk assessment.  (*Id.*)

7

Additionally, Defendant Matsumoto also instructed Plaintiff to recommend specific audits, but never approved going forward with them.  (Mov. Br. at 8; Cst. ¶¶ 36, 38, 41, 42.)  Furthermore, while Defendants now claim that Mr. Schanfield's work performance was poor, it is undisputed that there is not a single document of any purported performance issue in his personnel file or that he was never subject to any formal discipline during his entire employment.  (Cst. ¶ 90.)

Despite the many efforts to undermine his work and his lack of staff, on March 23, 2007, Mr. Schanfield issued a formal Company-wide audit plan, based on his final risk assessment.  He also submitted the final risk assessment to Defendant Matsumoto on March 30, 2007.  (Cst. ¶ 57.)  As with previous reports, this risk assessment opposed a number of discriminatory practices at Sojitz and listed among the top 43 risks to Sojitz an imbalance of Japanese to Americans, business plans in Japanese, individuals leaving Sojitz because of low morale and lack of succession planning caused by reliance on Japanese/Asian rotational staff.  (Thompson Ex. 58.)

On April 23, 2007, Mr. Schanfield and Defendant Matsumoto met to discuss the final risk assessment.  (Cst. ¶ 94.)  Plaintiff defended his work, explaining that he had prioritized the most serious risks to the Company, a number of which related to the area of human resources and discriminatory policies with respect to non-Japanese/non-Asian national employees and Japanese/Asian rotational staff, and had created an internal audit plan to address those risks. (Schanfield Aff. ¶ 43.)  After months of excluding Mr. Schanfield from essential management meetings, obstructing his access to information, denying him staff, failing to authorize a charter to guide his work and ignoring him when he did comply with specific instructions to highlight financial risks and provide specific audit plans, Defendant Matsumoto subjected Mr. Schanfield to a barrage of unfair criticisms and eventually shouted at Plaintiff that "This is a Japanese company and we will do as we please."  (Cst. ¶ 94.)  Defendant Matsumoto's displeasure with

Mr. Schanfield was not based on his work performance, which was consistent with what he had represented to the Company when he was hired, but on his race and national origin. (Cst. ¶¶ 86, 93, 94.) In particular, Defendant Matsumoto refused to listen to Plaintiff at the April 23, 2007 meeting and in prior months, whereas he would have engaged in a dialogue with an Japanese/ Asian employee in Plaintiff's position. (Cst. ¶ 94.) Additionally, Defendants Sojitz and Matsumoto never terminated or even reprimanded any Japanese/Asian General Managers for their work performance. (Cst. ¶ 91.)

Because of Defendant Matsumoto's statement that Sojitz was a "Japanese company" and the hostility of the April 23, 2007 meeting, Mr. Schanfield recognized that the discrimination and retaliation at the Company were so pervasive and severe that he needed protection. (Schanfield Aff. ¶ 44.) He therefore went to the General Counsel Richard Paice and reported the incident, explaining that he could no longer meet with Defendant Matsumoto alone. (*Id.*) Mr. Schanfield also thought that he might be discriminatorily and retaliatorily terminated for his continued opposition to Defendants' discrimination and began to send himself emails to document his claims. (*Id.*) Confirming his fears, he was unlawfully terminated on May 21, 2007. (Schanfield Aff. ¶ 45.) The decision to terminate Mr. Schanfield was made by Defendant Matsumoto in consultation with Defendant Tsukada (Thompson Ex. 52; Cst. 94).

## ARGUMENT

Summary judgment may be granted only when the movants carry their burden of demonstrating there is no genuine issue of material fact for trial, and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "[S]ummary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his burden of persuasion at trial. There must be either a lack of evidence to support plaintiff's position, or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would

constitute clear error." *Danzer v. Norden Systs., Inc.*, 151 F.3d 50, 54 (2d Cir. 1998) (reversing

district court's grant of summary judgment) (internal citations omitted).  Moreover, all factual

inferences must be resolved in favor of the nonmoving party, such that where there are several

interpretations for an incident, the nonmoving party's plausible interpretation must be accepted.

*Id.*  "[T]rial courts must be especially chary in handing out summary judgment in discrimination

cases, because in such cases the employer's intent is ordinarily at issue."  *Chertkova v. Conn.*

*Gen. Life Insur. Co.*, 92 F.3d 81, 87 (2d Cir. 1996).  Here, there are numerous factual

contentions, precluding the Court from granting Defendants' motion.

I.    **PLAINTIFF HAS MADE A *PRIMA FACIE***
      **CASE FOR UNLAWFUL DISCRIMINATION**[1]

Defendants state the elements of a *prima facie* case of discrimination under Title VII and

Section 1981.  (Mov. Br. at 18, citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93

S.Ct. 1817, 1824 (1973).)  Despite Defendants' contentions, Plaintiff has met this burden.

A.    **Plaintiff is a Member of a Protected Group**

As an initial matter, Mr. Schanfield is a member of a protected group as a non-

Japanese/non-Asian.  *Cf. McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 96 S.Ct. 2574

(1976) (Title VII bars racial discrimination against whites as well as non-whites).  Defendants

falsely argue that Plaintiff claims that he was discriminated against not based on his race or

national origin, but instead based on his status as a member of Sojitz's national staff.[2]  To the

---

[1]      Identical standards apply to claims brought under Title VII, Section 1981, New York
State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL").
*See Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S. Ct. 2363, 2378 (1989);
*Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000).

