UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARNOLD SCHANFIELD, individually and on behalf of others similarly situated,<br><br>　　　　　　　　Plaintiff,<br><br>　　　- against -<br><br>SOJITZ CORPORATION OF AMERICA; JUN MATSUMOTO in his official and individual capacities; and TAKASHI TSUKADA in his official and individual capacities,<br><br>　　　　　　　　Defendants. | No. 07 Civ. 9716 (CM) (JCF) |

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

SIDLEY AUSTIN LLP

ATTORNEYS FOR    Defendants
　　　　　　　　Sojitz Corporation of America, Jun Matsumoto
　　　　　　　　and Takashi Tsukada

787 SEVENTH AVENUE
NEW YORK, NEW YORK  10019
(212) 839-5300

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................... ii

I.    THE EXISTENCE OF THE ROTATIONAL SYSTEM DOES NOT CREATE A
      GENUINE ISSUE OF MATERIAL FACT. ....................................................... 2

II.   DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S INDIVIDUAL
      DISCRIMINATION CLAIMS SHOULD BE GRANTED. .................................. 3

      A.    Plaintiff Cannot Make Out a *Prima Facie* Case of Disparate Treatment................ 3

            1.   "National Staff" is not a protected category. ................................... 3

            2.   Plaintiff was not qualified to be SCA's Chief Internal Auditor. ................. 5

            3.   Other than termination, Plaintiff suffered no adverse employment
                 action. ............................................................................... 6

            4.   Plaintiff's "evidence" does not support an inference of
                 discrimination. .................................................................... 7

      B.    Plaintiff Has Failed to Show That Defendants' Reasons for Terminating
            His Employment Are Pretextual. ................................................................. 9

      C.    The Same Actor Inference Is Valid and Applicable Here. .................................... 12

III.  PLAINTIFF'S RETALIATION CLAIMS SHOULD BE DISMISSED. ........................ 12

      A.    There Is No Evidence of Retaliation Because of Reports to Management. .......... 12

      B.    SCA's Counterclaims Are Not Retaliatory and Are Meritorious.......................... 14

IV.   ALL CLAIMS AGAINST MATSUMOTO AND TSUKADA SHOULD BE
      DISMISSED. ................................................................................................. 15

CONCLUSION ..................................................................................................... 15

## **TABLE OF AUTHORITIES**

**Page(s)**

CASES

Albury v. J.P. Morgan Chase,
   No. 03 Civ. 2007, 2005 WL 746440 (S.D.N.Y. Mar. 31, 2005) .........................................8, 10

Beers v. NYNEX Material Enters. Co.,
   No. 88 Civ. 0305, 1992 WL 8299 (S.D.N.Y. Jan. 13, 1992) ......................................................4

Bill Johnson's Restaurants, Inc. v. NLRB,
   461 U.S. 731, 76 L. Ed. 2d 277 (1983)..............................................................................14, 15

Bodley v. N.Y. Hosp.,
   No. 86 Civ. 2018, 1988 WL 61976 (S.D.N.Y. June 8, 1988) .....................................................4

Copeland v. Rosen,
   38 F. Supp. 2d 298 (S.D.N.Y. Mar. 9, 1999)..........................................................................12

Crawford v. Metro. Gov't of Nashville & Davidson County, Tenn.,
   129 S. Ct. 846, 172 L. Ed. 650 (2009)...................................................................................14

D'Amico v. City of N.Y.,
   132 F.3d 145 (2d Cir. 1998) ...................................................................................................9

Feingold v. N.Y.,
   366 F.3d (2d Cir. 2004) .......................................................................................................12

Grady v. Affiliated Cent., Inc.,
   130 F.3d 553 (2d Cir. 1997) .................................................................................................12

Griffin v. Ambika Corp.,
   103 F. Supp. 2d 297 (S.D.N.Y. 2000) ...................................................................................11

Holt v. KMI-Continental, Inc.,
   95 F.3d 123 (2d Cir. 1996) .....................................................................................................9

Mandell v. Suffolk County,
   316 F3d 368 (2d Cir. 2003) ....................................................................................................8

Pergament v. Fed. Express Corp.,
   No. 03 Civ. 01106, 2007 WL 1016993 (E.D.N.Y. Mar. 30, 2007) .........................................11

Richards v. Calvet,
   No. 99 Civ. 12172, 2005 U.S. Dist. LEXIS 5365 (S.D.N.Y. Mar. 20, 2005) .........................12