[2]      Defendants rely on *Fortino v. Quasar Co.*, 950 F.2d 389 (7th Cir. 1991), and *Bennett v.*
*Total Minatome Corp.*, 138 F.3d 1053 (5th Cir. 1998), to argue that, as a matter of law,
differences between rotational and national staff are not discrimination based on race or national
origin.  (Mov. Br. at 16.)  However, in those cases, the alleged discriminatory act, *i.e.,* plaintiffs'
termination, was directed by a parent company with rights pursuant to a treaty.  *Fortino*, 950

contrary, Plaintiff's claims reside in what lies at the heart of the distinction between rotational

and national staff, which is race and national origin, since only Japanese/Asians are even

considered for rotational positions and virtually all of the non-Japanese/non-Asian national staff

are relegated to lower positions, paid less compensation and subjected to different treatment and

discipline.  (Cst. ¶¶ 5, 9, 13, 14, 91; Declaration of Mark R. Killingsworth ("Killingsworth

Decl.") at ¶¶ 7-11, 17.)  This case is exactly like *Shane v. Tokai Bank, Ltd.*, 96 Cv 5187 (HB),

1997 U.S. Dist. LEXIS 16000 (S.D.N.Y. Oct. 15, 1997), where the defendant bank maintained a

dual-tiered employment system with the upper tier consisting solely of Japanese men sent from

Tokyo, none of whom could be terminated in the United States.  *Id.* at \*2-\*3.  There, as here, the

plaintiff was a member of a protected class as a non-Japanese employee.  Both here and in

---

F.2d at 393; *Bennett,* 138 F.3d at 1057.  Even if Sojitz had standing to invoke treaty rights, which it does not claim, the courts' holdings in *Fortino* and *Bennett* are narrower than Defendants represent.  Specifically, *Fortino* and *Bennett* held that an American-subsidiary of a foreign parent cannot be held liable for *conduct dictated by the parent*, where the parent has rights pursuant to a treaty.  *Fortino,* 950 F.2d at 393; *Bennett,* 138 F.3d 1059.  Where, as here, the American subsidiary performed the discrimination, and it was not directed by the foreign parent company, the American subsidiary remains liable under U.S. anti-discrimination laws and cannot assert the parent's treaty rights.  *Sumitomo v. Avigliano*, 457 U.S. 176, 189, 102 S.Ct. 2374, 2382 (1982).  *See also Morelli v. Cedel*, 141 F.3d 39, (2d Cir. 1998) (holding that "even where a foreign employer operating in the United States can invoke a … treaty to justify employing its own nationals, this does not give [the employer] license to violate American laws prohibiting discrimination in employment") (internal quotations omitted).  Here, there is no evidence that Mr. Schanfield's termination was directed by Sojitz's Japanese parent.  Accordingly, *Fortino* and *Bennett* do not apply.  *See, e.g., Santerre v. AGIP Petroleum Co.,* 45 F. Supp. 2d 558, 577 (S.D. Tex. 1999) (holding that *Fortino* and *Bennett* inapplicable where "the record contains no evidence that [the parent] required [its subsidiary] to take the disputed employment actions with regard to [the plaintiff]").

   Even if Sojitz had standing under the treaty, which it does not claim, the Second Circuit has ruled that U.S. laws prohibiting discrimination still apply, and the preference afforded Japanese executives must be justified with bona fide occupational qualifications ("bfoq").  *Avigliano v. Sumitomo*, 638 F.2d 552, 559 (2d Cir. 1981).  Neither *Fortino* nor *Bennett* conducted this analysis.  *See also Goyette v. DCA Advertising Inc.*, 830 F. Supp. 737, 749 (S.D.N.Y. 1993) (requiring that Japanese corporation doing business in the U.S. hire according to national origin only if the company can show that it is a bfoq; finding no such showing and denying summary judgment) (citation omitted).  Consequently, the preference afforded Japanese/Asian staff by Sojitz must be based on bfoq, a showing which Sojitz cannot make.

*Shane,* because the plaintiff was not Japanese/Asian, he was relegated to national staff, without even the opportunity to apply for a position as rotational staff, and subjected to the lower compensation, inferior terms and conditions of employment and harsher discipline, culminating in his termination, than applied to comparable Japanese/Asian employees. *Shane*, 1997 U.S. Dist. LEXIS 16000, at *5 (denying defendant's motion for summary judgment). (Cst. ¶¶ 9, 11, 12, 13.) Thus, Plaintiff has met his burden with respect to the first element of a *prima facie* case of discrimination.

### B. Plaintiff Was Qualified for the CIA Position

"[T]he legal standard for [job] qualification in a prima facie case is minimal. The plaintiff 'only needs to demonstrate that []he possesses the basic skills necessary for performance of [the] job.'" *Goyette v. DCA Advertising Inc.*, 828 F. Supp. 227, 233 (S.D.N.Y. 1993) (quoting *Owens v. N.Y. City Housing Auth., 934 F.2d 405, 409 (2d Cir. 1991); Powell v. Syracuse Univ.,* 580 F.2d 1150, 1155 (2d Cir. 1978)). As in *Shane*, Mr. Schanfield also meets the second element of a *prima facie* case because he possessed the basic skills for the performance of his job. *Shane*, 1997 U.S. Dist. LEXIS 16000, at *8. Indeed, he was recognized by Defendants for his expertise in internal auditing and hired as their CIA. (Cst. ¶ 18.) *See Feingold v. N.Y., 366 F.3d 138, 152* (2d Cir. 2004) (finding that plaintiff was qualified for the position because he was hired for it). Despite Defendants claim of being dissatisfied with Mr. Schanfield's work performance, he has met the criteria to establish the second *prima facie* element of being qualified for his position. Moreover, the complete absence of any documentation in Mr. Schanfield's personnel file showing he had any performance issues, which is undisputed, belies Defendants' contention that his work performance was unacceptable.