Schnabel v. Abramson,
  232 F.3d 83 (2d Cir. 2000) ........................................................................................ 12

Slattery v. Swiss Reinsurance America Corp.,
  248 F.3d 87 (2d Cir. 2001) ...................................................................................... 5, 6

Thermidor v. Beth Israel Med. Ctr.,
  683 F. Supp. 403 (S.D.N.Y. 1988) ........................................................................... 11

Thornley v. Penton Publishing, Inc.,
  104 F.3d 26 (2d Cir. 1997) ...................................................................................... 5, 6

Watson v. Arts & Entertainment Television Network,
  No. 04 Civ. 1932, 2008 WL 793596 (S.D.N.Y. Mar. 26, 2008) ................................ 8

Watson v. Paulson,
  578 F. Supp. 2d 554, 565 (S.D.N.Y. 2008) ............................................................... 7

Plaintiff's submission in opposition to summary judgment is a study in obfuscation and diversionary tactics. Because there is not a shred of evidence that Plaintiff actually suffered any discrimination as a Caucasian-American, he attempts to change the subject with an ill-founded and irrelevant attack on the rotational business model of Sojitz Corporation of America's ("SCA") Japanese parent company, Sojitz Corporation (the "Parent"). This attack is a *non sequitor*, because SCA does not control the rotational program, and Plaintiff chose not to sue the Parent, which does. It is also not material to Plaintiff's individual claims, because none of the employment decisions concerning Plaintiff had anything to do with the rotational system. Uncontroverted evidence shows that Plaintiff was terminated because he was unwilling and unable to perform his job in a way that was satisfactory and useful to SCA.

Unable to point to evidence that supports his individual claims, Plaintiff substitutes conclusory assertions, speculation and contradictions of his prior admissions, backed by "citations" to the record that can only by found by an arduous cross-referencing of four documents. When patiently traced to their roots, the statements in his Rule 56.1 Counterstatement ("Cst."), Affidavit ("Pl. Aff.") and Opposition Brief ("Opp. Br.") often prove to be "supported" by evidence that does not address the assertion for which it is cited, or by no evidence at all. Plaintiff apparently hopes that the Court will lose patience with his deliberately confusing submission, and simply assume that there must be some genuine issue of fact buried in the verbiage. If Plaintiff could point to real evidence, however, he would not need to resort to these tactics.

As set forth below, Plaintiff has failed to rebut Defendants' showing with competent and admissible evidence that raises a genuine issue of material fact. The Court should, therefore, grant Defendants' Motion for Summary Judgment in its entirety.

**I.    THE EXISTENCE OF THE ROTATIONAL SYSTEM DOES NOT CREATE A
GENUINE ISSUE OF MATERIAL FACT.**

As in all prior submissions and testimony, Plaintiff continues his attempt to divert the

Court's attention from the emptiness of his individual claims by asserting that the rotational

business model maintained by the Parent is *per se* discriminatory.  These conclusory assertions

are unsupported and, more importantly, immaterial to Plaintiff's disparate treatment claims.

First, as Plaintiff implicitly admits, SCA cannot be held responsible for the effects of the

rotational system, which is controlled by the Parent.  Plaintiff states: "Where, as here, the

American subsidiary performed the discrimination, and it was not directed by the parent

company, the American subsidiary remains liable under U.S. discrimination laws." (Opp. Br. 10-

11 n.2.)  Although Plaintiff asserts that SCA "performed the discrimination," he does not support

that untrue statement with any record citation.  To the contrary, the evidence shows (and Plaintiff

admits) that rotational employees sent to SCA for temporary overseas assignments remain

employees of the Parent, which has complete control over the decisions governing their

employment. (Cmplt. ¶ 16; Mats. Tr. 23-24, 34-38, 45-46 (Seltzer Aff. Ex. G); Tsuk. Tr. 26-35

(Seltzer Aff. Ex. H); Opp. Br. 17.)  Thus, to the extent that he challenges rotational assignments,

compensation and "discipline," he is challenging decisions of the Parent, and not of SCA.  Any

claim that the existence of the rotational system is inherently discriminatory is thus not properly

directed at SCA.[1]

Second, Plaintiff can point to no evidence that he was personally disadvantaged by the

existence of the rotational system.  Plaintiff cannot identify any rotational employee who was