### C.  **Plaintiff Suffered Adverse Employment Actions**

The third element of a *prima facie* case is that Plaintiff suffered an adverse employment action.  An adverse employment action is not defined "solely in terms of job termination or reduced wages and benefits[.] . . . [L]ess flagrant reprisals by employers may indeed be adverse." *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997).  Here, Plaintiff suffered a number of adverse employment actions that materially altered his employment, including being obstructed from doing his job by virtue of exclusion from key management meetings, forbidden to hire staff, denied access to critical documents written in Japanese and because Japanese staff refused to provide complete or comprehensible responses to his requests for information. (Cst. ¶¶ 24, 30, 40, 74, 89, 93, 94, 95.)  *See Bryant v. Begin Manage Program*, 281 F. Supp. 2d 561, 570 (E.D.N.Y. 2003) (finding exclusion from meetings to be an adverse employment action, because failure to attend was tied to the proffered reasons for termination).  Moreover, perhaps the most egregious form of adverse employment action suffered by Plaintiff was his unlawful termination. Even Defendants concede that his termination was an adverse employment action, which shows that the third *prima facie* element has been met.  Mov. Br. at 20.

### D.  **The Circumstances of Plaintiff's Termination Give Rise to an Inference of Discrimination**

Furthermore, the circumstances of the above adverse employment actions give rise to an inference of discrimination.  Discriminatory motive may be inferred from "actions or remarks made by decisionmakers that could be viewed as reflecting discriminatory animus [and] preferential treatment given employees outside the protected class."  *Chertkova*, 92 F.2d at 91. While "there is no unbending or rigid rule about what circumstances allow an inference of discrimination when there is an adverse employment action" (*Id.*), evidence of disparate treatment may constitute evidence of discrimination in terms and conditions of employment,

even if the treatment is not itself actionable.  *Borrero v. Am. Express Bank, Ltd.*, 533 F. Supp. 2d 429, 438 (S.D.N.Y. 2008) (denying summary judgment, citing unfair public criticism and being barred from certain meetings as evidence of discrimination).  Plaintiff also need not show that race was the *only* factor motivating any adverse employment actions he suffered in order to make a showing of employment discrimination.  *See* 42 U.S.C. § 2000e-2(m); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148 (2003).  "The 'ultimate issue' in an employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reason,' *i.e.*, a discriminatory reason."  *Stratton v. Dep't for the Aging for N.Y.*, 132 F.3d 869, 878 (2d Cir. 1997) (finding sufficient evidence of both pretext and illegal mixed motive).

In this case, there is ample evidence of actions and remarks that reflect Defendants' discriminatory animus toward Mr. Schanfield because he was not Japanese or Asian.  Among them are Defendants Matsumoto and Tsukada's intentional exclusion of Mr. Schanfield from all-Japanese management meetings (*see, e.g.,* Thompson Ex. 46) and their deference to the less experienced Hisashi Akita, simply because he was Japanese and Asian.  (Cst. ¶¶ 23, 69.) Moreover, just weeks before Defendants unlawfully terminated Mr. Schanfield, Defendant Matsumoto shouted, "This is a Japanese company and we will do as we please."  (Cst. ¶ 94.)

Furthermore, Mr. Schanfield was treated less favorably than comparable Japanese/Asian employees, an important type of indirect proof of discriminatory intent.[3]  *See Goyette*, 828 F.

---

[3]      Defendants' reliance on *Eschelbach v. CCF Charterhouse Credit Commer. De Fr.*, 01 cv 1778, 2006 U.S. Dist. LEXIS (S.D.N.Y. July 25, 2006), is inapposite.  There the court found that the crux of the claims was not that plaintiff was improperly terminated but that he could not sustain a discrimination claim based on employment contracts given to expatriate employees.  *Id.* at *17, 23-*24.  Because those contracts dealt with hardships that plaintiff did not experience, the court held that he was not similarly situated to the expatriates.  *Id.* at *24-*25.  Here, however, there are no contracts.

Supp. at 234.  Because no Japanese/ Asian General Manager – the position held by Plaintiff – would have been terminated by Sojitz for any reason, not even for performance problems (Cst. ¶ 91), Plaintiff's termination was discriminatory.  *See Shane*, 1997 U.S. Dist. LEXIS 16000, at * 9 (denying summary judgment because such evidence established *prima facie* case of discrimination; whether comparator Japanese employee was similarly situated was issue to be decided by jury) (*citing Hargett v. Nat'l Westminster Bank*, 78 F.3d 836, 840 (2d Cir. 1996); *Goyette*, 828 F. Supp. at 234 (S.D.N.Y. 1993)).

    This case also resembles *Goyette*, a case in which American-born plaintiffs claimed that because they were not Japanese, they were discriminated against and unlawfully terminated. There, as here, "[t]he plaintiffs . . . maintain that [defendant] provided higher compensation and a greater number of benefits to Japanese employees and this fact is additional evidence of [defendant's] discrimination against American workers."  *Id.* at 234.  (Cst. ¶¶ 9, 13; Killingsworth Decl. Tables 2-4.)  *Goyette* also noted that perks were granted exclusively to Japanese expatriates, such as cars and inclusion in meetings open only to Japanese (*Id.*), and both these practices are in evidence here.  (Cst. ¶¶ 9, 74.)  Furthermore, *Goyette* found that the differences in compensation and perks were evidence of disparate treatment based on national origin.  *Id.*  While the defendant in *Goyette* sought to explain the disparities, including by arguing, as Defendants do here, that when "proper" comparisons of salaries are made there is no difference, the court denied summary judgment and found that whether defendant's "explanation is true or whether the disparate treatment was based upon national origin, is a material issue of fact for the trier of fact to decide."  *Id.* at 235.  Likewise, summary judgment should be denied in this case.

"Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury." *Mandell v. Suffolk County*, 316 F.3d 368, 379 (2d Cir. 2003). Therefore, Defendants' claim that Mr. Schanfield is not similarly situated to Japanese rotational employees is insufficient to support summary judgment and should be rejected. Even if no rotational employee were similarly situated to Mr. Schanfield, disparities in discipline can still suffice to thwart summary judgment on a disparate treatment claim. For example, in *Feingold*, 366 F.3d at 153, the plaintiff was a probationary employee and therefore had different preconditions for termination from those applicable to permanent employees. However, the Court of Appeals still found that plaintiff made a *prima facie* case because "the evidence that African-American [employees] were not disciplined *at all* for their allegedly erroneous adjudications – and, indeed, that in at least one case such an adjudication was actually condoned by [a supervisor] – does support the conclusion that a discriminatory motive underlay [plaintiff's] dismissal." *Id.* (emphasis in original). *See also Dinkins v. Suffolk Transp. Servs.*, No. 07-CV-3567 (JFB) (AKT), 2009 U.S. Dist. LEXIS 9146, at * 21-22 (E.D.N.Y. Feb. 9, 2009) (finding genuine issue of material fact as to whether female bus drivers subjected to less severe discipline were similarly situated to plaintiff); *Hawkins v. County of Oneida*, 497 F. Supp. 2d 362, 673 (N.D.N.Y. 2007) ("while some of these correction officers were not similarly situated to plaintiff in every way, evidence of their misconduct and resulting punishments as compared to plaintiff's is sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination" (internal quotation omitted)). Thus, Plaintiff has established the final *prima facie* of discrimination.

### E.  Defendants' Proffered Reason for Plaintiff's Termination is a Pretext

Having established a *prima facie* case, the burden of production shifts to Defendants to articulate a legitimate, nondiscriminatory reason for the challenged employment decisions. *See*

16

*McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824.  "If the defendant has stated a neutral reason for the adverse action, to defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Feingold*, 366 F.3d at 152 (internal quotation omitted).

Defendants offer no reason for failing to pay Mr. Schanfield a bonus, obstructing his ability to do his job, berating him and/or excluding him from meetings.  With respect to the ultimate decision to unlawfully terminate him, Defendants offer different reasons for his termination.  First, they claim that on April 23, 2007, when Mr. Schanfield blew up and refused to meet with Defendant Matsumoto, it was the "last straw that triggered termination."  Mov. Br. at 2.  Then they later claim that Defendant Matsumoto's receipt of Mr. Schanfield's risk assessment on March 30, 2007 was the "'decisive moment' in his decision to remove Plaintiff as CIA."  Mov. Br. at 12.

These different purported reasons for Mr. Schanfield's termination are clearly a pretext for discrimination and retaliation.  As an initial matter, if Mr. Schanfield were Japanese or Asian, he would not have been terminated, because even the CEO lacks the authority to terminate Japanese/Asian staff at Mr. Schanfield's level, because virtually all of them are rotational staff. (Cst. ¶ 91.)  *See Ames v. Cartier*, 193 F. Supp. 2d 762, 769 (S.D.N.Y. 2002) (evidence of pretext can be the same evidence produced with respect to plaintiff's *prima facie* case).  Moreover, no Japanese General Managers were terminated for poor performance, although at least two – the Treasurer of the Company and the General Manager of Information Technology – were demonstrably incompetent.  (Cst. ¶ 91.)  *See Feingold*, 366 F.3d at 156 (finding sufficient evidence of pretext where non-protected class was subject to no discipline and denying summary

judgment); *Shane,* 1997 U.S. Dist. LEXIS 16000, at *10 (evidence that defendant would not have fired plaintiff had he been Japanese, regardless of performance, "presents a material issue of disputed fact, which must be decided by the jury.").

Additionally, Defendant's claims that Mr. Schanfield had performance problems are refuted by the evidence.  First, there is no formal documentation of any performance issues or reprimands prior to Mr. Schanfield's termination.  (Cst. ¶ 90.)  *See Snyder v. Advest, Inc.*, 06 Civ. 1426 (RMB) (FM), 2008 U.S. Dist. LEXIS 80862, at *12 (S.D.N.Y. Oct. 8, 2008) ("[t]he fact that Plaintiff never received a negative written performance evaluation or formal warning, and that there is no writing whatsoever criticizing his job performance, also indicate that as a reason for his firing poor job performance may have been an afterthought." (internal quotations omitted)).  Second, Mr. Schanfield followed Defendants' instructions, except for the instruction to cease reporting on the risks caused by the discrimination inherent in the rotational system.  For example, he provided detailed interim reports which set out his methodologies, identified a variety of risks, proposed a number of specific audits and he attempted to carry out meetings with senior management about his interim findings.  (Cst. ¶¶ 29, 31, 36, 38, 43, 44.)  In fact, several of Mr. Schanfield's recommendations to reduce risks, such as for a code of conduct and a hotline, were ultimately enacted by the Company.  (Cst. ¶ 92.)

Although Defendants now claim that they wanted specific, practical information, this is belied by their failure to act on Mr. Schanfield's suggestions for most of his tenure with the Company.  (Cst. ¶¶ 36, 37.)  Indeed, Mr. Schanfield did what he was hired to do by carrying out a risk assessment and creating an internal audit plan based on U.S. methodologies and the COSO framework, which was entirely consistent with the plan he created during his interview.  (Cst. ¶¶ 28, 86.)  Defendants even concede that Sojitz's accounting firm Deloitte advised the Company

that a risk assessment is a typical component of any audit program.  Mov. Br. at 8.  Given this evidence, whether Defendants' asserted reasons are credible raises issues of fact properly put to a jury.  *See Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir. 2003) ("[i]t s well established that [c]redibility assessments, choices between conflicting versions of events and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment."  (internal quotation omitted)).

Defendants also claim that Mr. Schanfield's delay in completing the risk assessment was a reason for his termination.  However, Mr. Schanfield was unable to complete the Company-wide risk assessment as quickly as he initially anticipated because he did not have the necessary staff, receive prompt or complete responses to inquiries from Japanese rotational managers and was excluded from key meetings that he needed to attend to effectively perform his duties.  (Cst. ¶¶ 30, 40, 46.)  These obstacles were directly linked to Defendants' discrimination against him as a non-Japanese/non-Asian.  For example, if he were Japanese or Asian, he would have been included in official meetings and informal social encounters, all of which would have given him the opportunity to address concerns as they arose, better explain the U.S. methodologies and COSO framework he was hired to apply.  Furthermore, as even the Chief Legal Officer, Richard Paice, acknowledged, Defendant Matsumoto never understood internal audit or its methodology. (Schanfield Aff. ¶ 35; Cst. ¶ 37.)