---

[1] None of the cases relied upon by Plaintiff in support of this argument has any bearing on the
situation presented here.  In Shane, Goyette and Morelli, the foreign parent was sued directly for
its own acts, not the case here.  In Avigliano and Santerre, unlike here, the subsidiaries allegedly
committed direct acts of discrimination in their own right with no involvement from the parents.

favored over him in any employment decision.  Plaintiff was a General Manager, so he cannot

claim that he suffered because some rotational employees were also assigned to General

Manager positions. (Allen Aff. Ex. 13, Paice Aff. ¶ 27.) (References to the "Allen Aff." refer

back to the Affidavit of Laura H. Allen submitted in support of Defendants' First Brief ("1st

Br.").)  Plaintiff cannot identify any position to which he aspired that was given to a rotational

employee instead. (Pl. Tr. 663 (Seltzer Aff. Ex. F).)  The rotational system had nothing to do

with his termination, as evidenced by the fact that Plaintiff was replaced by a Caucasian national

employee, not a member of rotational staff. (1st Br. 14.)  Nor can Plaintiff claim that a

"comparable" rotational was paid more, because his position was unique, and his $185,000

salary based on market rate for Chief Internal Auditors. (Allen Aff. Ex. 12; Ferr. Tr. 100 (Seltzer

Aff. Ex. J.)[2]  Finally, Plaintiff cites no evidence for his speculative assertion that a rotational who

behaved as he did would not have been terminated; he could not know this, because terminations

of rotational GMs are carried out by the Parent in Japan. (Paice Tr. 197-99 (Seltzer Aff. Ex. I).)

## II.   DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S INDIVIDUAL DISCRIMINATION CLAIMS SHOULD BE GRANTED.

### A.   Plaintiff Cannot Make Out a *Prima Facie* Case of Disparate Treatment.

#### 1.   "National Staff" is not a protected category.

At his deposition, Plaintiff admitted that the alleged discrimination is based on rotational

status, not on race or national origin. (1st Br. 151-52.)  Plaintiff now attempts to backtrack from

these admissions with contradictory affidavits and a labyrinthine Counterstatement replete with

unsupported conclusory assertions.  Thus, in response to Defendants' showing that different

treatment based on national vs. rotational status does not equate to race and national origin

---

[2] Plaintiff turned down two other CIA positions, with base salaries of $160,000 and $190,000, respectively, when he accepted SCA's offer.  (Pl. Tr. 76-77.)

discrimination, Plaintiff changes his story, now claiming that unidentified Japanese/Asian *national* employees received preferential treatment. (Pl. Aff. ¶ 28.) Plaintiff fails, however, to identify a single national employee who was treated more favorably than he was, or to support with evidence his speculation that any such hypothetical individual actually benefited from such trivial occurrences as being included in Japanese language discussions or social outings.

Moreover, Plaintiff's new assertions about national employees of Japanese heritage flatly contradict his sworn testimony, in which he repeatedly insisted that the "racial imbalance" at SCA is based entirely on the preferential treatment of rotational staff. (Pl. Aff., ¶¶ 8, 11, 29, 35; Pl. Tr. 151-52; 154-57.) It is axiomatic that a plaintiff cannot defeat summary judgment with an affidavit that contradicts his prior testimony. See Bodley v. N.Y. Hosp., No. 86 Civ. 2018, 1988 WL 61976, at * 8 (S.D.N.Y. June 8, 1988) (rejecting affirmation containing details about discrimination that were not raised at deposition despite questions that should have elicited testimony about such details); Beers v. NYNEX Material Enters. Co., No. 88 Civ. 0305, 1992 WL 8299, at * 10 (S.D.N.Y. Jan. 13, 1992) ("If a party who had been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."). Here, Plaintiff testified at length about alleged discrimination caused by the rotational system, never once suggesting that Japanese/Asian national staff were treated better than non-Japanese/non-Asian national staff. To the contrary, Plaintiff explicitly stated that *all* national staff, regardless of race or ethnicity, were treated equally. (Pl. Tr. 151-52, 155-57.) Plaintiff cannot defeat summary judgment by disavowing his

own prior admissions.[3]