Additionally, if he were Japanese or Asian, the meetings Mr. Schanfield was instructed to conduct with senior managers regarding the risks he was assessing would have been productive and successful, because Japanese rotational staff would have attended and deferred to him as meeting leader, which they did not.  (Schanfield Aff. ¶¶ 14, 23, 47.)  *See Heinemann v. Howe & Rusling*, 529 F. Supp. 2d 396, 408-09 (W.D.N.Y. 2008) (employer proffered attitude problems,

client cancellations and failure to bring in business as reasons for termination, but plaintiff raised factual issues by showing negative attitude was result of unfair compensation, that accounts assigned to her were more likely than other types to cancel and that new business was never stressed as a major job function); *Goyette,* 828 F. Supp. at 233-35 (evidence of remarks, reassignment of duties to less qualified Japanese staff, and additional benefits provided to Japanese employees "suffice to create a genuine factual issue as to whether [defendant's] stated reason for the firings . . . was pretextual."). Summary judgment on Mr. Schanfield's claims of discrimination therefore should be denied.

## II.   THE SAME-ACTOR INFERENCE IS INAPPLICABLE TO THIS CASE

Defendant Matsumoto seeks to rely on the same-actor inference in support of the motion for summary judgment. Mov. Br. 17-18. This effort is unavailing. As a threshold matter, the Second Circuit has raised doubts as to whether the same-actor inference is even appropriate in the context of Title VII cases. *See, e.g., Feingold*, 366 F.3d at 155 n.15. (noting that the inference is appropriately applied in the Age Discrimination in Employment Act context). Even more importantly, however, "[t]he 'same actor' inference is not a necessary inference, it is only a plausible one, and decisions in this Circuit addressing it have warned that its use is not to become a substitute for a fact-intensive inquiry into the particular circumstances of the case at hand." *Copeland v. Rosen*, 38 F.Supp.2d 298, 305 (S.D.N.Y. 1999). The *Copeland* court further noted that there are a variety of reasons why an actor who originally hired an employee might eventually fire him for discriminatory reasons. *Id*.

> [T]he Court does not underestimate the variety of unlawful motivations which may lurk behind the conduct of a person who hires and then fires an individual in a protected class. Such motivations, like all issues of intent, are by their very nature difficult to bring to light, especially prior to scrutiny of the relevant individual on the stand at trial.

*Id.* Thus, the same-actor inference is a legal theory particularly ill-suited for a motion for

summary judgment.  *See also Masters v. F.W. Webb Co.*, 03 cv 6280, 2008 U.S. Dist. LEXIS

73585, at *20 (W.D.N.Y. Sept. 8, 2008) ("the [same-actor] inference alone is generally not a

sufficient basis to grant summary judgment for the employer, at least when the employee has

proffered evidence of pretext").

Mr. Schanfield has presented ample evidence to make clear that the same actor inference

is inapplicable to Defendant Matsumoto.  Most notably, Defendant Matsumoto did not

individually make the decision to hire Mr. Schanfield.  (Cst. ¶ 18.)  Indeed, he met with Mr.

Schanfield for only 10 minutes before approving the recommendation of the search team to hire

him and the discussion did not touch on any expectations for the CIA role.  (Cst. ¶ 19.)  At most,

Defendant Matsumoto rubber stamped Mr. Schanfield's hiring.  Therefore, the same actor theory

does not apply him.  *See, e.g., Jetter v. Knothe Corp.*, 324 F.3d 73, 76 (2d Cir. 2003) (same actor

inference only applicable "when the person who made the decision to fire was the same person

who made the decision to hire"); *Richards v. Calvet*, 99 cv 12172, 2005 U.S. Dist. LEXIS 5365,

at *15-*17 (S.D.N.Y. Mar. 30, 2005) (denying summary judgment because same-actor inference

inapplicable where defendant was member of committee that collectively decided to hire the

plaintiff and it was unclear who made the actual hiring decision).  Accordingly, the same actor

inference cannot be a basis for granting summary judgment in the instant case.

Defendants' reliance on the same-actor inference is also misplaced because substantial

time lapsed between the decision to hire Mr. Schanfield and the decision to terminate him.  The

same actor inference is available and most probative when only a short period of time has passed

between the two decisions.  *See Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 560 (2d Cir. 1997)

(same actor inference available when a mere nine days passed between hiring and firing of

plaintiff).  Courts have recognized that people's attitudes may change over time, increasing the

discriminatory animus an employer feels towards a protected class. *See, e.g., Heinemann*, 529 F.

Supp. 2d at 412 (noting that same actor inference undercut by fact that employer may hire a

member of protected class expecting him to conform to stereotypes and terminate employee for

failing to conform). Here, Mr. Schanfield was terminated almost a year after he was hired at

Sojitz. Therefore the same-actor inference does not apply to these facts. *See, e.g., Douglas v. M.*

*Swift & Sons, Inc.*, 371 F. Supp. 2d 137, 144-45 (D. Conn. 2005) (holding same actor inference

inapplicable because almost a full year had elapsed between hiring and firing).

### III.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S RETALIATION CLAIM SHOULD BE DENIED

The Second Circuit set forth the elements of a *prima facie* case of retaliation in *Feingold*:

"(1) participation in a protected activity known to the defendant; (2) an employment action

disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the

adverse employment action." 366 F.3d at 156. Here, the record clearly demonstrates that Mr.

Schanfield has satisfied all the elements of a *prima facie* retaliation claim.