   This rule applies with equal force to Plaintiff's expert, Mark Killingsworth, who attempts to rehabilitate his prior damaging testimony by submitting a contradictory declaration.  Having testified under oath that this case is not about "a Japanese/non-Japanese difference . . . . This is a rotational versus national difference," Killingsworth now asserts that the focus of his prior analysis was indeed race and national origin. (Kill. Decl. ¶¶ 12-15.)  But Killingsworth continues to ignore the inconvenient fact that there is no compensation disparity between national Japanese/Asian managers and national non-Japanese/non-Asian managers – the only population whose compensation SCA controls. (Cohen Report pp. 6-7 (Seltzer Aff. Ex. E).)  Moreover, Killingsworth persists in inflating rotational compensation with expatriate allowances provided to rotational employees on overseas assignments – allowances not provided to Japanese/Asian national employees or Japanese citizens employed by the Parent in Tokyo.  Killingsworth's latest effort does nothing to overcome the obvious conclusion that it is rotational status, and not race or national origin, that affects compensation.

   2.    Plaintiff was not qualified to be SCA's Chief Internal Auditor.

   With respect to the second prong of Plaintiff's *prima facie* case – that he was performing his duties satisfactorily – it makes no difference whether the court applies the standard in Thornley v. Penton Publishing, Inc., 104 F.3d 26, 29 (2d Cir. 1997), or in Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 91-92 (2d Cir. 2001).  In this case, Plaintiff cannot

---

[3] For this further reason, Plaintiff's reliance on Goyette and Shane, in which courts determined that rotational systems could be discriminatory, is misplaced. In those cases, there either were no national staff who were Asian or Japanese-American, or the plaintiffs claimed that those national staff who were Asian or Japanese-American were favored over other employees, thus permitting an inference of unlawful bias. In this case, by stark contrast, Plaintiff has already conceded that his Asian and Japanese-American colleagues received the same treatment he did, negating any possible inference of discrimination. Moreover, as Plaintiff's expert's declaration asserts, 35.5% of national managers are Asian and 25.8% are of Japanese national origin. (Kill. Decl., Table 1.)

satisfy either.  As set forth in the First Brief, Plaintiff failed to perform his job in a manner that was acceptable to his managers, thus failing under the <u>Thornley</u> standard. (1st Br. 19.)  He fails under the <u>Slattery</u> standard as well, because many of Plaintiff's deficiencies demonstrated a lack of the "basic skills" required of an internal auditor.  Those basic skills, as articulated by the Institute of Internal Auditors, include the ability to communicate clearly, set priorities, support conclusions with facts, keep confidences and remain impartial. (Seltzer Aff. Ex. A §§1100, 2010, 2330, 2420.)  It is uncontroverted that Plaintiff was unable to maintain impartiality toward favored SCA colleagues (1st Br. 11), unable to prioritize and present his risk assessment in a way that could be understood by the management of SCA (1st Br. 6-8) and that his communication style interfered with his ability to build relationships and effectiveness as an internal auditor. (1st Br. 9-11.)  In short, Plaintiff has failed to meet the requirements of the second prong of a *prima facie* case of discrimination, regardless of which standard is used.

      3.    <u>Other than termination, Plaintiff suffered no adverse employment action.</u>

Plaintiff baselessly asserts that the following "adverse employment actions . . . materially altered his employment": (1) exclusion from key management meetings; (2) being forbidden to hire staff; (3) being denied access to critical documents written in Japanese; and (4) being denied complete or comprehensible responses to his requests for information. (Opp. Br. 13.)  Apart from the fact that such actions do not qualify as "adverse employment actions" as a matter of law (1st Br. 19-20), there is no competent evidence to support these allegations.

Plaintiff's assertion that Defendant Jun Matsumoto "told him he would not devote any resources to him" (Pl. Cst. ¶46)[4] is contradicted by his own sworn testimony that he stopped recruiting and refused to hire staff either because Matsumoto failed to sign off on his Audit

---

[4] In a typical "hide the pea" tactic, Plaintiff creates the appearance that this statement has evidentiary support by citing to two exhibits, Ex. 25 and 48, neither of which supports it.