### A.   Plaintiff Engaged In Protected Activity

To show that he engaged in protected activity, a plaintiff must demonstrate that he

complained of conduct that he reasonably and in good faith believed to violate the law. *Holtz v.*

*Rockefeller & Co.*, 258 F.3d 62, 79 (2d Cir. 2001) (reversing summary judgment on retaliation

claim). Under this standard, it is clear that Mr. Schanfield both engaged in protected activity and

that Defendants had actual knowledge of it. Defendants do not dispute that Mr. Schanfield

complained to senior management about discrimination against non-Japanese/non-Asian

employees as a result of the rotational system. They merely seek to confine these complaints to

December 2006. Mov. Br. 26. This misstates the evidence in the record. Mr. Schanfield

repeatedly complained about discrimination, up to and including his March 30, 2007 risk

assessment.  (Cst. ¶¶ 33, 51; Thompson Ex. 58.)  *See, e.g., Thomas v. iStar Fin., Inc.*, 438 F.

Supp. 2d 348, 364 (S.D.N.Y. 2000) ("informal complaints to supervisors can be considered

protected activity under Title VII"); *Coleman v. Wayne State Univ.*, 664 F. Supp. 1082, 1092

(E.D. Mich. 1987) (repeated public and private expressions of the belief that defendant had

serious problems with race discrimination in employment and with affirmative action were

protected activity).

    The circumstances of Mr. Schanfield's complaints are closely analogous to those in the

Supreme Court's recent decision in *Crawford v. Metro. Gov't of Nashville*, 129 S.Ct. 846, 172 L.

Ed. 2d 650 (2009).  In *Crawford*, the plaintiff participated in the employer's internal

investigation regarding complaints of discrimination against a human resources employee.  *Id*. at

850, 655.  Specifically, plaintiff responded affirmatively to a question regarding whether she had

been discriminated against by the target of the investigation.  *Id.* at 850, 655.  Plaintiff was

subsequently terminated in retaliation for her bringing forth the evidence of illegal conduct.  *Id*.

The Supreme Court reversed the lower courts, finding that "when an employee communicates to

her employer a belief that the employer has engaged in . . . a form of employment discrimination,

that communication virtually always constitutes the employee's *opposition* to the activity."  *Id*. at

851, 656.  (emphasis in original; internal citations and quotations omitted).  Accordingly, the

Court held that "[t]here is, then, no reason to doubt that a person can 'oppose' by responding to

someone else's question just as surely as by provoking the discussion."  *Id.* at 851, 657.  Notably,

the Court rejected the argument, identical to Defendants' argument here, that because it was the

employee's duty to participate in the employer's investigation, her complaints did not constitute

protected activity.  *Id*. at 853, 658 n.3.  Instead, the Court held that a plaintiff's complaints of

discrimination constitute a protected activity under Title VII sufficient to sustain a cause of

action for retaliation, even where the employer obliges the plaintiff to voice the complaint. *Id.*

In the instant case, Mr. Schanfield raised his concerns about the discriminatory nature of Sojitz's rotational system to Defendants in the course of providing requested updates about his risk assessment.  In this respect, he was equivalent to the plaintiff in *Crawford*, as both spoke out about discrimination encountered during investigations for their employer.  Unlike in *Crawford*, however, Defendants Matsumoto and Tsukada repeatedly instructed Mr. Schanfield that it was not his job to criticize the rotational system or about human resources issues at Sojitz.  (Cst. ¶ 52.)  While Mr. Schanfield's complaints are clearly protected activity under the ruling of *Crawford,* the fact that he was instructed to be silent on discrimination issues means that his persistent complaints were not within the scope of his job duties.  As the Supreme Court conclusively held in *Crawford*, employees in Mr. Schanfield's position are entitled to bring a retaliation claim protesting the termination of their employment under Title VII.  Thus, Mr. Schanfield's activity was protected.

### B.   Defendants' Action was Likely to Deter a Reasonable Employee from Making Complaints of Discrimination

Defendants wrongly argue that the only retaliatory conduct for which they can be held liable is Mr. Schanfield's unlawful termination.  Defendants' argument is a gross misreading of the applicable case law.  Specifically, in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405 (2006), the Supreme Court clarified that to meet the second element of his *prima facie* case of retaliation, the plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* at 67, 2415. (internal quotations omitted).  Thus, the Court rejected the argument that Title VII required

that the plaintiff show that the employer's retaliatory actions affected the terms and conditions of his employment.  *Id.* at 62, 2412.

Under the *Burlington* standard, it is clear that Mr. Schanfield's termination, the counterclaims against him, being berated by Defendant Matsumoto and the many obstacles to performing his duties are all materially adverse actions that would have dissuaded a reasonable worker from making a claim of discrimination.  *Hinton v. City College of N.Y.*, 05 Civ. 8951 (GEL), 2008 U.S. Dist. LEXIS 16058, at * 92-*93 (S.D.N.Y. Feb. 29, 2008) (denial of committee assignments and withdrawal of promised funds to put on a lecture series could be found by jury to deter reasonable employee from making a charge of discrimination); *Lamere v. N.Y. State Office for the Aging*, 03-CV-356, 2005 U.S. Dist. LEXIS 41904, at *42-*43 (N.D.N.Y. Apr. 27, 2005) (denying summary judgment on retaliation claims because "a jury could conclude that the string of seemingly isolated events - the denial of [a] day off …; the denial of the right to move her files; the insistence that she continue to report to [defendant] and seek his approval on routine matters …; reprimanding her for not being on the third floor; and the last minute canceling of the transportation to … training - reached a 'critical mass' that materially and adversely affected her job.")  Similarly, the record is also clear that after Mr. Schanfield complained of discrimination, Defendant Matsumoto began to unfairly criticize his work.  (Cst. ¶¶ 33-34.)  *See, e.g., Wright v. Stern,* 450 F.Supp.2d 335, 373 (S.D.N.Y. 2006) (holding that negative performance evaluations constitute adverse employment actions); *Bush v. Fordham Univ.*, 452 F.Supp.2d 394, 416 (S.D.N.Y. 2006) (same).