Charter or due to his alleged concerns about the work environment. (Allen Aff. Ex. 35; Pl. Tr. 220-21, 229, 370 & 552-54; Thomp. Decl. Ex. 1.)  As to "exclusion" from meetings, Plaintiff identifies only two such occasions (Opp. Br. 13), one of which was a meeting that he admitted to having convened himself (Pl. Tr. 549-50; Thom. Decl. Ex. 1).  The other was a meeting of the Tokyo Audit Committee in which Hisashi Akita explained to the Committee (presumably in Japanese) the difference between Japanese and American auditing styles. (Thomp. Decl. Ex. 46.) As Exhibit 46 shows, Tatsuya Morita, a rotational employee assigned to the Legal Department, offered to discuss the content of the meeting with Plaintiff, negating his claim that he was purposely kept in the dark about information affecting his ability to do his job. Id.  Plaintiff presents no evidence as to how such purported exclusion affected his ability to do his job, as required to show an adverse employment action. See Watson v. Paulson, 578 F. Supp. 2d 554, 565 (S.D.N.Y. 2008) (no material issue of fact created by plaintiff's conclusory statements that she was excluded from meetings, with no evidence how the exclusion affected her performance). As to Japanese documents, Defendants' showing that Plaintiff was given access to translations stands unrebutted. (Allen Aff. Ex. 43.)  Thus, Plaintiff has failed to establish any adverse employment action other than his termination.

> ### 4.    Plaintiff's "evidence" does not support an inference of discrimination.

In a typically sweeping missstatement, Plaintiff claims to set forth "ample evidence" of Defendants' discriminatory animus. (Opp. Br. p. 14.)  After laborious cross-referencing through Plaintiff's multiple submissions, that evidence proves to be: (1) the same email from Morita to Plaintiff describing the meeting of the Tokyo Audit Committee (Thomp. Decl. Ex. 46); (2) an email from Akita to his Japanese supervisors describing his amicable collaboration with Plaintiff (id. Ex. 20); (3) an email from Tsukada thanking the Parent for sending Akita to New York to assist Plaintiff and expressing a desire to hire "local American employee[s] into core work-

7

function position[s]" (id. Ex. 17); and (4) an alleged remark by Matsumoto that "This is a Japanese company and we will do as we please." (Opp. Br. 14.)  The first three pieces of evidence on their face actually negate any possible inference of hostility toward non-Japanese. Even assuming for purposes of this motion that Matsumoto made the statement attributed to him (which Defendants deny), the statement was allegedly made during a disagreement over Plaintiff's work product. (Allen Aff. Exs. 60 & 61.) Far from creating an inference of racial hostility, this statement can be interpreted as nothing more than an expression of frustration with a nay-saying subordinate who refused to comply with instructions.

Nor does Plaintiff raise any fact issue with his conclusory assertion that he was treated less favorably than comparable Japanese/Asian employees. (1st Br. 20-22.)  Plaintiff concedes that he has failed to present evidence that there was any specific Japanese/Asian individual, rotational or national, who is comparable to him, but argues that this does not matter. (Opp. Br. 16.) He is wrong. "[A] court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." Albury v. J.P. Morgan Chase, No. 03 Civ. 2007, 2005 WL 746440, at *10 (S.D.N.Y. Mar. 31, 2005) (citation omitted). Where, as here, Plaintiff fails even to identify any such person, there is no issue of fact for the jury to decide. Watson v. Arts & Entertainment Television Network, No. 04 Civ. 1932, 2008 WL 793596, at *16 (S.D.N.Y. Mar. 26, 2008) ("Vague references that plaintiff's treatment was inferior to that afforded to unidentified comparators are insufficient to withstand a motion for summary judgment.") Mandell v. Suffolk County, 316 F3d 368 (2d Cir. 2003), cited by Plaintiff, observes only that comparability is a normally fact question; it in no way limits the availability of summary judgment when the plaintiff raises no genuine dispute as to that fact.

B.   Plaintiff Has Failed to Show That Defendants' Reasons for Terminating His Employment Are Pretextual.

"In order to survive a motion for summary judgment . . . plaintiff must put forth adequate evidence to support a rational finding that the legitimate non-discriminatory reasons proffered by the employer were false, and that more likely than not the employee's [national origin] or race was the real reason for the discharge." Holt v. KMI-Continental, Inc., 95 F.3d 123, 129 (2d Cir. 1996) (citations omitted).  A party opposing summary judgment "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence that [his] version of the events is not wholly fanciful." D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998).  Plaintiff's showing falls far short of this standard.