The cases cited by Defendants do not warrant a different result.  For example, *Chan v. N.Y.U. Downtown Hosp.*, 03 cv 3003, 2005 U.S. Dist. LEXIS 40243 (S.D.N.Y. Feb. 14, 2005), was decided before the Supreme Court's decision in *Burlington* and cannot be reconciled with

the more liberal definition of retaliatory conduct established in that case. In *Nieves v. Angelo, Gordon & Co.*, 05 cv 7782, 2007 U.S. Dist. LEXIS 27006 (S.D.N.Y. Apr. 10, 2007), the court found that the plaintiff's statement that the defendant began behaving towards her with an "increasingly abrupt and hostile demeanor" was conclusory because it did not contain any details about this behavior. In contrast, Mr. Schanfield has presented specific evidence demonstrating the nature of Defendants Matsumoto and Tsukada's retaliatory conduct towards him. (Cst. ¶¶ 94, 96.) Finally, the decision in *Dixon v. City of N.Y.*, 03 cv 343, 2008 U.S. Dist. LEXIS 75721 (E.D.N.Y. Sept. 30, 2008), affirmatively supports Plaintiff's claims in this case because, as that court found, conduct by defendants that impeded plaintiff's ability to perform his job did constitute retaliatory actions in violation of Title VII. *Id*. at *12.

The premise for Defendants' argument that the counterclaims are not retaliatory is that they are "not legally cognizable adverse employment action[s]." Numerous decisions contradict Defendants' assertion. *See, e.g., Bill Johnson's Rest. v. NLRB,* 461 U.S. 731, 740, 103 S. Ct. 2161 (1983) (acknowledging that "by suing an employee who files charges . . . an employer can place its employees on notice that anyone who engages in such conduct is subjecting himself to the possibility of a burdensome lawsuit"); *Kreinik v. Showbran Photo, Inc.,* 02 cv 1172, 2003 U.S. Dist. LEXIS 18276, at *21-22 (S.D.N.Y. Oct. 10, 2003) (noting that "this Court has expressly refused to adopt a rule stating that . . . counterclaims, or any other legal cause of action, cannot, as a matter of law, constitute retaliation in violation of the employment discrimination laws;" finding counterclaims were an adverse employment action); *Jacques v. DiMarzio, Inc*., 200 F. Supp. 2d 151, 162 (E.D.N.Y. 2002) ("this Court is deeply troubled by [defendant's] counterclaim, which appears to be nothing more than a naked form of retaliation against [plaintiff]").

*Torres v. Gristede's Operating Corp.*, 04 cv 3316, 2008 U.S. Dist. LEXIS 66066 (S.D.N.Y. Aug. 28, 2008), is instructive.  In *Torres*, the employer brought counterclaims against plaintiffs under the faithless servant doctrine, or a breach of loyalty.  *Id*. at *43-*44.  In analyzing plaintiffs' retaliation claims stemming from the counterclaims, the court explained that "legal proceedings against employees who assert statutory rights are actionable retaliation precisely because of their in *terrorem* effect."  *Id*. at *63.  The court found that the defendant's actions "sent both the [plaintiffs] and other actual and potential class members a strong message that, by initiating and/or maintaining claims against [the defendant], they would be subject to burdensome countersuits."  *Id*. at *64-*65.  Accordingly, the counterclaims were found to be retaliatory.  *Id*. at *65.

Similarly, Defendants' argument that their counterclaims cannot be retaliatory because they are meritorious is unsupported by the facts of this case.  As explained in Plaintiff's Motion for Summary Judgment, each counterclaim fails as a matter of law.  Defendants concede that Mr. Schanfield's conduct was always undertaken to benefit the Company (Mov. Br. 25), and additionally, that Sojitz has suffered no damage as a result of Mr. Schanfield's purported conduct.  (Plaintiff's 56.1 Statement for Summary Judgment of Counterclaims ¶ 36.)  Absent evidence of damages, none of Defendants' claims can survive summary judgment.  Since the Company has always known that it suffers no damage as a result of Mr. Schanfield's conduct, its counterclaims are totally baseless.  Clearly, the only reason that Defendant Sojitz brought these counterclaims is to harass Mr. Schanfield, to ruin his professional reputation by claiming that he engaged in misconduct and to deter other potential class members from also joining in this suit.  For all the above reasons, Defendants' conduct was likely to deter a reasonable employee from raising complaints of discrimination and satisfies the second *prima facie* element of retaliation.

**C.    Plaintiff Has Established a Causal Connection Between
His Complaints of Discrimination and His Termination**

Defendants falsely contend that Mr. Schanfield cannot meet the third prong of a *prima facie* case for retaliation because there is no casual connection between the protected activity and Defendants' retaliatory conduct.  This argument also fails.  To prove a causal connection between an adverse employment action and the protected activity, the plaintiff must show one of three things: "(1) direct proof of retaliatory animus directed against the plaintiff; (2) disparate treatment of similarly situated employees; or (3) that the retaliatory action occurred close in time to the protected activities."  *McNair v. N.Y.C. Health & Hosp. Co.*, 160 F. Supp. 2d 601 (S.D.N.Y. 2001); *see also Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990) (causal connection shown because "the protected activity was followed by discriminatory treatment;" reversing summary judgment because defendant's reason for terminating plaintiff was pretext). In this case, there is no question that Plaintiff has established the necessary causal connection.