In response to Defendants' well-supported evidence of performance problems, disagreements with management, and insubordination, Plaintiff blames SCA for his deficiencies, offers his own subjective opinion of his performance, and puts forth unsupported speculation about the treatment of others. (Opp. Br. 16-20.)  Most amazingly, he tries to shift his burden of proof to Defendants, arguing that "Defendants offer no reason for failing to pay Mr. Schanfield a bonus, obstructing his ability to do his job, berating him and excluding him from meetings." (Opp. Br. 17.)  It is Plaintiff's burden to present admissible evidence to show pretext, not Defendants' burden to disprove Plaintiff's unsupported fabrications.  Plaintiff sets forth no facts to support these vague accusations, and any such evidence, if it existed, would be insufficient to support a finding of pretext, since criticizing Plaintiff and holding certain meetings without him could be an appropriate and understandable response to Plaintiff's well-documented business disagreements with his peers and management. (1st Br. 9-11.)  As to the bonus issue, Plaintiff admits he had no contractual right to a bonus, and, given his short tenure (and lack of success), he was not eligible to receive one. (Pl. Tr. 114; Ferr. Tr. 283-84.)

9

Nor is it enough for Plaintiff to point to two rotational managers he considers incompetent and claim that that they were not disciplined or terminated. First, Plaintiff's opinion as to other managers' competence is not evidence, and he proffers none to demonstrate their supposed "demonstrable incompetence." Second, Plaintiff offers no information as to the nature of the "incompetence," or whether it can be equated with Plaintiff's deliberate refusals to follow instructions and other acts of insubordination. Third, the evidence Plaintiff does cite proves that terminations of rotational employees are carried out by their employer, the Parent, and then only under the auspices of the Award and Discipline Deliberation Counsel in Japan, rendering them dissimilar for comparative discipline purposes. (Cst. ¶ 91.) Unlike the plaintiffs in <u>Feingold</u> and <u>Shane</u> (Opp. Br.17-18), who produced specific evidence of individuals who committed similar wrongdoing and were treated more favorably, Plaintiff can point to no evidence of any Japanese/Asian management employee who, like him, willfully defied management's wishes but was treated more favorably. "[W]here, as here, the claim of disparate treatment is based on inconsistent disciplinary practices, a plaintiff is required to show that similarly situated employees who went undisciplined engaged in comparable conduct." <u>Albury</u>, 2005 WL 746440, at *9 (citations omitted).

Plaintiff next suggests that Defendants' "different reasons" for his termination show pretext. (Opp. Br. 17.) What Plaintiff miscasts as "different reasons" are simply steps in the evolution of a termination decision. As Matsumoto testified (and his contemporaneous emails corroborate), he concluded that Plaintiff should not continue as CIA when he received the risk assessment in late March 2007, but deferred to those who wanted to give Plaintiff a final chance to perform an audit. (Mats, Tr.187-90; Allen Aff. Exs. 55 & 57.) Then, Matsumoto decided the termination had to go forward when Plaintiff severed their business relationship by announcing

he would no longer speak to him. (Allen Aff. Exs. 60 & 61.) Matsumoto's deliberation in arriving at the decision to discharge Plaintiff undercuts any inference of discriminatory motive.

Equally nonsensical is the suggestion that the Court can infer that Plaintiff's performance problems were a pretext for his termination because Plaintiff never received a formal performance evaluation or formal reprimand. Plaintiff worked at SCA only ten months, and never completed a performance review cycle. (Ferraro Tr. 281-84, 362-63.) In any event, unlike the plaintiff in Snyder, cited by Plaintiff, Plaintiff received repeated guidance and criticism with respect to his performance and was well aware that Matsumoto was unhappy with his work product and his approach to his job. (1st Br. 6-13.) See Thermidor v. Beth Israel Med. Ctr., 683 F. Supp. 403, 412-13 (S.D.N.Y. 1988) (disregarding the plaintiff's argument that he had not received a written evaluation of his work where there was uncontroverted evidence of verbal criticism of his performance and where the plaintiff was aware of the criticism).

Finally, neither Plaintiff's subjective opinion as to the value of his work, nor his assignment of blame for his failures to unnamed rotational employees, raise a genuine issue of fact. Plaintiff's conclusory accusations notwithstanding, it was Plaintiff who refused to hold meetings and share information with the GMs (Pl. Tr. 247-48; Pl Aff ¶ 23), and it was Plaintiff who openly expressed disdain for the rotational GMs (1st Br. 9-10). Moreover, "[a] plaintiff's subjective opinion of [his] own performance is insufficient to give rise to a triable issue of fact regarding pretext." Pergament v. Fed. Express Corp., No. 03 Civ. 01106, 2007 WL 1016993, at *12 (E.D.N.Y. Mar. 30, 2007) (citations omitted). See also Griffin v. Ambika Corp., 103 F. Supp. 2d 297, 309 (S.D.N.Y. 2000). Whatever his excuses, the evidence that SCA was legitimately dissatisfied with Plaintiff's performance stands unrebutted.