First, Defendant Matsumoto became enraged and demanded that Mr. Schanfield desist from further investigations related to the rotational system, eventually shouting that "[t]his is a Japanese company and we will do as we please."  (Cst. ¶¶ 33, 94.)  Second, the evidence shows disparate treatment of similarly situated employees, because no poorly performing Japanese/Asian General Manager has ever been terminated.  Third, Mr. Schanfield's protected conduct was closely followed by his retaliatory termination.  Specifically, Mr. Schanfield continued complaining about discrimination through the end of March 2007, merely seven weeks before his termination, and well within the guidelines for temporal proximity.  *Antonmarchi v. Consol. Edison Co., Inc.,* 03 cv 7735, 2008 U.S. Dist. LEXIS 75458, at *39-40 (S.D.N.Y. Sept. 29, 2008) ("The Second Circuit has held that a temporal proximity of less than two months between complaint and adverse action is sufficient to support an inference of retaliation.") (citing

28

*Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998)); *Allen v. Advanced Digital Info. Corp.*, 500 F. Supp. 2d 93, 110 (N.D.N.Y 2007) (three months between protected activity and termination sufficient to create causal connection).

Moreover, the facts in this case are similar to those in *Whaley v. City Univ. of N.Y.*, 555 F. Supp. 2d 381 (S.D.N.Y. 2008) (McMahon, J.). In *Whaley*, the defendant responded to the plaintiff's complaints of discrimination by demanding that he withdraw the complaints or there would be "negative repercussions" on plaintiff's employment. *Id*. at 57. As a result, this Court denied grant summary judgment on the retaliation claim. *Id*. Similarly, in the instant case, Mr. Schanfield was instructed not to continue investigating risks related to discrimination or other human resources issues and was then punished when he persisted. (Cst. ¶¶ 52-54, 94, 96.) Accordingly, Plaintiff has presented sufficient evidence of a retaliatory animus to warrant denial of Defendants' motion for summary judgment.

### D.   Defendants Reasons for the Retaliation Are Pretext

For the reasons delineated in Part I, Section E, Defendants' proffered reasons for Mr. Schanfield's termination and other retaliatory actions are pretext. *See Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001) ("A plaintiff may establish a Title VII violation even when a retaliatory motive is not the sole cause of the adverse employment action, or when there were other objectively valid grounds for a discharge.") (internal citations omitted).

### IV.   DEFENDANTS MATSUMOTO AND TSUKADA ARE INDIVIDUALLY LIABLE FOR THE UNLAWFUL CONDUCT PLAINTIFF EXPERIENCED

Defendants Matsumoto and Tsukada argue that they cannot be held individually liable for Plaintiff's Section 1981, NYSHRL and NYCHRL claims based on the premise that Sojitz is not liable for discrimination and retaliation.[4] As delineated above, however, there is ample

---

[4]    Defendants Matsumoto and Tsukada do not address Plaintiff's claims of aiding and abetting under the NYSHRL and NYCHRL. Therefore, Defendants do not seek summary

evidence that that <u>all</u> Defendants discriminated and retaliated against Mr. Schanfield.  For example, Defendants concede that Defendant Matsumoto made the decision to terminate Mr. Schanfield's employment.  (Mov. Br. at 13; Cst. ¶ 69.)  Defendant Matsumoto also berated Mr. Schanfield and deprived him of necessary staff and resources to perform his job, which constitute discriminatory and/or retaliatory conduct.  (Cst. ¶¶ 46, 93.)  Similarly, there is no question that Defendant Tsukada was also actively participated in the decision to terminate Mr. Schanfield.  (Cst. ¶¶ 69.)  Moreover, Defendant Tsukada, like Defendant Matsumoto, participated in Defendants' decision to deny Mr. Schanfield resources necessary to perform his CIA duties, such as support staff, inclusion in meetings and access to documents in English. (Cst. ¶ 94, 95.)  Defendant Matsumoto, in consultation with Defendant Tsukada, also unlawfully terminated Mr. Schanfield's employment.  (Cst. ¶ 69.)  Furthermore, *Hargett v. Metro. Transit Auth.*, 552 F. Supp. 2d 393 (S.D.N.Y. 2008), is inapposite, because the individual defendants there were not employed by plaintiff's employer and had no authority over plaintiff.  In contrast, Defendants Matsumoto and Tsukada, as the President and CEO and CFO, respectively, were actively involved in the discriminatory and retaliatory employment decisions about Mr. Schanfield.  Therefore, neither individual Defendant is entitled to summary judgment.

## <u>CONCLUSION</u>

For the reasons set forth herein, Mr. Schanfield respectfully requests that Defendants' Motion for Summary Judgment be denied in its entirety.

---

judgment as to these claims and they must therefore be permitted to proceed to trial.  *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir. 1995) (holding that an individual could be held liable for aiding and abetting his own conduct under NYSHRL).  Moreover, the individual Defendants can still be liable for aiding and abetting discrimination and retaliation pursuant to the NYSHRL and NYCHRL, even if Sojitz is not found primarily culpable.  *See Long v. Marubeni Am. Corp.*, 05 Civ. 0639 (GEL), 2006 U.S. Dist. LEXIS 8932, at *14-*16 (S.D.N.Y Mar. 6, 2006).

Dated: March 2, 2009
        New York, New York

THOMPSON WIGDOR & GILLY LLP

By: _____
        Kenneth P. Thompson (KT-6026)
        Patricia E. Ronan (PR-0345)

        85 Fifth Avenue
        New York, New York 10003
        Telephone: 212-257-6800
        Facsimile:  212-257-6845

        *Attorneys for Plaintiff and*
        *Proposed Class Counsel*

31

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and copy of the foregoing Memorandum of Law in

Opposition to Defendants' Motion for Summary Judgment was served via ECF and hand

delivery, this 2nd day of March 2009, upon the following counsel for Defendant:

       Joanne Seltzer, Esq.
       Sidley Austin LLP
       787 Seventh Avenue
       New York, New York 10019

                                                  Patricia E. Ronan

Dated: New York, New York
         March 2, 2009