11

C.    The Same Actor Inference Is Valid and Applicable Here.

Contrary to Plaintiff's assertions,[5] the same actor inference is alive and well in Title VII

cases, as evidenced by its application in cases cited by Plaintiff, Richards v. Calvet, No. 99 Civ.

12172, 2005 U.S. Dist. LEXIS 5365 (S.D.N.Y. Mar. 20, 2005) and Copeland v. Rosen, 38 F.

Supp. 2d 298 (S.D.N.Y. Mar. 9, 1999).  Matsumoto was not a "member of a committee" as in

Richards, but, as CEO, had final, independent, and essential power of approval over Plaintiff's

hire. (Mats. Tr. 69-72; Paice Tr. 72-73.)  As Plaintiff's own cases make clear, the ten-month

interval between Plaintiff's hire and his termination is well within the time period allowed for the

same actor inference to be valid. See Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir.

1997) ("less than two years" is a suitable period of time for a valid inference). See also Schnabel

v. Abramson, 232 F.3d 83, 91 (2d Cir. 2000) (dismissing discrimination claims under same actor

inference where only three years passed between hiring and firing).

## III.    PLAINTIFF'S RETALIATION CLAIMS SHOULD BE DISMISSED.

A.    There Is No Evidence of Retaliation Because of Reports to Management.

Plaintiff disingenuously asserts, without any record citation, that "Defendants do not

dispute that Mr. Schanfield complained to senior management about discrimination against non-

Japanese/non-Asian employees as a result of the rotational system."  Defendants' position, amply

supported by the record, is that as part of his job, Plaintiff reported on potential economic and

business risks arising from the Parent's rotational system—not that Plaintiff "complained" about

"discrimination" based on race or national origin. (1st Br. 24-25; Paice Aff. passim.)

Plaintiff does not dispute that SCA had identified concerns with the Parent's rotational

_____

[5] Plaintiff reaches too deep when he cites Feingold, where the Court merely commented in a
footnote: "We do not pass judgment on the extent to which this inference is either required or
appropriate outside of the [ADEA] context in which it generally is applied." Feingold v. N.Y.,
366 F.3d at 155 n. 15 (2d Cir. 2004).

system before Plaintiff even arrived, and hired him in part to evaluate such issues. (Allen Aff. Ex. 68; 1st Br. 25.) Plaintiff admitted in his deposition that it was his duty to articulate the potential risks to SCA arising from, among other things, risks in the human resources area. (Pl Tr. 189-90, 563.) Plaintiff submitted six reports to management on his risk findings between July 2006 and his final Risk Assessment on March 30, 2007. As Plaintiff confirmed at his deposition, he raised no issues of "discrimination" other than those that appear in these reports. (Pl. Tr. 415-16.) While several of the reports point out risks associated with the "rotational imbalance," none mentions race or national origin discrimination, preferences for persons of Japanese heritage within the national staff, or any disfavoring of non-Japanese national staff vs. Japanese national staff. (Paice Aff. *passim*.)

Although Plaintiff conclusorily asserts that Matsumoto discouraged him from exploring potential risks in the human resources or compliance areas, he admitted at his deposition that he consistently included these issues in his reports. (Pl. Tr. 651-52.)[6] He further admitted that Matsumoto was concerned with his personal advocacy for individual employees – an inappropriate practice for an impartial internal auditor. (1st Br. 11.) But even if it were true that Matsumoto tried to direct the scope of Plaintiff's risk assessment to accounting controls or other traditional internal audit concerns, this would not create an issue of fact about retaliatory motive. An effort to direct Plaintiff's focus in the performance of his official duties has nothing to do

---

[6] In another mischaracterization, Plaintiff states that "the record is also clear that after Mr. Schanfield complained of discrimination, Defendant Matsumoto began to unfairly criticize his work." (Opp. Br. P. 25.) His evidence of "unfair" criticism (not an adverse action, in any event) is nothing more than two of his own reports (Thom. Decl. Exs. 32 & 11), innocuous deposition testimony by Matsumoto explaining why he thought Plaintiff's reports were too general and lacked factual support (Mats. Tr. 110-115), and Plaintiff's own testimony that Matsumoto asked him to stop advocating for individual employees on their compensation and title issues. (Pl. Tr. 91-96, 363-67.) Plaintiff's characterization of these citations as "clear" evidence of retaliation only highlights the absence of factual support for his claims.

with impeding him from complaining in his capacity as an employee. Significantly, Plaintiff does not and cannot claim that he ever lodged an actual "complaint" of discrimination. His reports to management relating to the rotational system were intended only as reports on potential risks facing the company, brought forth by a professional charged with identifying them (Pl. Tr. 435-36, 445, 457), and there is no evidence that anyone viewed them otherwise.

Plaintiff's performance of his job is not turned into protected activity by Crawford v. Metro. Gov't of Nashville & Davidson County, Tenn., 129 S. Ct. 846, 172 L. Ed. 650 (2009), which narrowly (and unremarkably) holds that "[Title VII's] antiretaliation provision's protection extends to an employee who speaks out about discrimination not on her own initiative, but in answering questions during an employer's internal investigation." Id. at 848. Unlike Plaintiff, the employee in Crawford was speaking in her capacity as a victim/witness, not as a professional reporting on risks she was hired to examine. Extending Crawford to Plaintiff would effectively immunize from routine employment decisions all human resources, compliance, legal personnel, or even "hot line" personnel whose jobs entail investigating or receiving reports of violations. This was clearly not the holding or the intent of Crawford.

B.     SCA's Counterclaims Are Not Retaliatory and Are Meritorious.

SCA's justification for filing counterclaims against Plaintiff for his theft of confidential information is amply set forth in its opposition to Plaintiff's motion for summary judgment as to the counterclaims. As the Supreme Court stated in the decision cited by Plaintiff, Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 76 L. Ed. 2d 277 (1983), a party cannot, under the guise of retaliation, halt the prosecution of a lawsuit, regardless of the motive, "unless the suit

lacks a reasonable basis in fact or law." Id. at 731.  SCA's counterclaims have a basis in both.[7]

## IV.   ALL CLAIMS AGAINST MATSUMOTO AND TSUKADA SHOULD BE DISMISSED.

Despite Plaintiff's attempt to again confuse issues, Defendants' motion for summary judgment addresses *all* of the claims brought against them by Plaintiff, including the "aiding and abetting" claims under the NYSHRL and the NYCHRL. (1st Br. 29.)  With respect to the claims against Matsumoto, Plaintiff has failed to support his allegations of "berating," relies only on improper contradictions of his own testimony in regard to the alleged deprivation of resources (*supra* at pp. 6-7), and has offered not a shred of evidence supporting an inference that Matsumoto harbored discriminatory motives – deficiencies that require dismissal of the claim.

With respect to Defendant Tsukada, all witnesses with personal knowledge testified that Tsukada did not participate in the decision to terminate Plaintiff (Tsuk Tr. 187-88; Mats. Tr. 201-02; Paice Tr. 311), and the two documents Plaintiff cites to controvert that testimony do no such thing.  Exhibit 52 is an email to Matsumoto after Tsukada had returned to Japan, in which Tsukada responds to a request for background on Plaintiff's hiring and suggests that Plaintiff be allowed to conduct an actual audit to prove his worth to SCA.  Exhibit 53 is Akita's response to a similar request for background information regarding his three month visit to the United States to assist Plaintiff.  Neither of these exhibits indicates that Tsukada had any involvement in the decision to terminate Plaintiff's employment.

## CONCLUSION

For the reasons set forth above and in the First Brief, the Court should grant Defendants' motion for summary judgment dismissing Plaintiff's complaint in its entirety.

---

[7] For the record, Defendants have never "concede[d] that Mr. Schanfield's conduct [in misappropriating documents] was always undertaken to benefit the Company," as Plaintiff preposterously represents to the Court.  (Opp. Br. 27.)  See 1st Br. 24-25.

Dated: New York, New York
      March 16, 2009

                            SIDLEY AUSTIN LLP

By: _____
            Laura H. Allen
            Nicholas H. De Baun
            Joanne Seltzer
            787 Seventh Avenue
            New York, New York 10019
            (212) 839-5300

            Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of March 2009, I caused a true and correct

copy of Defendants' Reply Memorandum of Law in Further Support of Their Motion for

Summary Judgment be served on Plaintiff's counsel of record by hand at the following address:

Patricia Ronan, Esq.
Thompson Wigdor & Gilly
85 Fifth Avenue, 5th Floor
New York, NY   10003

_____
Joanne Seltzer