UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

ARNOLD SCHANFIELD, individually and on
behalf of others similarly situated,

Plaintiff,

- against -                                                    07-CV-9716

SOJITZ CORPORATION OF AMERICA; JUN
MATSUMOTO, in his official and individual
capacities; and TAKASHI TSUKADA,

Defendants.

-----------------------------------------------------------------x

**DECISION AND ORDER GRANTING IN PART, AND DENYING IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; DENYING SUMMARY JUDGMENT TO PLAINTIFF ON ALL OF SCA'S COUNTERCLAIMS; GRANTING SUMMARY JUDGMENT TO SCA ON ITS COUNTERCLAIMS AGAINST PLAINTIFF; AND DENYING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

McMahon, J.:

## INTRODUCTION

Plaintiff Arthur Schanfield ("Schanfield") brings this action against Sojitz

Corporation of America ("SCA") and individuals Jun Matsumoto ("Matsumoto") and

Takashi Tsukada ("Tsukada") (collectively, the "Defendants") alleging race and national

origin discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§§ 2000 *et seq*. ("Title VII"); 42 U.S.C. § 1981, as amended by the Civil Rights Act of

1991, Pub. L. No. 102-166, 105 Stat. 1071 (1991) ("Section 1981" or "§ 1981"); New

1

York State Human Rights Law, N.Y. Exec. §§ 290 *et seq.* ("NYSHRL"); and New York

City Human Rights Law, N.Y.C. Admin. Code § 8-107(1) ("NYCHRL").

Plaintiff claims that he was personally discriminated against by his employer,

SCA, and by his superiors Matsumoto and Tsukada (together, the "Individual

Defendants") because of his race and national origin, and that he experienced a retaliatory

discharge because of his complaints of discrimination.

Plaintiff also purports to bring class claims against SCA for discriminatory

employment practices on behalf of all current and former SCA "non-Japanese/non-

Asian" management-level employees.

SCA has asserted counterclaims against Schanfield for breach of contract, breach

of fiduciary duty and duty of loyalty, and misappropriation of trade secrets. SCA alleges

that Schanfield secreted numerous confidential SCA documents and disclosed them to

third parties not affiliated with SCA as well as in connection with the instant litigation.

Defendants move for summary judgment dismissing plaintiff's complaint in its

entirety. That motion is granted in part, and denied in part.

Plaintiff moves for summary judgment dismissing SCA's counterclaims against

him. That motion is denied. However, the Court, *sua sponte*, grants summary judgment

to SCA on its counterclaims against plaintiff.

Plaintiff also moves for the certification of a class of all current and former SCA

"non-Japanese/non-Asian" employees asserting race and national origin discrimination at

SCA. SCA opposes class certification. That motion is denied.

# BACKGROUND[1]

## I.    Facts Relating to Schanfield's Individual Claim of Discrimination and the Counterclaims Asserted against Schanfield

### A.    Schanfield's Individual Claim of Discrimination

Schanfield alleges that he was discriminated against because he was not Japanese or Asian, and that he experienced a retaliatory discharge from SCA because he reported incidents of discrimination at SCA.

<u>SCA Hires Schanfield</u>

SCA is a wholly-owned subsidiary of Sojitz Corporation, a global trading company based in Japan.  SCA is a New York corporation with its headquarters in New York, and other office locations in the United States and elsewhere.  (Defs. Rule 56.1 Stmt. ¶¶ 1-2.)

As will be discussed further *infra*, SCA has two types of employees.  "National" employees are those who reside permanently in the United States and are hired by and work directly for SCA.   (<u>Id.</u> ¶ 5; Pl. Rule 56.1. CntrStmt. ¶ 5.)  Also working at SCA are employees of SCA's parent company Sojitz, who are seconded from Japan to work at SCA's United States offices for periods of three to five years.  These employees are referred to as "Rotational" employees.

All of the Rotational employees are "exclusively Japanese/Asian."  (Pl. Rule 56.1 CntrStmt. ¶ 9.)  National employees are "predominantly American and Caucasian" (<u>id.</u> ¶

---

[1] These facts are taken from the Defendants' Rule 56.1 Statement, attached to their motion for summary judgment; plaintiff's Rule 56.1 Counter Statement, attached to his opposition to Defendants' motion for summary judgment; plaintiff's Rule 56.1 Statement attached to his motion for summary judgment on Defendants' counterclaims against him; and Defendants' Rule 56.1 Counter Statement, attached to their opposition to plaintiff's motion for summary judgment.

11), although it appears that there are some National employees who are of Japanese or other Asian ancestry.

In 2006, SCA decided to hire a Chief Internal Auditor ("CIA") to build and head a new Internal Audit Department at SCA. (Defs. Rule 56.1 Stmt. ¶ 15.) Plaintiff Schanfield, a naturalized United States citizen from Canada, applied for the CIA position after seeing SCA's posting with the Institute of Internal Auditors. (Id. ¶ 17.)

Schanfield was evaluated by a search team made up of both National and Rotational employees, including defendant Tsukada, a Japanese Rotational employee, who was at that time the Chief Financial Officer of SCA. (Id. ¶ 18.)

SCA offered Schanfield the CIA position, and on June 27, 2006, Schanfield countersigned SCA's offer letter, agreeing to be employed by SCA at will with an annual salary of $185,000 per year. (Id. ¶ 21; Thompson Decl. Ex. 19.) Schanfield, hired by SCA, was a National employee based out of SCA's New York office.

Schanfield's hiring was approved by defendant Matsumoto, a Japanese Rotational employee, who served as the Chief Executive Officer of SCA. (Defs. Rule 56.1 Stmt. ¶ 19.) Plaintiff asserts that Matsumoto simply rubber stamped his hiring after meeting with him for "ten minutes." (Pl. Rule 56.1 CntrStmt. ¶ 19.)

Schanfield's Position at SCA

The parties disagree over the level of Schanfield's seniority at SCA.

Defendants assert that plaintiff "held the highest level position in his field" at SCA. (Defs. Rule 56.1 Stmt. ¶ 23.) Plaintiff's official classification was that of a "General Manager," a position junior only to CEO, CFO, and COO. (Id.) Plaintiff asserts that even though he was called a General Manager, his work was overseen by and

he was effectively made to report to Rotational staff of lower rank.  In particular, plaintiff asserts that CFO Tsukada brought in Rotational employee Hisashi Akita ("Akita") from Japan to keep plaintiff in check, and that plaintiff also had to run his work by "Mr. Hirai in Planning, Mr. Manabe in Accounting and Mr. Morita in the Legal Department."  (Pl. Rule 56.1 CntrStmt. ¶ 23; Schanfield Aff. ¶ 8; Defs. Rule 56.1 Stmt. ¶ 24; Matsumoto Dep. Tr. at 25:2-15.)  According to Defendants, Akita was brought in from Japan because it was useful to have someone familiar with Japanese auditing standards and techniques. (See Matsumoto Dep. Tr. at 87:14-91:19.)

Plaintiff alleges that his experience reflects the failure of SCA to give National employees opportunities for advancement within the company, in favor of Rotational employees.  Citing the fact that only Rotational employees fill the CEO, CFO and COO slots at SCA, plaintiff contends that National employees were unfairly denied promotional and managerial opportunities.

Schanfield's Salary at SCA

As noted above, at his hiring Schanfield agreed to be employed at a salary of $185,000 per year.

Schanfield claims that he was paid less than similarly situated Japanese/Asian employees because of his national origin and his race.

He also alleges that SCA failed to pay him any incentive bonus or similar compensation during his ten-month tenure as CIA.  Schanfield's offer letter does not promise a bonus but states that "we will continue discussions on incentive compensation for you."  (Allen Aff'n Ex. 12 (hereinafter "Offer Letter").)  Schanfield claims that SCA knew he had a higher competing offer when he accepted with SCA, and asserts that

Rotational employees are "eligible" for bonuses and incentive compensation under their payment plans. (Pl. Rule 56.1 CntrStmt. ¶ 21.) Schanfield argues that SCA's failure to pay him a bonus constituted discrimination. (Id.)

### The Scope of Schanfield's Duties at SCA

The parties do not agree on what exactly Schanfield was hired to do as CIA.

In February 2006, a few months prior to plaintiff's hire, the SCA legal department hired an outside consultant to review SCA's business model. (Defs. Rule 56.1 Stmt. ¶ 26.) That consultant issued an "Internal Control Questionnaire," which identified a number of issues the consultant recommended SCA address through internal audits, including, *inter alia*, issues with the Rotational system, communication issues relating to Japanese language and integration of Rotational staff, lack of job descriptions, and training problems. (Id.)

Following the outside consultant's report, SCA's General Counsel and Chief Compliance Officer, Richard Paice—a National employee—created a "Proposed Action Plan," for how to address the Internal Control Questionnaire. (Id. ¶ 27.) SCA expected that Schanfield, as the new CIA, would put into practice this Proposed Action Plan. (Id.) Indeed, SCA contends that during the interview process, it gave Schanfield a copy of the Proposed Action plan and asked Schanfield to produce a methodology of how to proceed. (Id.) Defendants expected that Schanfield would generally implement that methodology when he began work at SCA.

Schanfield contends, however, that his duties were never specifically laid out and he never had a clear idea of SCA's expectations of him. (Pl. Rule. 56.1 CntrStmt. ¶ 27.) He admits that during his interview he created an audit methodology based on the

Proposed Action Plan provided to him, but asserts that his objectives changed when, upon starting work, he reviewed for the first time a copy of the outside consultant's Internal Control Questionnaire.  (Id. ¶ 28.)

According to plaintiff, the Internal Control Questionnaire was much broader than the Proposed Action Plan, and it contained issues related to problems associated with the Rotational system. (Id. ¶ 26; Allen Aff'n Ex. 3 (hereinafter "Schanfield Dep. Tr.") at 104:23-105:11.)  Plaintiff submits a version of the Internal Control Questionnaire, which states the following:

- "Compensation does not appear to be based on achievement of short-term performance targets.  Promotions and advancement seem to be closely related to achievement of profitability targets and an hierarchy of seniority; however promotions, whether vertical or lateral, in many instances are not based on merit or any requirement to have any particular skill set required for the position into which the promoted person is moving, particularly for RS [Rotational Staff] employees.  Criteria for establishing compensation and who may be promoted into what position is also directly linked to whether an employee is a RS employee or a NS [National Staff] employee.  NS employees are generally not permitted to hold General Manager positions regardless as to the individual's skills or qualifications."  (Thompson Class Cert. Decl. Ex. H. at AS 6539);

- "It does not appear that RS staff placed into various positions (from lower administrative positions to senior management) have the training and experience to handle the assignments they are given." (Id. at AS 6540);

- "It does not appear that relevant experience is a strong criterion or requirement for assigning RS employees to certain jobs."  (Id. at AS 6547);

- "It would appear that the level of authority and scope of responsibility assigned to RS employees is not always merited in light of the apparent low level of knowledge and skill level of RS employees." (Id. at AS 6549);

- "The rotational system does not breed experts; it breeds employees with low-level knowledge in many areas who are not given adequate time to acquire a higher level of relevant knowledge for the positions they're placed in.  Rather than fill a vacancy with a highly skilled NS employees [sic], an unskilled RS employee will often be given the job." (Id. at AS 6564.)

7

According to Schanfield, these issues were not adequately addressed by the Proposed Action Plan. (Paice Reply Aff'n. ¶¶ 1-2; Thompson Opp'n Decl. Ex. 22.)

### The Risk Assessment

As a precursor to conducting an actual internal audit, Schanfield undertook a preliminary risk assessment.

Disagreements quickly arose over the time frame in which Schanfield was expected to complete the risk assessment and how the risk assessment should proceed.

Defendants contend that, in July 2006, at the time of his hiring, plaintiff represented to them that he would complete a "high quality risk assessment by December 31, 2006." Plaintiff counters that he never represented that he could definitively finish the project by year's end, and that any representation was based on an expectation that plaintiff could hire competent and effective staff—something, as will be discussed further below, plaintiff alleges SCA prevented him from doing. (Def. Rule 56.1 Stmt. ¶¶ 29-30; Pl. Rule 56.1 CntrStmt. ¶¶ 29-30.)

Schanfield and Matsumoto also clashed over how to do the risk assessment. Schanfield contends that he pressed Matsumoto and Tsukada to sign off on an "Internal Audit Charter," which he submits was necessary to provide the basic "road map" for the whole auditing process. Schanfield asserts that the failure of Matsumoto and Tsukada to do so crippled his ability to proceed with the risk assessment and audit procedures. According to Defendants, Schanfield's preoccupation with creating a "best in class" risk assessment (Allen Aff'n Exs. 24, 28) before he conducted any actual internal audits was counterproductive and impractical. (Defs. Rule 56.1 Stmt. ¶¶ 36-38.)

Over the course of conducting the risk assessment, Schanfield was frustrated by the flow of information from and problems in communicating with Rotational employees. An October 30 e-mail from Schanfield to, *inter alia*, Paice, recounts the difficulty Schanfield experienced getting information about potential risks to SCA from certain Rotational employees. (Thompson Decl. Ex. 24.)

Schanfield Begins Reporting Risks

In furtherance of the risk assessment (and ultimate internal audit) Schanfield visited various branches of SCA and interviewed over 100 SCA employees. (Pl. Rule 56.1 Stmt. ¶ 10.)

Schanfield provided periodic updates to Tsukada and Matsumoto, as well as other National and Rotational employees, as he performed risk assessments at various offices. (See Defs. Rule 56.1 Stmt. ¶ 29.)

On July 21, 2006, plaintiff sent an e-mail to, *inter alia*, Tsukada with an attached memorandum entitled "SCA-Preliminary Assessment of the Risks, Current Situation and Contemplated Action Plan by internal auditing." (Thompson Decl. Ex. 23.) In that memorandum, Schanfield mentioned the need for "US style business strategy for all new Rotational Managers" and he also noted under the heading "Absence of detailed job descriptions including competency requirements could result in business objectives not getting accomplished,"

> All of the rotational staff have excellent skill sets but in some instances these skill sets may be different from what we need here to be able to accomplish the goals and to continue robust growth. The first thing is to determine the competency requirements including compensation/promotion, how success will be measured, actions to be taken for failing to perform, etc. When an individual is to be placed in a position—a skills gap analysis could be

determined and a robust training plan created and executed within
the first six months of the individual's tenure with the company . . .

(Id. at SCA 043580.)

On or about October 20, 2006, after visits to several SCA offices, Schanfield

provided Tsukada an "Updated Status Report Memo" in which he elaborated on risks

identified during his tours of SCA offices. (Id. Ex. 29; Paice Reply Aff'n ¶ 8.)

Schanfield highlighted a number of issues related to the Rotational system and the

relations between Rotational and National employees, including the following points:

- "Communication Issues - As discussed, all communications here in the US
  should be in English. The risks by communicating in Japanese are that we
  will not receive benefit of input from the rest of the workforce. Secondly,
  the effort needed to translate such documents eats into our bottom line as
  time needed to be expended for such matters. Thirdly, and most
  importantly, this contributes to many morale issues and will cause us to
  lose national staff." (Thompson Decl. Ex. 29 at SCA 028466);

- "National Staff - There are no Americans in the group at a Management
  level. I think that the group needs a high level American to work along
  side Hirai-san to both bring rigor to the business planning process and as
  well bring concrete deals to the table." (Id. at SCA 028472);

- "Anti-Discrimination - there is a clearly noted imbalance between
  rotationals and national staff. I am not exactly sure of the numbers but I
  think it has improved slightly from when I started three months ago. It
  needs to improve much further. We would have a difficult time in the
  event of an affirmative action audit. In addition we should communicate
  again especially to the rotationals to not ask questions or make hiring
  decisions based on an individual's age." (Id. at SCA 028475);

- "Cost of Rotationals - it is recognized that there is a significant cost
  associated with the rotational system. The question is whether any
  changes need to be made to mitigate the risks—(i.e. receiving less value
  than we should be getting.) I have discussed job descriptions, goals and
  objectives, training sessions below and in addition the way rotational
  assignments are given out vis a vis the opportunity of a national person
  filling the role. This is quite critical going forward. As well, I think that
  we should think carefully through the rotational program and train as well
  successors to key rotationals that could be replaced in cases through a

highly qualified national person. This will impact morale positively and save on bottom line costs." (Id.);

• "Morale - As discussed throughout this document, the morale in this company varies from very good to not so good. We have many examples from through out the company. The question is what we do about the 'not so good'. Training as discussed below is key. More English spoken and written documents in English are key, more lunches between Japanese and non-Japanese is key. We have one common business objectives goal and the key is to bring both cultures together in harmony. Making Americans more sensitive to Japanese culture is key - read Nikkei weekly, join Japan Society, read Japanese culture books are all critical from the perspective of the Americans. Creating a career path for nationals to replace some rotationals is key. Setting up goals and objectives for all with incentive based compensation is key." (Id. at SCA 028476.)

On or about November 10, 2006, Schanfield provided Matsumoto with an update of his activities since his hiring. (Thompson Decl. Ex. 11.) In that document Schanfield noted that communication was "quite dismal," partly because "so many documents are in Japanese." (Id. at SCA 029537.) He also reported that the Rotational system had a negative impact on morale of National staff, and it was commented during his staff interviews that National staff felt like "second class citizens." (Id.) He noted, however, that with respect to morale, "many solid recommendations in place and are being done to remedy these problems." (Id.) Schanfield also highlighted the "imbalance between rotationals and national staff," noting that it "needs to be fixed for various reasons including morale, inability to withstand an external agency audit and inability to adequately execute the work." (Id. at SCA 029539.)

On December 27, 2006, Schanfield sent another update e-mail to, *inter alia*, Matsumoto and Tsukada, in which he reported,

"Code of Corporate Conduct – Although the code of conduct has been prepared, it has not yet been issued and as such—we can say that there is no code. I think that this is particularly important. It is one of the essential ingredients of the control environment. To

11

> date, we have noted two individuals for sexual harassment, indications of age discrimination (based on my observations in Detroit and also based on conversations with our Head of HR), an apparent absence of women in management positions, an imbalance of rotationals to Americans, a lawsuit filed against us by former GC. . . ."

(Thompson Decl. Ex. 42 at SCA 031000.)

As to the reported incident of sexual harassment by Rotational employees, Defendants contend that SCA responded properly to the incident, writing the employees up and sending them to sexual harassment training. (Defs. Rule 56.1 CntrStmt. ¶ 12; Schanfield Aff. ¶ 33.) In a November 15, 2006 e-mail to Matsumoto, Schanfield appeared to agree with Defendants assessment: "Glad we got the sexual harassment issue resolved." On November 29, 2006, Schanfield wrote another e-mail to, *inter alia*, Matsumoto, Tsukada and Paice, stating,

> Today we resolved this harassment issue—this issue did not make us any money but in 18 months time when we have a most successful company here, you will look back and see this event— right here and now—as a defining moment for us. Frankly, I was not so optimistic that we would get this resolved and since this matter is one of the most sensitive types of issues, this was a really good thing and will send proper messages throughout the company. This is precisely what good companies do.

(DeBaun Aff'n Ex. 14 at SCA 044307.)

At his deposition, Schanfield admitted to writing the above e-mails, but testified that he really was not pleased with the way the situation was handled because he believed the individuals involved in the sexual harassment should have been terminated, instead of getting what he termed "a slap on the wrist." (Schanfield Dep. Tr. at 203:19-205:12.)

In regards to the former general counsel's lawsuit, in November 2006, Richard Brendzel sued SCA and individual defendants, including Matsumoto and Tsukada

alleging, *inter alia*, discrimination and retaliation on the basis of race, national origin and age. (Ronan Decl. Ex. N.) This lawsuit was settled by SCA prior to Schanfield's filing of this lawsuit. (Paice Reply Aff. ¶ 10.)

### Complaints about Compensation and Promotion

During his tenure at SCA, Schanfield also made comments about what he perceived as under-compensation of certain employees. In his December 27, 2006 e-mail, plaintiff reported that the compensation and incentive systems were "no good" and that SCA needed to pay at market or above to attract top professionals, noting that "For example Paulo is being paid well below the market . . ." (Thompson Decl. Ex. 42 at SCA 031001.) Paulo appears to be a National employee.

Schanfield also believes that SCA's promotional policies favored Rotational staff such that they had more favorable job status than National staff.

Schanfield, as noted previously, advocated for the placement of more National employees in senior positions at SCA. For instance, he made it known that he thought Paice should be chief legal officer, and not have to answer to Rotational staff. (Schanfield Dep. Tr. at 363:10-365:16.) Schanfield believed it was unfair that Rotational employees possessed higher titles—and he believed higher compensation—when National employees did "90 percent" of the work in the legal department. (Id. at 364:15-21.)

Defendants contend that management became concerned that it was an abuse of plaintiff's position for him to insert himself into promotion and compensation decisions for employees who he favored, but who did not report to him. (Defs. Rule 56.1 CntrStmt. ¶ 13.)

SCA Reaction to Schanfield's Reporting

According to plaintiff, Matsumoto was displeased by his risk assessment reports

and told plaintiff to stop identifying discriminatory risks created by the Rotational model.

(Schanfield Aff. ¶ 31.) At his deposition Schanfield testified,

> When I started finding issues of discrimination going on in the company, and these issues were not being addressed by the chief legal officer and the head of HR I kept on insisting to the CEO [Matsumoto] as professionally as I could, We need to get these issues resolved, okay, 'we' being you, and simultaneously I'll—I'll be able to execute internal audit projects. But without getting these issues resolved nothing else will make a difference here.

(Schanfield Dep. Tr. at 89:17-90:2.)

When Schanfield continued to identify risks related to what he terms

discrimination and the Rotational system, Schanfield alleges that Matsumoto "yelled" at

and "berated" him. (Id. at 366:24-367:3.) Schanfield contends that this treatment was in

contrast to the way Matsumoto treated Japanese/Asian employees, which was with

civility and respect. (Schanfield Aff. ¶ 35.)

Schanfield asserts that Matsumoto also began taking proactive steps to undermine

plaintiff's work performance. Schanfield claims in his motion papers that in January

2007 Matsumoto held a secret meeting with Deloitte & Touche ("Deloitte"), SCA's

outside accountants, concerning Schanfield's audit methodology. (Schanfield Dep. Tr. at

244:3-6.) Schanfield contends that he was not invited to this meeting where his work was

discussed, but other Rotational employees—some of lower rank than Schanfield—were

included. (Id. at 244:11-17.) However, in response to a late December 2006 e-mail from

Deloitte employee Marshall Schlimer about the meeting, Schanfield wrote, "I am aware

that you are meeting with [Matsumoto] as I have been insisting that they meet with an

external provider." (Id. at 549:15-550:9.) Schanfield admitted at his deposition that it

was "possible" that it was in fact his idea for the meeting to occur. (Id. at 550:17-19.)

Schanfield also cites to an e-mail written by Rotational employee Morita, which

references a video conference Rotational staff attended with the Sojitz Tokyo Audit

Department, which Schanfield apparently did not attend. (Thompson Opp'n Decl. Ex.

46.) At the end of Morita's e-mail, Morita offers to debrief Schanfield on what went on

at the meeting, writing, "I would like to discuss with you also based on what we

discussed with the Tokyo Audit Dept." (Id. at SCA 018931.)

By e-mail dated March 27, 2007 Yoshiki Manabe wrote to Deloitte employee

Schlimer that "Matsumoti-san [sic] would like to have your comments on the attached

risk assessment done by Arnold." (Ronan Decl. Ex. N.) The first line of the e-mail

reads, "**Please note that this communication is confidential and not to be disclosed to

Arnold**." (Id.) (emphasis in original.)

Schanfield contends that Matsumoto and Tsukada also failed to support him in the

creation of an "Internal Audit Charter" (id. at 86:22-88:14); Matsumoto failed to provide

him with the resources necessary to complete his audit; Matsumoto and Tsukada

continually put off Schanfield's inquiries about hiring additional audit staff or

outsourcing some of the audit work, and stated that they did not want to discuss resources

until after the risk assessment was complete (id. at 367:23-368:19); Rotational employees

failed to provide Schanfield with timely English translations of key documents written in

Japanese (id. at 89:12-13; 159:5-13); and Matsumoto failed to give authorization for risk

assessments and audits to proceed (Pl. Rule 56.1 CntrStmt. ¶ 38).

Defendants disavow Schanfield's accusations and provide a contrasting version of events.

First, Defendants assert that Matsumoto's dissatisfaction with Schanfield's work had nothing to do with Schanfield's reporting of discrimination, but was the result of the over generality and lack of focus in Schanfield's work. At his deposition, Matsumoto testified that Schanfield's risk assessments were "too general, and so I had some doubts as to his thinking on the over all audit . . . There are many areas to be covered, but there was very little portions that referred to specific items." (Matsumoto Dep. Tr. at 188:16-17; 22-24.) Plaintiff denies that Matsumoto ever told him that his work was too general, and asserts that the only specific instructions Matsumoto gave were that plaintiff should stay out of human resource and compliance areas. (Pl. Rule 56.1 CntrStmt. ¶ 34.)

Defendants also point out that there were efforts made by upper management to integrate Schanfield into SCA. Immediately following Schanfield's arrival at the company, Tsukada sent an e-mail to the heads of all SCA departments, explaining plaintiff's role as CIA and instructing everyone to cooperate with requests for information. (Allen Aff'n Ex. 15.) Meetings were also organized for Schanfield to meet with SCA management teams. (Id. Ex. 16.) In a December 20, 2006 e-mail, Matsumoto asked Schanfield for a "prioritized list" of documents Schanfield needed translated. (Id. Ex. 43.) Defendants contend that despite good-faith efforts to help Schanfield assimilate, Schanfield was "too inflexible" in his demands for information. (Defs. Rule 56.1 Stmt. ¶ 50.)

Defendants also assert that it was plaintiff—not them—who bears blame for the failure to hire auditing staff, because in or around November 2006, Schanfield ceased all

recruiting activities. (Schanfield Dep. Tr. at 369:17-21.) Defendants claim that Schanfield stopped recruiting as a way to pressure upper management to sign off on his Internal Audit Charter. According to Schanfield, "The only reason I stopped recruiting was because I realized by that date that the entire company environment was discriminatory in nature and it would be impossible for me to attract and keep high qualified professionals in the company. . . ." (Id. at 370:4-9.)

Defendants also contend that Schanfield was ineffective because he had a "verbose and rambling communication style," and that he was encouraged by senior management to adopt a more focused speaking style, to make his reports more succinct and to be more courteous in his e-mails. (Ferraro Dep. Tr. at 251-56; Paice Dep. Tr. at 97-98; Tsukada Dep. Tr. at 153-58.)

Matsumoto also complained that Schanfield was quick to point to an impropriety without sufficient investigation of the circumstances. (Matsumoto Dep. Tr. at 166-72.)

The March 2007 Risk Report

On or about March 30, 2007, Schanfield produced his final risk assessment report, and distributed it to SCA. (Thompson Decl. Ex. 58.) The document was 90 pages and identified 485 risks that plaintiff estimated would take 735 days to audit. In a March 30, 2007 e-mail announcing the distribution of the document, Schanfield listed a summary of the "top 43" risks facing SCA. On this list were, *inter alia*, the following risks:

- "Human Resource risk exists because the communication process here is quite poor;"

- "Human Resources risk exists because job descriptions for Japanese do not exist in English and are MOU, ones in English contain redundant information, salary bands are confusing, performance appraisal process is weak, goal setting is quite weak;"

- "Governance risk exists because although a Chief Internal Auditor is in place, a department has not been established and an internal audit charger does not exist;"

- "Strategic risk exists because the business plans are in Japanese and are not robust documents;"

- "Governance risk exists because our parent is supposed to be monitoring the risks of its subsidiaries in the United States;"

- "Governance risk exists because there is an imbalance of rotationals to Americans here;"

- "Governance risk exists because we operate completely as a Japanese company. No independent audit committee exists."

(Id. at SCA 034276-77.)

According to Defendants, Schanfield's risk assessment was overly general, too long, not focused, and excessively negative. (Defs. Rule 56.1 Stmt. ¶¶ 57-60.) On April 16, 2007, Matsumoto e-mailed Schanfield,

> I reviewed your risk element report and judged that it can not be utilized as a base for determining an order of priority to conduct the operating program. As I already instructed, please give me a list and rational analysis for top five operations among business departments, subsidiaries business operations, and branch office operations that have highest priority for conducting the operating audit program.

(Allen Aff'n Ex. 55 at SCA 025207.)

The same day, Paice wrote in an e-mail to Rotational employee, Tatsuya Morita, "I feel bad for Arnold [Schanfield] because he wants to do the right thing but Matsumoto-san has no understanding of internal audit or the methodology behind it. That being said, Arnold is in the position he is in because he's failed to sell his function." (Id. Ex. 57 at SCA 046542.)

Schanfield responded to Matsumoto's request for a list of the top priority audits and the time he estimated it would take to complete them. He emailed:

- "Sojitz Motors – compliance, financial, operational – 6-8 weeks;"
- "Turboflo – everything – 4-6 weeks;"
- "Detroit branch – compliance review of code and accounting policies only – 4 weeks;"
- "Houston – same as Detroit – 4 weeks;"
- "Portland – same as Detroit and Houston but also some import/export."

(Id. Ex. 58 at SCA 040240-41.)  Matsumoto forwarded Schanfield's e-mail to Rotational employee Yoshiki Manabe and questioned whether the audits should take as long as Schanfield anticipated.  (Id. Ex. 59 at SCA 056310.)

Defendants also complain that the report did not sufficiently take into account auditing standards in Japan, a deficiency they claimed undermined its usefulness. Plaintiff counters that he utilized the well accepted, so-called "COSO" framework,[2] but that he was precluded from educating Rotational managers about his approach. (Schanfield Aff. ¶ 14.)  Schanfield also asserts that his risk assessment was "typical of most internal audit departments in the United States" and was done with regard to "J-Sox," the compliance rules applicable to Japanese companies, but that it was impossible to do an audit in the United States by the Japanese methodology because there are "fundamental" differences in the approaches.  (Id. ¶¶ 14-15; Pl. Rule 56.1 CntrStmt. ¶ 57.)  Schanfield contends that he attempted to explain the differences to Rotational management a number of times.  (Schanfield Aff. ¶ 15.)

The April 23, 2007 Meeting

At an April 23, 2007 meeting, Schanfield met with Matsumoto to discuss his work product.  The discussion became heated.  At one point, Matsumoto told Schanfield, "This is a Japanese Company and we will do as we please."  (Pl. Rule 56.1 CntrStmt. ¶

---

[2] According to the COSO website, COSO refers to the "Committee of Sponsoring Organizations of the Treadway Commission."  http://www.coso.org/.

94.) Schanfield understood this statement to be in response to Schanfield's reports of discrimination against National employees. (Id.) Schanfield told Matsumoto that he would no longer meet with him unless a third party was present. (Defs. Rule 56.1 Stmt. ¶ 65.) Plaintiff contends that Matsumoto was retaliating against him for the contents of his report and that Schanfield wanted to protect himself. (Pl. Rule 56.1 CntrStmt. ¶ 65.)

In a May 2, 2007 e-mail to an accounting colleague not employed by or associated with SCA, Schanfield reported that he had "a big fight with CEO—I suggested that he should resign and go home!! Now we are not on speaking terms . . . I have a great product that unfortunately our CEO understands less than 1% of." (Allen Aff'n. Ex. 60 at SCA 014352.)

Matsumoto testified that "because [Schanfield] said he could no longer communicate unless a third party was present, then I felt that we could not create an environment in which the normal business could be carried out." (Matsumoto Dep. Tr. at 213:4-8.)

Schanfield's Termination

On May 21, 2007, Schanfield was notified that he was fired effective May 31, 2007. (Defs. Rule 56.1 Stmt. ¶ 67.)

Matsumoto testified that Schanfield was fired because "he did not meet expectations," elaborating that,

> Well, as I have been saying, there were many factors. But the results of the risk assessment itself were not sufficient, and were not as I had expected. And I thought that the risk assessment was going to be very important. And based on the specific risks identified and submitted from the risk assessment, we would decide on the priority of the items to audit. However, the contents of the risk assessment were not directly—sufficiently linked to doing that. . . . the risk assessment that was submitted was too

> broad. And as I said before, some of the information that was included was mistaken. And the input of information, I could see on certain cases, was insufficient. And, in many cases, the problems were not properly defined.

(Matsumoto Dep. Tr. at 209:6-17; 210:4-10.)

Plaintiff contends that, in addition to Matsumoto, Tsukada—whose United States secondment ended two months before in March 2007—also participated in the decision to terminate him. (Defs. Rule 56.1 Stmt. ¶ 69; Pl. Rule 56.1 CntrStmt. ¶ 69; Allen Aff'n Ex. 63.) In response to an April 24, 2007 e-mail from Matsumoto stating, "I think a judgment needs to be made whether it is a wise decision to use him [Schanfield], in light of the future smooth execution of internal auditing," Tsukada provided his take on Schanfield's work at SCA. (Thompson Opp'n Decl. Ex. 52.) At his deposition, however, Tsukada testified that he did not participate in any way in the decision to terminate Schanfield. (Tsukada Dep. Tr. at 187:23-188:2.)

Schanfield was replaced as SCA's CIA by Myriam Miguel, a "white female Argentinean," who was hired in the United States as a National employee. (Defs. Rule 56.1 Stmt. ¶ 71; Paice Aff. ¶ 25.)

On August 15, 2007, SCA received a letter from plaintiff's counsel alleging discrimination and threatening litigation. (Defs. Rule 56.1 Stmt. ¶ 75.)

**B.     Schanfield's Retention and Dissemination of Confidential SCA Documents**

In response to the August 15, 2007 letter, SCA began an internal investigation, which led to its discovery that without SCA's knowledge or permission Schanfield had sent hundreds of confidential or privileged SCA documents from his SCA computer to third parties unassociated with SCA or SCA employees who were not authorized to see such documents. (Defs. Rule 56.1 Stmt. ¶ 76.)

21

Among the documents plaintiff sent to outside third parties were risk assessment documents that listed sensitive information involving legal and business risks to SCA. For example, on April 2, 2007, Schanfield forwarded the e-mail in which he identified the "top 43 risks facing SCA" to Nancy Bakeman—a person who is not and has never been affiliated with SCA. (Paice Aff. Ex. C.)

Schanfield does not deny sending risk assessment documents and information to third-party strangers, but contends that he sent e-mails in SCA's best interests "so that he could retain [the third parties] as audit professionals, and in order to share ideas and seek feedback to generate a high quality work product." (Pl. Rule 56.1 CntrStmt. ¶ 76.)

Upon discovery of Schanfield's e-mails, SCA became very concerned about the dissemination of confidential proprietary information, and believed Schanfield to be in breach of the obligations he assumed when he counter-signed his offer letter in 2006.

Sidley Austin LLP ("Sidley"), Defendants' outside counsel, wrote plaintiff's counsel on August 23, 2007, requesting that plaintiff cease and desist from disclosing and return to SCA all of its proprietary documents currently in plaintiff's possession. (Paice Aff. ¶ 18; Ex. E.)

Thereafter, Defendants' counsel and plaintiff's counsel engaged in unsuccessful settlement discussions. After those discussions proved unfruitful, Sidley made additional requests for the return of the documents in November 2007. (Paice Aff. ¶ 20; Ex. G.)

On December 5, 2007, plaintiff's counsel responded that the documents would not be returned, and that "Mr. Schanfield is fully within his rights to retain copies of information required for the prosecution of his employment discrimination and retaliation action against Sojitz." (Id. Ex. H.)

22

On January 2, 2008, SCA filed counterclaims against plaintiff alleging that his actions with confidential SCA documents breached the contract formed by the Offer Letter he signed in June 2006, breached his duty of loyalty to SCA, and amounted to a misappropriation of trade secrets.

Schanfield maintains that he produced all non-privileged documents through discovery in this action, and that SCA's counterclaims are asserted in retaliation for Schanfield's filing this discrimination lawsuit. (Pl. Rule 56.1 CntrStmt. ¶ 88.)

## II.    Facts Relating to Plaintiff's Class Allegations

In his complaint, Schanfield purports to bring a class action on behalf of all "non-Japanese/Non-Asian" current and former management-level employees of SCA who worked at SCA at any time between October 1, 2004 and the present. Schanfield alleges that "non-Japanese/non-Asian employees" are treated less favorably in regard to the terms of their employment because of their national origin or race.

He asserts discrimination and retaliation claims under Title VII and Section 1981.

The parties cannot agree on the number of people who would be in the proposed class. Schanfield alleges that it is comprised of 46 non-Japanese current and former management-level employees. Defendants correctly point out that this includes Asian-Americans who are not of Japanese descent, and contend that no race discrimination class can be certified (Asian being a race in Defendants' argument). Were persons of Asian descent to be eliminated from the proposed class it would consist of 37 persons.

### A.    Schanfield's Class Claim for Discrimination

Schanfield's allegations of class-wide discrimination are premised on the alleged "imbalances" inherent in the Rotational system.

As discussed above, there are both National employees and Rotational employees working at SCA.

All Rotational employees are employed by SCA's parent company Sojitz. (Abe Aff. ¶¶ 2-3.) During the period of their secondment, which is typically three to five years, Rotational employees are considered employees of SCA as well as Sojitz. The SCA Employee Handbook describes Rotational Employees as follows:

> Rotational Employees: Expatriate Employees possess dual employment status under the United States and International law and practice. Moreover, such expatriate employees, consistent with the practice used by American companies and companies of other developed countries, are paid on a separate basis solely because of their expatriate status. Additionally, as employees of both employees of Sojitz Corporation of America and as on loan employees from their respective home offices, certain SCA policies may not apply, in part or in total, to our expatriate workforce during their temporary foreign assignment at Sojitz Corporation of America.

(Thompson Class Cert. Decl. Ex. G at SCA 000030.)

The Defendants' stated purpose for using the Rotational system is so that Sojitz employees in Japan can "learn about the Parent's overseas operations, educate subsidiaries about the Parent's business policies and methods, report on activities of the subsidiary to the Parent's management, and facilitate Japanese-language communications with the Parent and customers." (Paice Aff. ¶ 5.)

All Rotational employees are Japanese; no non-Japanese/non-Asian person has ever been a Rotational employee. (Matsumoto Dep. Tr. at 57:16-58.) During the relevant time period there were, at all times, approximately 40 Rotational employees working at SCA. (Id. at 23:17-22.)

24

National employees, by contrast, are individuals who live permanently in the United States. They are hired by SCA in accordance with SCA's hiring policies, and are employees only of SCA, a New York corporation. (Defs. Rule 56.1 Stmt. ¶ 10.)

National employees are "predominantly of non-Japanese/non-Asian" descent. However, during the class period, there have been National employees whose ancestry was either Asian-American (race) or Japanese-American (national origin). As of April 2008, over 30% of National managers were Asian-American, and 25% of National managers were Japanese-American.

Schanfield alleges that the "rotational system is the equivalent of a corporate caste system in which the rotational staff—which is exclusively Japanese/Asian—is given preferential treatment over national staff—which is predominantly non-Japanese/non-Asian." (Pl. Class Cert. Mem. at 2.)

He asserts that National employees were treated less favorably in a number of ways:

### 1.    Exclusion from Top Management Positions ("Job Status")

Schanfield alleges that National employees are excluded from the top management positions. He cites the fact that since 2004, ninety to ninety-five percent of the General (i.e. top) Manager positions have been filled by Rotational employees, (Ferrraro Dep. Tr. at 26:8-28:22.) In 2004, 2005 and 2006, there was only one National employee who held the title of General Manager. (Id.; Thompson Class Cert. Decl. Ex. J.) In 2007 and 2008 there were only two, one of whom was Schanfield. (Id.) The positions of CEO, CFO and COO have never been held by a Rotational employee. Hereafter, I will refer to this as the "job status" claim.

The following chart, reproduced from Dr. Killingsworth's March 2, 2009

declaration, provides the breakdown of managers at SCA *as of April 2008*:

| Group | Total | # Asian | % Asian | # Japanese | % Japanese |
|-------|-------|---------|---------|------------|------------|
| All Managers | 65 | 45 | 69.2% | 42 | 64.6% |
| Rotational Managers | 34 | 34 | 100% | 34 | 100% |
| National Managers | 31 | 11 | 35.5% | 8 | 25.8% |

## 2.    Different Rules

Under the Overseas Regulations, Rotational employees are subject to different

disciplinary rules that are inapplicable to National employees. (Thompson Class Cert.

Decl. Ex. D; Abe Dep Tr. at 38:8-40:3.) Rotational and National employees are also

subject to different performance review evaluation standards and process. (Id. at 133:23-

136:20.)

Schanfield contends that, although Rotational staff have the ability to subject

National staff to discipline, the reverse is not true. (Schanfield Class Cert. Aff. ¶ 8.)

SCA Human Resources head Ferraro testified that, although he was not involved with

disciplinary actions, he did not believe that National staff could discipline Rotational

staff. He could not point to any National staff who had the authority to discipline

Rotational staff. (Ferraro Dep. Tr. at 335:10-336:20.)

Rotational employees are evaluated only by other Rotational employees. (Abe

Dep. Tr. at 137:6-24.) Abe testified that this was so because "the rotational staff working

at—working at SCA are Sojitz employees, but the national staff employed at SCA are not

employees of Sojitz; and, therefore, the employer is completely different and so the

system is different." (Id. at 146:5-11.)

26

Abe also testified that "all of the authority regarding personnel at SCA would be held by the head office [in Japan]." (Id. at 149:20-24.)

### 3.    Discrimination in Pay

Schanfield's principal class claim is that Rotational employees are paid more than similarly situated National employees.

The salaries of Rotational employees are set by Sojitz—not by SCA—and are based on the employee's status at Sojitz.  Rotational employee pay may be a function of negotiations with Japanese labor unions.  (Abe Aff. ¶ 3.)  Rotational compensation includes not just base salary but also allowances related to Rotational employees' overseas assignment, such as cost of living adjustments and housing reimbursement.  (Id. ¶ 4.)  Rotational employees are eligible for bonuses under Sojitz's bonus program, as administered in Japan; they do not participate in SCA's bonus program.  (Id. ¶ 5.)

National employees are compensated by SCA and participate in SCA's bonus program.  They do not receive housing allowances or other similar payments.

Expert Reports

Both sides have submitted expert reports on the issue of pay discrimination at SCA.

Plaintiff's expert is Mark R. Killingsworth.  Dr. Killingsworth has a doctorate degree in economics from the University of Oxford, and is a professor of economics at Rutgers University.  (Thompson Decl. Ex. 18.)  Dr. Killingsworth has previously been associated with Princeton, Vanderbilt and Columbia Universities.  (Id.)  He also has significant publishing experience and has testified before government agencies.  (Id.)

Defendants retained Malcolm S. Cohen as their expert. Dr. Cohen has a doctorate in economics from MIT and is the president of the Employment Research Corporation in Ann Arbor, Michigan. (Selzer Aff'n Ex. E.) Cohen previously served as Director of the Institute of Labor and Industrial Relations at the University of Michigan from 1980 to 1993. (Id.) He has written over 50 articles and books on topics related to labor market issues. Dr. Cohen has testified or been a consultant in over 1,000 cases. (Id.)

The record contains several expert reports.

Dr. Killingsworth submitted an initial report, dated September 30, 2008.

During October and November 2008, the parties went back and forth over problems Dr. Killingsworth had identified in the data provided by SCA and plaintiff's counsel requested clarification and supplemental productions from Sojitz. (Ronan Decl. ¶¶ 5-8.)

In October 2008, Dr. Cohen submitted a report commenting on Dr. Killingsworth's initial report on behalf of Defendants. (DeBaun Aff'n Ex. 3.)

On November 17, 2008, Dr. Killingsworth submitted a second report, which contained a regression analysis that was purportedly made possible by a clarification contained in a letter from defense counsel dated October 17, 2008.

Defendants moved in front of Judge Francis to exclude Dr. Killingsworth's second report as untimely. Judge Francis ruled that Defendants could submit a rebuttal report from their expert, Dr. Cohen. (Ronan Decl. ¶ 11.) Dr. Cohen did so on November 20, 2008. (Id.; DeBaun Aff'n Ex. 5.)

Both experts were deposed on November 24, 2008. (Ronan Decl. ¶ 12.) Both experts submitted declarations in connection with the instant motions.

28

The experts—not surprisingly—reach radically different conclusions about pay disparities, but that is entirely a function of who each expert includes in the "similarly situated employee" group. Dr. Killingsworth includes both National and Rotational employees in his calculations, because both types of employees are working at SCA together. He also includes as "salary" the allowances paid to Rotational employees related to their expatriate status. Dr. Cohen, however, posits that it is incorrect to compare Rotational employees to National employees because they have a different employer; he also believes expatriate allowances should be excluded from any analysis of "comparative" compensation as between Rotational and National employees.

<u>Plaintiff's Expert's Findings</u>

In Dr. Killingsworth's first report, he compared the salaries of Rotational managers to National managers. He concluded that, as of April 2008,[3] the average compensation for Rotational management-level employees was $151,215, while the average compensation for National management-level employees was $120,431. (Thompson Class Cert. Decl. Ex. M.) Accordingly, Killingsworth concluded that the average Rotational manager's compensation exceeded that of National managers by $30,783 or approximately 25%. (<u>Id.</u>) This difference was found by Killingsworth to be statistically significant. (<u>Id.</u>)

To measure compensation of Rotational managers Killingsworth used "base salary" plus the overseas allowances, which he obtained from the SCA spreadsheet entitled "Sojitz Net Salary." (<u>Id.</u> at 1 n.3.)

---

[3] According to Dr. Killingsworth, he was only able to use data from the end of April 2008 because there is only one database—called Employease—which provides comprehensive data for both Rotational and National employees and this database only contains data for April 2008. (Killingsworth Class Cert. Decl. ¶ 14.)

To measure compensation of National employees, Killingsworth used "base pay" as given in a spreadsheet entitled the "Employease Database." (Id.)

In his first report, Dr. Killingsworth did not analyze whether Japanese-American or Asian-American National employees were treated more favorably than non-Japanese-American or non-Asian-American employees.

In a second report, dated November 17, 2008, Dr. Killingsworth performed a regression analysis seeking to determine (1) whether there is a pay gap (with "pay" defined to include overseas allowances for Rotational employees, but excluding bonuses) between SCA Rotational managers and SCA National managers; and (2) whether there is a pay gap between SCA Japanese managers and SCA non-Japanese managers, considering both National and Rotational employees. (Thompson Decl. Ex. 63.) In his analysis, Killingsworth considered two groups: (1) the group of all managers at SCA; and (2) the group of SCA managers who were hired after 2003 (i.e. "recent hires"). (Id.)

The results of Killingsworth's analysis were presented in two tables. Table 1 compared pay of Rotational versus National managers.

- Rotational managers made an average of 78.2% more than National managers when their pay (including expatriate allowances) was compared; of recent hires, Rotational managers made an average of 73% more than National managers;

- When Rotational managers were compared to National managers who are the same in terms of (i) years of service; (ii) office location (New York); and (iii) division of the company, they make an average of 77.6% more than National managers; of recent hires, Rotational managers made 78.4% more than National managers;

- When Rotational managers are compared to National managers who are the same in terms of (i) years of service; (ii) office location (New York); (iii) division of the company; and (iv) occupational category, they made an average of 59.8% more than National managers; of recent hires, Rotational managers made an average of 61.2% more than National managers.

In Table 2, Killingsworth compared the gap in pay between Japanese and Non-Japanese managers at SCA. As best as the Court can decipher, "Japanese" for these purposes means Japanese by citizenship; Japanese-American National employees are considered "Non-Japanese" in this analysis. Killingworth found:

- Japanese managers made an average of 57.8% more in base amount than Non-Japanese managers at SCA; considering only recent hires, the difference is 67.2% (Killingsworth Opp'n Decl.);[4]

- When Japanese managers are compared to non-Japanese managers who are the same in terms of (i) years of service; (ii) office location (New York); and (iii) division of the company, they made an average of 61.6% more than non-Japanese managers; of recent hires, the difference is 70.6%;

- When Japanese managers are compared to non-Japanese managers who are the same in terms of (i) years of service; (ii) office location (New York); (iii) division of the company; and (iv) occupational category, they make an average of 44.8% more than non-Japanese managers; of recent hires, the difference is 52.6%. (Id.)

In his March 2, 2009 declaration submitted in support of plaintiff's motion for summary judgment, Dr. Killingsworth performed the same analysis as in his November 17, 2008 report, comparing Asian versus Non-Asian managers. Again, Dr. Killingsworth included in this pool both Rotational and National managers, and he included the overseas allowances in Rotational pay.

- Asian managers made an average of 56.0% more in base amount than non-Asian managers at Sojitz; of recent hires, the difference is 70.4% (Killingsworth Opp'n Decl. Table 4);

- When Asian managers are compared to non-Asian managers who are the same in terms of (i) years of service; (ii) office location (New York); and (iii) division of

---

[4] Killingsworth revised his initial findings for Japanese versus non-Japanese in the tables submitted with his March 2, 2009 declaration in support of plaintiff's opposition to Defendants' motion for summary judgment because of an employee who was left out of the dataset when Killingsworth performed his analysis for his November 17, 2008 report. (Killingsworth Opp'n Decl. n.3.) The numbers shown in the text are the corrected figures.

the company, they made an average of 57.1% more than non-Asian managers; of recent hires, the difference is 72.0%;

- When Asian managers are compared to non-Asian managers who are the same in terms of (i) years of service; (ii) office location (New York); (iii) division of the company; and (iv) occupational category, they made an average of 42.1% more than non-Japanese managers; of recent hires, the difference is 56.2%. (Id.) All of the differences were above the threshold for statistical significance.

(Thompson Decl. Ex. 63.) In none of his analyses does Dr. Killingworth back out the overseas/expatriate allowances to see whether the effect he observed holds if that money is not deemed part of the employee's "base pay."

Defendants' Expert's Findings

In his report of October 15, 2008, Dr. Cohen analyzed Killingsworth's first report, and made several counter-arguments:

- Since Rotational managers are employees of Sojitz—not SCA—and are paid by Sojitz—not SCA—the comparison between Rotational and National managers' pay is not meaningful;

- The data set analyzed by Killingsworth did not encompass July 10, 2006 to May 31, 2007, the time period when Killingsworth was employed by SCA;

- Killingsworth did not take into account the tax consequences of living abroad, the monetary impact of living abroad, including cost of living differences, for Rotational employees;

- Killingsworth included in the pay for Rotational managers the amount these employees received for housing, car, transportation, and overseas assignment allowances, which are provided to Rotational managers for living and working in the United States. Cohen asserts that it would be more meaningful to compare compensation excluding these amounts; and

- Dr. Cohen could not replicate Killingsworth's findings (Dr. Cohen withdrew this criticism after he was provided with data from Killingsworth).

(First Cohen Report, Allen Aff'n Ex. 11.)

Dr. Cohen compared the average pay for Rotational managers,[5] *excluding* the amounts for overseas assignment allowances.  Dr. Cohen found that the average pay in April 2008 for Rotational managers was $97,989, or $115,134 if the CEO and CFO were included.  (Id.) The average pay for National managers was $120,431, which is the very same number Dr. Killingworth used.  Thus, under Cohen's analysis, the pay for Rotationals that is not attributable to their overseas allowances is actually lower than Nationals.

To arrive at these figures, Dr. Cohen relied on data from the "Sojitz Net Salary" database, using the column "Japanese Base Salary," which he adjusted by a cost of living factor and the exchange rate to determine salary for Rotational employees.  Dr. Cohen used data from the Employease dataset and the "National Management Employees" dataset. (Id.)

Dr. Cohen also compared the compensation of National managers on an Asian versus non-Asian and Japanese versus Non-Japanese basis, to see if there was any disparity among the SCA National managers (exclusive of Rotational managers) that could be attributed to race or national origin.  (Id. at n.2.)  Dr. Cohen relied on the data from the Employease dataset and the "National Management Employees" dataset.  (Id.) Cohen found that non-Japanese/non-Asian managers were paid slightly more than Japanese/Asian managers, although the differences were not statistically significant (defined as 0.05%).  (Id.)

Dr. Cohen's second report, dated November 20, 2008, responded to Dr. Killingworth's second report.  (DeBaun Aff. Ex. 5.)  According to Dr. Cohen, his

---

[5] Dr. Cohen initially used the term "employees," not managers in this section.  It is clear, however, based upon the rest of his report, that he meant to refer to "managers."

criticisms of Dr. Killingsworth's first report—except for his assertion that he could not replicate Dr. Killingsworth's results—applied with equal force to Dr. Killingsworth's second report. (Id.) Dr. Cohen reiterated that Dr. Killingsworth's decision to include Rotational employees in his "Japanese" and "Asian" manager groups rendered his results meaningless because Rotational employees are employees of—and have their compensation set by—the parent Sojitz, not SCA. (Id.) Dr. Cohen also criticized Dr. Killingsworth for including expatriate overseas allowances in the calculation of Rotational salaries, and he objected to Dr. Killingsworth's "lump[ing]" of all management employees together because by doing so he includes the CEO and top employees who earn five to six times as much as what some Vice Presidents make. (Id.)

***

Schanfield alleges that SCA was aware of the "inefficiency and detrimental effect of the Rotational system—because of the outside consultant's Internal Audit Questionnaire, and because of Schanfield's own reports—yet refused to take any action." (Pl. Class Cert. Mem. at 3.)

### B.    Schanfield's Class Claim for Retaliation

In his complaint, Schanfield pleads a class claim for retaliation under Title VII and Section 1981. Schanfield's memorandum of law in support of his motion for class certification makes no mention of any such claim, however, and he offers no evidence of how many persons would be members of such a class. Neither does he include a single anecdote from any other employee about any retaliation taken against him/her. The Court deems this aspect of the action abandoned.

**DISCUSSION**

I.    **Summary Judgment Standard**

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Whether any disputed issue of fact exists is for the Court to determine. Balderman v. U.S. Veterans Admin., 870 F.2d 57, 60 (2d Cir. 1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. Celotex v. Catrett, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. Finally, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Industries Co., 475 U.S. at 586. To withstand a summary judgment motion, sufficient

evidence must exist upon which a reasonable jury could return a verdict for the nonmovant.

Whether a reasonable jury could return a verdict for the non-moving plaintiff is determined in cases brought under the various antidiscrimination statutes by using the familiar three-step test announced by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 (1973).[6]

The plaintiff bears the initial burden of proving, by the preponderance of the evidence, every element of a *prima facie* case of discrimination. McDonnell Douglas, 411 U.S. at 802; McMillan v. Examination Mgmt. Servs., Inc., No. 94-2229, 1996 WL 551725, at * 7 (S.D.N.Y. Sept. 27, 1996). If he meets that burden (which has been described as minimal), the burden of production shifts to the defendant, who must come forward with a legitimate non-discriminatory reason for taking the action it took. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55 (1981). However, "The defendant's burden of production also is not a demanding one; [he] need only offer [] an explanation for the employment decision." Bickerstaff v. Vassar College, 196 F.3d 435, 446 (2d Cir. 1999). Once the defendant has come forward with a legitimate business reason for taking the adverse employment action, the burden shifts back to the plaintiff to prove—with hard evidence, not conclusory supposition—that the defendant's articulated rationale is a pretext for discrimination. McDonnell Douglas, 411 U.S. at 804. "A reason

---

[6] The standard for liability for illegal discrimination under Title VII, NYSHRL, NYCHRL and § 1981 is the same. See Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 617 (1999) (applying same standard to Title VII and § 1981); Miller Brewing Co. v. State Div. of Human Rights, 66 N.Y.2d 937, 938-39 (1985) (NYRHL claims are evaluated under the Title VII framework); Leopold v. Baccarat, Inc., 174 F.3d 261, 264 n.1 (2d Cir.1999) (same); Landwehr v. Grey Adver. Inc., 622 N.Y.S.2d 17, 18 (1st Dep't 1995) (applying Title VII standard to NYCHRL discrimination claim). They are therefore evaluated in tandem.

cannot be proved to be a pretext *for discrimination* unless it is shown *both* that the reason

was false, *and* that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks,

509 U.S. 502, 515 (1993) (internal citation omitted) (emphasis in original).

"The ultimate burden of persuading the trier of fact that the defendant

intentionally discriminated against the plaintiff remains at all times with the plaintiff."

Burdine, 450 U.S. at 253 (citing Bd. of Trs. of Keene State Coll. v. Sweeney, 439 U.S.

24, 25, n.2 (1978).

Defendant has moved for summary judgment dismissing all of Schanfield's

personal claims.  The Court will consider that motion before addressing the issue of class

certification.

## II.    Schanfield's Individual Claims

Schanfield asserts claims of discrimination and retaliation under virtually every

applicable civil rights statute: 42 U.S.C. § 1981, Title VII, the New York State Human

Rights Law, Executive Law § 296, and the New York City Human Rights Law.

He claims that he was discriminated against on the basis of national origin and race in

that he was:  (1) paid less than similarly situated Japanese and Asian managers, both in

terms of his base salary and his bonus; (2) not offered opportunities for promotion to jobs

with greater "status" than his own; (3) excluded from various meetings and subjected to

rude behavior and slights; and (4) fired.  He also alleges that he was discharged in

retaliation for his engaging in protected activity:  pointing out to senior executives at

SCA that various aspects of the "rotational" system were discriminatory.

Schanfield asserts his claims against SCA, and individual defendants Matsumoto

and Tsukada.  He did not sue the parent corporation, Sojitz.

**A.    Schanfield's Claim for Discrimination in Terms of His "Job Status" Is Barred by the Friendship, Commerce and Navigation Treaty between Japan and the United States**

Plaintiff's claim that he was denied an opportunity for promotion to higher-ranking executive jobs (or, put otherwise, that he was denied an opportunity to improve his "job status") must be viewed against the backdrop of the Friendship, Commerce and Navigation Treaty between the United States and Japan (the "FCN Treaty"). This solemn compact, entered into by the two sovereign governments as part of their foreign policies, "entitles companies of each nation to employ executives of their own choice in the other one." Fortino v. Quasar, 950 F.2d 389, 391-92 (7th Cir. 1991) (Posner, J.). The FCN Treaty is similar to treaties the United States has entered into with numerous other foreign countries doing business in the United States. See, e.g., Eschelbach v. CCF Charterhouse Credit/Commercial De France, No. 01-1778, 2006 WL 2057205 (S.D.N.Y. 2006).

The FCN Treaty does not grant Japanese corporations operating in the United States blanket immunity against the anti-discrimination provisions of Title VII—including discrimination based on national origin. Avigliano v. Sumitomo Shoji Am., Inc., 638 F.2d 552 (2d Cir. 1981), *rev'd and remanded on other grounds*, 457 U.S. 176 (1982). However, insofar as is relevant to this particular claim, Article VIII(1) of the FCN Treaty authorizes "companies of either Party [i.e., the U.S. and Japan] to engage, within the territories of the other Party . . . executive personnel . . . of their choice." That is to say, under the FCN Treaty Japanese companies operating in the United States are authorized to bring in Japanese nationals to run the company's U.S. business affairs, and

U.S. companies operating in Japan may do the same, without running afoul of any laws of the host country. Thus, the FCN Treaty specifically contemplates discrimination *on the basis of citizenship* in the choice of executive personnel. See, .e.g., <u>Fortino</u>, 950 F.2d at 389. Citizenship discrimination is not prohibited by Title VII, Section 1981 or the New York State Human Rights Law,[7] and it is improper to conflate discrimination based on citizenship (which is not prohibited by law) with discrimination based on national origin (which is prohibited)—even though, as a practical matter, there can be considerable overlap between the two concepts.

In <u>Sumitomo Shoji Am., Inc. v. Avagliano</u>, 457 U.S. 176 (1982), the Supreme Court addressed whether a *New York subsidiary* of a Japanese corporation could invoke Article VIII(1) of the Treaty to defend against a claim of discrimination. The plaintiffs in <u>Sumitomo</u> were employees of defendant Sumitomo Shoji America, Inc. ("Sumitomo America"), a wholly-owned subsidiary of a Japanese parent corporation. Sumitomo America invoked the FCN Treaty as a defense to the allegation of discriminatory employment practices. <u>Id.</u> at 179.

The Supreme Court concluded that "under the literal language of the treaty" Article VIII(1) applies only to "companies of either Party" doing business "within the territories of the other Party." Under Article XXII(3) of the FCN Treaty "the term 'companies' means corporations, partnerships, companies and other associations, whether or not with limited liability and whether or not for pecuniary profit. Companies

---

[7] Discrimination on the basis of citizenship is forbidden by the New York City Human Rights Law, but I need not consider whether that provision is preempted by the FCN Treaty, because plaintiff does not plead any claim of discrimination based on citizenship; his NYCHRL claims, like his federal and state law claims, are limited to national origin and race.

constituted under the applicable laws and regulations within the territories of either Party shall be deemed companies thereof . . . ." Id. at 182. The Court concluded that since Sumitomo America is "constituted under the applicable laws and regulations" of New York," it is "a company of the United States, not a company of Japan." Id. at 182-83. "As a company of the United States operating in the United States, under the literal language of the Article XXII(3), Sumitomo cannot invoke the rights provided in Article VIII(1), which are available only to companies of Japan operating in the United States and to companies of the United States operating in Japan." Id.

However, in Sumitomo, the Supreme Court specifically left open the question of whether a United States subsidiary can invoke "any Article VIII(1) rights *of its parent*" in an anti-discrimination action brought against it. Id. at 289 n.19 (emphasis added).

The Second Circuit does not appear to have considered the precise question of whether a subsidiary of a foreign corporation can invoke its parent's treaty rights when it is sued for discrimination. However, other courts have. Beginning with the Seventh Circuit's decision in Fortino, 950 F.2d at 393, most have concluded that a United States subsidiary can invoke the FCN Treaty rights on behalf of the Japanese parent if the parent corporation dictated the conduct at the subsidiary that is alleged to be discriminatory.

Fortino's facts are uncannily similar to the facts in this case. Quasar, an American subsidiary of Matsushita, a Japanese corporation, was charged with discriminating against American executives (in favor of seconded Matsushita executives) on the basis of, *inter alia*, national origin. Id. at 392. The court described the situation of the temporary Japanese employees thus:

> They are employees of Quasar and are under its day-to-day control
> but they also retain their status as employees of Matsushita and are

40

> designated as "MEI [Matsushita Electric Industrial] personnel.
> Quasar does not evaluate their performance-Matsushita does, and
> also keeps their personnel records and fixes their salaries and
> assists with the relocation of their families to the United States
> during the period of the assignment.

Id. In a Quasar reorganization, none of the Japanese expatriate employees was

terminated, while American employees of non-Japanese descent were terminated. Id.

Two out of three of Quasar's Japanese-American employees were also discharged,

although they were not at the executive level. Following these terminations, the

expatriate employees received an increase in their compensation; no similar increase was

offered to American executives who remained at the company. Id.

Three of the American executives sued, alleging that the reorganization that

favored Japanese over American employees, as well as the subsequent salary situation,

were both discriminatory. Quasar defended on the ground that both of the challenged

decisions had been made by Matsushita, not by the U.S. subsidiary, and that the parent

company was acting within its rights under the FCN Treaty.

The court held that Quasar could invoke Matsushita's rights under the FCN

Treaty because Matsushita had directed whatever allegedly discriminatory conduct

occurred. Judge Posner reasoned as follows:

> A judgment that forbids Quasar to give preferential treatment to
> the expatriate executives that its parent sends would have the
> same effect on the parent as it would have if it ran directly
> against the parent: it would prevent Matsushita from sending its
> own executives to manage Quasar in preference to employing
> American citizens in these posts.

Id. at 393. The court refused to opine on "whether the treaty of friendship in effect

confers a blanket immunity from Title VII," because the record contained no evidence of

national origin discrimination: "[T]here is no evidence of discrimination here save what

is implicit in wanting your own citizens to run your foreign subsidiary." Id. The court

explained:

> No favoritism was shown Quasar's Japanese-American employees, which would have been true national-origin discrimination since they are not citizens of Japan; and whatever his ancestry, [plaintiff] would have had the irremediable disability of not being an executive of Matsushita. That was the real source of "prejudice" against him, and it is not prejudice based on national origin. It may have had a similar effect to national-origin prejudice (though not identical—for look what happened to Quasar's Japanese-American employees) because of the correlation between citizenship and national origin, but the Treaty prevents equating the two forms of discrimination or, what as a practical matter would amount to the same thing, allowing the first to prove the second.

Id.

Other courts have followed Fortino's reasoning on similar facts.  In Bennett v.

Total Minatome Corp., 138 F.3d 1053, 1058-59 (5th Cir. 1998), the Fifth Circuit held that

a wholly-owned subsidiary of a French corporation could invoke its parent's rights under

the Convention of Establishment between the United States and France (the

"Convention")—an agreement equivalent to the FCN Treaty.  In Bennett, the temporary

French expatriate employees directed a corporate restructuring that resulted in the

transfer, demotion and termination of non-French managers because such decisions were

dictated by the parent company.  The Fifth Circuit, like the Seventh Circuit, noted that the

only evidence of discrimination in the record was evidence of discrimination based on

citizenship: "We need not decide whether [the Convention] immunizes French

companies to the extent urged [by the defendant] because the record contains no evidence

that [the plaintiff] was discriminated against on any basis other than his citizenship." Id.

See also Papaila v. Uniden Am. Corp., 51 F.3d 54 (5th Cir. 1995).

However, "Even when a foreign employer operating in the United States can invoke a Friendship, Commerce and Navigation treaty to justify employing its own nationals, this does not give [the employer] license to violate American laws prohibiting discrimination in employment." Morelli v. Cedel, 141 F.3d 39, 43 (2d Cir. 1998) (internal citations and quotation marks omitted). And no court since Fortino has suggested that an international treaty protects a subsidiary from liability for employment decisions dictated by its parent when the decisions are based on anything except citizenship. See, e.g., Santerre v. Agip Petroleum Co., Inc., 45 F. Supp. 2d 558 (S.D. Tex. 1999).

In this case, the FCN Treaty bars plaintiff from contending, as he does, that he was prevented from ascending to a higher management position at SCA on the basis of racial or ethnic (national origin) discrimination. Sojitz, a Japanese corporation, has chosen to send its own employees to work in top management positions at its wholly-owned subsidiary, SCA. The Treaty allows it to do so. While this may block Schanfield (and other National employees) from achieving a higher position in the company (not that he ever applied for one), any discrimination in this regard is entirely a function of citizenship.

The undisputed evidence demonstrates that plaintiff was one of the highest ranking (if not the highest ranking) National employees at SCA. Indeed, in his brief opposing the motion for summary judgment, plaintiff admits that nearly all SCA employees at his level or higher were Rotational employees. (Pl. Br. at 17.) It thus appears that the only positions at SCA of higher rank – positions to which plaintiff could have been promoted had he applied for promotion (which he did not) – were the very

type of senior executive position that Sojitz was free, under the FCN Treaty, to fill with employees from its Japanese headquarters without offending any United States anti-discrimination law.

Significantly, plaintiff offers no evidence tending to suggest that Japanese-American or Asian-American employees (i.e., persons with ethnic heritages similar to that of Rotational employees who are not citizens of Japan) occupied top management positions at SCA or that they were eligible to do so. As Judge Posner observed, it is evidence of that sort that would suggest discrimination based on national origin or race; in the absence of such evidence, only discrimination based on citizenship can be fairly inferred.

**B.   Schanfield's Claim of Pay Discrimination Based on Race/National Origin Must Be Dismissed Because He Fails to Raise a Genuine Issue of Fact That Similarly Situated Employees Are Paid Differently Because of Either Race or National Origin**

Schanfield's principal claim relates to the alleged pay disparity between Rotational and National employees. Plaintiff's expert analysis, summarized above, showed a statistically significant gap in compensation between National and Rotational employees. However, plaintiff's expert obtained that result by comparing the base (salary) compensation of National employees against Rotational employees' salary plus special overseas allowances for X, Y and Z. Furthermore, Rotational employees' compensation is set by Sojitz, their ultimate employer, while the pay of National employees (of whatever race or ethnicity) is set by SCA, their only employer. Thus, the two types of employees are not similarly situated.

### 1.    Rotational and National Employees Are Not Similarly Situated

Where a plaintiff, as is the case here, seeks to raise an inference of discrimination by offering proof of disparate treatment of other employees, "those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." McGuinness v. Lincoln Hall, 263 F.3d 49, 54 (2d Cir. 2001). In other words, "To be 'similarly situated,' the individuals with whom [plaintiff] attempts to compare herself must be similarly situated *in all material respects*." Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997) (internal citations omitted) (emphasis added).

Ordinarily, the determination of whether employees are similarly situated is a question of fact to be decided by the jury. Feingold v. N.Y., 366 F.3d 138, 154 (2d Cir. 2004). "This rule[, however,] is not absolute . . . and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." Albury v. J.P. Morgan Chase, No. 03-2007, 2005 WL 746440, at *10 (S.D.N.Y. Mar. 31, 2005) (citing Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 n.2 (2d Cir. 2001)).

In this case, the only employees whose race and/or ethnicity differs from plaintiff's and who were allegedly treated more favorably than he in terms of compensation are Rotational employees. But Rotational employees are not similarly situated to Schanfield and other National employees in all material respects.

First and foremost, Schanfield and the other National employees were employed by SCA, while the Rotational employees with whom plaintiff's expert compared their

compensation are employed by Sojitz, which assigns them to their positions and sets their compensation.

Second, it is undisputed that compensation decisions for Rotational employees—including the fact and amount of any special overseas allowances—were made in Japan by executives of Sojitz, while pay for National employees was determined at SCA. This is true even though the Rotational employees are considered by SCA to be jointly employed by both companies. (Defs. Rule 56.1 Stmt. ¶¶ 8-10.)

It follows inexorably from these undisputed facts that, because the alleged pay discrimination results from pay decisions that are directed by Sojitz, SCA may invoke Sojitz's rights pursuant to the FCN Treaty, as long as the pay discrepancy is attributable entirely to citizenship—which it is.

Schanfield has presented no evidence tending to suggest that the pay differential his expert identifies is anything other than a function of overseas assignment. It is undisputed that National employees who are Japanese and/or Asian are not paid more than SCA employees who are not of Japanese or other Asian ancestry. Put another way, Japanese/Asian National employees of SCA do not receive any of the benefits provided to Rotational employees in terms of pay; SCA's Japanese-American and Asian-American employees are just as disadvantaged by the extra pay given to the Rotational employees as Schanfield is. Schanfield identifies no SCA employee of Japanese or Asian ancestry who is similarly situated to him—that is, who is not a Japanese citizen and an employee of Sojitz—and who was paid more than he was.

If SCA were discriminating on the basis of race and national origin, one would expect to see some evidence that Japanese/Asian National employees enjoyed some

advantage over Caucasian National employees or African-American National employees or Hispanic National employees. There is no evidence of any such favoritism.

There is no evidence in the record before this Court that any National employees are Japanese citizens, although there is evidence that at least eight managers employed by SCA are Americans of Japanese national origin. (First Cohen Report, Allen Aff'n Ex. 11 at 5-6.) Since all Rotational employees are Japanese citizens, and there is no evidence that any National employees are Japanese citizens, it appears that the payment of special allowances to Rotational employees to counteract the economic impact of their overseas assignment – assuming *arguendo* that such payments constitute discrimination – is discrimination on the basis of citizenship. Federal and state discrimination laws do not prohibit discrimination on the basis of citizenship.[8]

Schanfield actually concedes that the allegedly discriminatory distinctions he is concerned with have to do with Rotational status. At his deposition, Schanfield testified that he was discriminated against "for no reason other than I was not a Japanese *rotational*." (Allen Aff'n Ex. 3, Schanfield Dep. Tr. at 653:14-16.) Schanfield also testified that the Japanese and Asian National employees were no better off than he vis a vis Rotationals:

> Q: . . . Now, there were people on national staff who were not Caucasian Americans, correct?
>
> A: Yes

---

[8] The NYCHRL does prohibit discrimination on the basis of citizenship. N.Y.C. Admin. Code 8-107(1). However, Schanfield did not make a claim for discrimination on the basis of citizenship, and, in any event, such a claim would have been preempted by the FCN Treaty. See U.S. Const. Art. VI, cl. 2; U.S. v. Pink, 315 U.S. 203, 230-31 (1942) ("[S]tate law must yield when it is inconsistent with or impairs the policy or provisions of a treaty.").

Q: Do you consider them Americans for purposes of this imbalance calculation or did you consider them to be something else?

A: I would—I would have included them in the non-Japanese.

Q: Okay.  So your assistant, for example, Nadia Reyes?

A: Yes.

Q: Was she of Asian origin?

A: She was of Asian origin.  That's correct.

Q: And you would consider her to be American national staff?

A: Yes.

Q: Okay.  So the distinction doesn't have to do with what your ethnic background is, it has to do with whether your national or rotational background . . . —the distinction you're drawing here?

A: Yes.

(Schanfield Dep. Tr. at 151:12-152:14.)

Schanfield's pleading reflects that his real complaint is with advantages that he perceives are given to Rotational employees.  The complaint is replete with allegations of pay disparities between National and Rotational employees.  (See, .e.g., Second Am. Compl. ¶ 16 ("the Japanese/Asian *rotational* staff are paid significantly more compensation than their national staff counterparts . . . .").)  Schanfield's argument for certification of a pay and benefits class is premised upon differentiation between Rotational and National staff.  (See, e.g., Pl. Class Cert. Mem. at 6 ("*rotational* employees are entitled to a level of compensation and benefits that is not reciprocated for national staff employees . . . .").)

Judge Posner noted in <u>Fortino</u> that discrimination on the basis of citizenship "may have had a similar effect to national-origin prejudice . . . because of the correlation

between citizenship and national origin." That is clearly correct. However, "[T]he treaty prevents equating the two forms of discrimination or, what as a practical matter would amount to the same thing, allowing the first to be used to prove the second." Fortino, 950 F. 2d at 393. In this case, the error in equating citizenship distinctions with national origin discrimination is laid bare by the fact that *Japanese-American* National employees enjoyed no advantage over National employees with different ancestry. Defendants' expert, Dr. Cohen, compared the base pay (salary only) of Japanese-American and Asian-American National employees to National employees with other racial backgrounds. (First Cohen Report, Allen Aff'n Ex. 11 at 5-6.) He found no statistically significant evidence that National managerial employees who were of Japanese or Asian extraction made more money than their non-Japanese or non-Asian counterparts. In fact, the pay for non-Asian and non-Japanese National employees was actually slightly higher for two of the three managerial job grades Dr. Cohen looked at, though this difference was not statistically significant. (Id. at 7.)

Thus, because the undisputed evidence demonstrates that the discrimination Schanfield alleges in pay is really based on citizenship, plaintiff's contention that SCA discriminated against him in terms of his compensation on the basis of national origin and race must be dismissed.

> **2. Because the Rotational and National Employees Schanfield Compares Are Not Similarly Situated, Plaintiff's Expert's Report Fails to Raise Any Genuine Issue of Fact Concerning Pay Discrimination Based on Race or National Origin**

Plaintiff's case for his claim that non-Japanese/non-Asian employees are paid more than their non-Japanese/non-Asian counterparts at SCA rests entirely on the statistical analysis performed by his expert, Dr. Killingworth. But Dr. Killingworth's

analysis is fatally flawed in two ways.  Not only did he compare the compensation packages of employees who were not similarly situated – Rotational employees versus National employees – but he included in his definition of a Rotational employee's "base pay" certain allowances that are attributable to the expatriate status of the Japanese citizens who serve as Rotationals.

Rotational employees also incur special costs associated with their overseas secondment.  Those costs are reflected in their compensation.  National employees are not expatriates; they do not incur similar costs.  This difference also renders Rotational and National employees inherently dissimilar – and makes it impossible to build a pay case based on analysis that includes overseas allowances in Rotational employee pay.

The case of Eschelbach v. CCF Charterhouse/Credit Commercial De France, No. 01-1778, 2006 WL 2057205, at *6 (S.D.N.Y. July 25, 2006), is on point.  In that case, an American employee brought suit against his former employer alleging, *inter alia*, that he was discriminated against because of his national origin.  The plaintiff argued that the employer treated expatriate French employees seconded from the employer's headquarters in France to the United States office more favorably than permanent employees of the United States office.  Id.  Plaintiff objected, *inter alia*, to the perquisites that were offered exclusively to French employees, which included:  salary add-ons for relocation expenses, United States school tuition, travel expenses, continuation of French pension funds, social insurance, and unemployment insurance.  Id. at *7.

The court concluded that the French expatriate employees, as seconded workers from France, were not similarly situated to plaintiff:

> Even if [plaintiff] was an extraordinarily valuable employee, the
> evidence still compels the conclusion that he and the French

> employees assigned to the New York branch office were not
> similarly situated. At the outset, the comparator employees had
> been asked to leave countries where they were then working to
> accept a temporary assignment in the United States. Their
> secondment agreements dealt with the issues created by these
> international transfers, such as the need to continue their French
> pension coverage, in a manner which differed not only from CCF's
> treatment of its other United States employees, but also from its
> treatment of its other employees in France. Eschelbach, by
> comparison, had not been asked to move to a foreign country, did
> not face a potential differential in benefits as a result of an
> international transfer, and did not have a job which was intended to
> be temporary at the time that it was offered to him.

Id. at * 8.

The same logic applies here. Schanfield's claim of pay discrimination depends on

comparing his pay to the total compensation of rotational employees, *including their*

*special overseas allowances.* But including those allowances leads to an unfair

comparison. The Rotational employees who were seconded temporarily from Sojitz to

SCA were paid, not just salary, but allowances similar to those in Eschelbach, for travel,

housing, schooling and transportation. Schanfield—as a National employee—did not

face such expenses, so it is not surprising that he was not provided with similar

allowances. When the special overseas allowances are backed out of the comparative pay

analysis (which Defendants' expert did), there is no evidence of discrimination in favor

of the Rotational employees. To the contrary, even when the top two officers are

included in the analysis, National managers made an average of $5,000 per year more

than Rotational managers.

Again, it bears noting that when the pay of National employees who are not of

Japanese or Asian ancestry is compared to that of National employees who are Japanese-

American or Asian-American, the data show no preference for employees of Japanese or

Asian ancestry. Those employees are similarly situated: all are managers, all are employed only by SCA, all are in non-temporary jobs, and none is seconded to a foreign country or "on loan" to a foreign (United States) corporation. Dr. Cohen, Defendants' expert, found no statistically significant difference in pay between Japanese/Asian and non-Japanese/non-Asian employees, and some non-Japanese and non-Asian managers (including plaintiff) were actually paid *more* on average than their Japanese and Asian counterparts. The fact that no favoritism in pay was shown to Japanese/Asian National employees negates an inference that race and national origin discrimination were behind discrepancies in pay at SCA. See Fortino, 950 F.2d at 393.

Plaintiff cites Goyette v. DCA Advertising, 828 F. Supp. 227 (S.D.N.Y. 1993), for the proposition that the issue of discriminatory pay should go to the jury. In Goyette, 22 Americans (of non-Japanese descent) were fired out of a total work force of 144 employees. These plaintiffs were replaced by either Japanese-American or Japanese expatriate employees sent from the former employer's parent company in Japan. Id. at 230-32. Five of the discharged employees brought an action against their former employer and its Japanese parent corporation alleging national origin discrimination. The plaintiffs alleged that the firings reflected their former employer's preference for Japanese workers over non-Japanese workers, and offered statements from Japanese management employees expressing such a preference. Id. at 233-34. Plaintiffs also introduced evidence suggesting that the employers retained employees of Japanese ancestry (both American and expatriate) who were less qualified than plaintiffs. As evidence of disparate treatment, plaintiffs introduced evidence that American employees of Japanese ancestry were more often included in social and work meetings. Finally,

plaintiffs introduced evidence that Japanese expatriate employees received certain benefits that were unavailable to non-Japanese employees, including club memberships, car services and check cashing services. Id. at 234. The defendants' motion for summary judgment was denied, at least as to the issue of whether plaintiffs experienced a discriminatory discharge. Id. at 235.

In Goyette, however, the plaintiffs had introduced evidence that the employer offered special treatment to all employees of Japanese ancestry, including expatriate *and* Japanese-American employees. The plaintiffs also did not rely on allowances paid to compensate expatriates for the additional cost of living and working temporarily in a foreign country to establish compensation discrimination; instead, they relied on evidence about forms of remuneration that were in theory applicable to all employees, foreign and domestic, such as club memberships.

In this case, by contrast, Schanfield offers no evidence that SCA shows any partiality toward National employees of Japanese or Asian ancestry. Indeed, as discussed in the previous section, Schanfield pleaded in his complaint, and admitted at his deposition, that he believes National employees of Asian descent were discriminated against along with National employees of non-Asian descent. (Schanfield Dep. Tr. at 151:12-152:14.) And Dr. Cohen's analysis – the only analysis to address this highly pertinent question – shows that this was in fact the case. (First Cohen Report, Allen Aff'n Ex. 11 at 7.)

Shane v. Tokai Bank, Ltd., No. 96-5167, 1997 WL 639255 (S.D.N.Y. Oct. 15, 1997), is also not persuasive counter-authority on the issue of pay discrimination. In Shane, 1997 WL 639255, at *1, two terminated employees sued their former employer,

Tokai Bank Ltd. ("Tokai"), alleging race and national origin discrimination and, as to one

plaintiff, sex discrimination.  It appears that both the expatriate employees and the

domestic employees were employed by the same company, which is not the case here.

As part of his pay discrimination claim, Schanfield contends that he was unfairly

denied a bonus during his tenure at SCA.  However, Schanfield has failed to raise a

genuine issue of fact as to this aspect of his claim.  To begin with, Schanfield admits that

he was never promised a bonus or any specific amount of incentive compensation when

he was hired; his offer letter said that incentive compensation would be negotiated later.

(Offer Letter ¶ 2.)  Schanfield alleges that he believed "discussions would continue" after

he was hired, and he argues that Defendants knew he had a more lucrative counter-offer

pending at the time he signed the offer letter.  But Schanfield has only himself to blame if

he turned down a more lucrative counter-offer without nailing down the details of any

incentive compensation to which he might be entitled.  SCA's failure or refusal to

continue those discussions, without more, is not evidence of racial or ethnic

discrimination.

And there is nothing more in the record to bolster plaintiff's claim.  Schanfield

alleges that the failure of SCA to pay him a bonus during his ten-month tenure at the

company is suggestive of racial animus, but his "evidence" consists of a bare allegation

that Japanese and Asian employees (without specifying National or Rotational) were

"eligible" for a bonus.  (Pl. Rule 56.1 CntrStmt. ¶ 21.)  He does not offer evidence that

Japanese or Asian national employees were paid bonuses, and the terms of his offer letter

suggest that Schanfield "could have" received a bonus as well.  No evidence whatsoever

supports a claim that the failure to pay him a bonus was predicated on either Schanfield's

race or his national origin. "Vague references that plaintiff's treatment was inferior to that afforded to unidentified comparators are insufficient to withstand a motion for summary judgment." Watson v. Arts & Entertainment Television Network, No. 04-1932, 2008 WL 793596, at *16 (S.D.N.Y. Mar. 26, 2008).

Defendants are, therefore, entitled to summary judgment dismissing plaintiff's claim that he was discriminated against on the basis of his race and/or national origin in terms of his compensation.

### C.    Schanfield Has Not Raised a Genuine Issue of Fact Concerning His Claim That He Was Fired on the Basis of His Race and/or National Origin

In connection with Schanfield's discriminatory termination claim, the Court will assume that Schanfield has met the minimal *prima facie* burden, and that Defendants have articulated a legitimate business reason for taking the actions they took—i.e., dissatisfaction with Schanfield's work—and proceed directly to the "ultimate" question of pretext. This approach is well accepted, since the question of whether a plaintiff has raised an inference of discrimination is often inter-mingled with the issue of pretext. See, e.g., Shafrir v. Assoc. of Reform Zionists of Am., 998 F. Supp. 355, 360 (S.D.N.Y. 1998).

Schanfield argues that his firing was discriminatory on the basis of race and national origin because "were he Japanese or Asian, he would not have been terminated, because even the CEO lacks the authority to terminate Japanese/Asian staff at Mr. Schanfield's level, *because virtually all of them are rotational staff.*" (Pl. Opp'n at 17.) In other words, Schanfield is arguing that his termination was part of the disparate

treatment of National versus Rotational staff in terms of matters like salary, discipline and termination.

But, as discussed, Schanfield is not similarly situated to Rotational employees, who retain their status as Sojitz employees, and whose terms of employment (including discipline and termination) are determined by Sojitz in Japan, not by SCA in the United States. Therefore, the fact that he could be fired by SCA whereas the members of the Rotational staff could not raises at most an inference of non-actionable citizenship discrimination – not discrimination based on race or national origin. Again, Schanfield fails to raise a genuine issue of fact because he points to not a single Japanese-American or Asian-American manager who was or could have been fired only by executives at Sojitz in Japan.

However, as will be seen below, the dismissal of Schanfield's claim for discriminatory discharge does not mean that his claim for retaliatory discharge must meet the same fate.

> **D.    Schanfield Has Raised Genuine Issues of Fact Concerning His Claim That He Was Discriminated Against in Other Terms and Conditions of Employment Because of His Race and/or National Origin**

What remains of Schanfield's individual claim of discrimination is his claim based on the various slights and indignities he experienced as an SCA employee and his termination claim. He contends that he was discriminated against in the terms and conditions of his employment because he was not included in certain meetings that he should have attended, was subjected to berating and yelling by Matsumoto, and had to report to lower level Rotational employees.

"Not everything that makes an employee unhappy is an actionable adverse action." Castro v. N.Y. City Bd. of Educ., 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12,

1998). The question is whether the slights identified by Schanfield evidence a material adverse employment action, which is defined as "a change in working conditions [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities." Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000).

On all counts, the evidence of material adverse employment action is, at best, equivocal. For example, Schanfield's claim that he was excluded from meetings includes a claim that he was not present at a meeting where his job performance was discussed. But Title VII and the NYSHRL do not impose on employers any requirement that employees be asked to sit in when their supervisors evaluate their job performance and decide whether or not to fire them. Schanfield offers no evidence that SCA managers of Japanese or Asian ancestry were asked to attend meetings where their job performance was discussed. After another meeting from which Schanfield was allegedly "excluded," he admits that he was offered a briefing about what went on at a third meeting he did not attend.

As to Schanfield's allegation that he was yelled at and "berated" by Matsumoto, such behavior rises to the level of an adverse employment action if it creates a hostile work environment. The Supreme Court has cautioned that anti-discrimination laws do not create a "general civility code" for the American workplace. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998); see also, e.g., Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000); Quarless v. Bronx-Lebanon Hosp. Ctr., 228 F. Supp. 2d 377, 385 (S.D.N.Y. 2002). And "behavior that simply leaves a plaintiff feeling frightened or threatened does not constitute an adverse employment action." O'Dwyer v. Snow, No. 00-8918, 2004 WL 444534, at *10 (S.D.N.Y. Mar. 10, 2004).

Finally, Schanfield's contention that he had to informally "report to" Rotational employees – particularly Hisashi Akita, who was assigned to advise plaintiff about Japanese audit standards and methodology (Schanfield Aff. ¶ 8) – does not seem terribly out of place. It is hardly surprising that a subsidiary of a Japanese company would utilize one of its Japanese parent's employees to work with the American auditor. Nor does it seem necessarily out of line that Schanfield was required to work collaboratively with certain lower-level Rotational employees.

However, just because there is a basis to conclude that these are petty and insignificant grievances does not mean plaintiff's discrimination claim can be summarily dismissed on motion – particularly since Matsumoto was quoted as telling plaintiff that SCA could treat National employees as it pleased because it was a Japanese company. The New York City Human Rights Law does not require that an adverse employment action be "material." It is possible that plaintiff is here trying to assert a claim for a hostile work environment. And while he does not articulate that claim well, or with precision, that is exactly the sort of claim that should go to a jury. The motion for summary judgment dismissing this aspect of plaintiff's discrimination claim is denied.[9]

### E. Defendants' Motion for Summary Judgement Dismissing Schanfield's Individual Claim for Retaliation Is Denied

#### 1. Retaliation Claim under Title VII, § 1981, NYSHRL

Title VII prohibits employers from discriminating against an employee who "has opposed any practice made an unlawful employment practice" or "has made a charge,

---

[9] The claim against the individual defendants for aiding and abetting under the New York State Human Rights Law will also go to trial.

testified, assisted, or participated in any manner in an investigation, proceeding, or

hearing . . . ." 42 U.S.C. § 2000e-3(a).

Section 1981 has also been held to encompass claims of retaliation. CBOCS

West, Inc. v. Humphries, --- U.S. ----, ----, 128 S.Ct. 1951, 1955, 170 L. Ed. 2d 864

(2008).

The NYSHRL also prohibits retaliation for engaging in protected activities,

stating that it is an unlawful discriminatory practice,

> For any employer, labor organization or employment agency to
> discharge, expel or otherwise discriminate against any person
> because he or she has opposed any practices forbidden under this
> article or because he or she has filed a complaint, testified or
> assisted in any proceeding under this article.

NYSHRL § 296(1)(e).

The standard for retaliation under NYSHRL § 296 is also the same as Title VII.

Miller Brewing Co. v. State Div. of Human Rights, 66 N.Y.2d 937. 938-39 (1985);

Leopold v. Baccarat, Inc., 174 F.3d 261, 264 n.1 (2d Cir. 1999); Cruz v. Coach Stores,

Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000).

To make out a *prima facie* case of retaliation, under Title VII, Section 1981 and

NYSHRL, a plaintiff must show:  (1) participation in a protected activity known to

Defendants; (2) an adverse employment action; and (3) a causal connection between the

two. See, e.g., Watson v. Paulson, 587 F. Supp. 2d 554, 556 (S.D.N.Y. 2008); Burlington

Northern & Santa Fe Ry. v. White, 548 U.S. 53, 68-69 (2006) (citations and quotations

omitted); Pugni v. Reader's Digest Ass'n, Inc., No. 05 Civ. 8026, 2007 WL 1087183, at

*22 (S.D.N.Y. Apr. 9, 2007).

(i)    *Did Schanfield Participate in a Protected Activity Known to Defendants?*

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000). It is "clear" that a protected activity need not "rise to the level of a formal complaint in order to receive statutory protection." Id. Protected activities encompass "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990).

A plaintiff "need not establish that the conduct [he] opposed was in fact a violation of [the law]," Bush v.Fordham Univ., 452 F. Supp. 2d 394, 416 (S.D.N.Y. 2006) (citing Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir.1988); see also Davis v. State Univ. of N.Y., 802 F.2d 638, 642 (2d Cir.1986), but he must demonstrate a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Sumner, 899 F.2d at 209.

The record demonstrates that Schanfield's risk assessment reports included references to potential issues of discrimination, and that Defendants received such reports.

Defendants contend, however, that because reporting risks is an activity that is within the scope of an employee's duties it cannot be considered "oppositional," and is, therefore, not protected activity in Schanfield's case.

That argument, which relies on older precedents, seems foreclosed by the Supreme Court's recent decision in Crawford v. Metro North Gov't of Nashville, 129

S.Ct. 846, 851 (2009), where the Court considered the meaning of the term "oppose" in Title VII's anti-retaliation provision. The plaintiff in <u>Crawford</u> did not make any sort of complaint about discrimination to her employer; she merely answered questions during an investigation into the conduct of another employee. She was asked if she had observed any inappropriate behavior by one Hughes; her answers revealed that Hughes had engaged in sexual harassment. Shortly thereafter, Crawford filed (ostensibly for embezzlement); the employer took no action against Hughes. Crawford sued, claiming that she was terminated in retaliation for opposing sexual harassment in the workplace. Defendant argued that plaintiff's activity could not be considered "oppositional."

The Supreme Court disagreed, holding, "When an employee communicates to her employer a belief that the employer has engaged in . . . a form of discrimination, that communication virtually always constitutes the employee's *opposition* to the activity." (<u>quoting</u> Brief of United States as Amicus Curiae) (emphasis and ellipses in original). The Court did not allude in its opinion to decisions holding that activity is not "oppositional" if it is part of one's job to complain about it, and courts have long acknowledged the difficult situation of reconciling the language of Title VII with the dismissal of an employee whose job it is to handle discrimination complaints.[10] However, the Supreme Court's decision is sweeping in its language, and it would be utterly inconsistent with it to conclude that Schanfield's activities – at least when (as he testified) he continued to bring the discriminatory aspects of the Rotational system to the attention of his superiors after being told not to – were not "oppositional," whether they were made in the context of his job or not. I thus decline to accept Defendants' argument

---

[10] The employees in those cases were generally members of the Human Resources staff, not internal auditors.

that Schanfield's retaliation complaint must be dismissed because it was his job as an internal auditor to identify litigation risks.

### (ii)    Did Schanfield Suffer an Adverse Employment Action?

Plaintiff alleges that both his termination and the Defendants' filing of counterclaims against him in this lawsuit are adverse employment actions. The former is clearly an adverse employment action, and Defendants do not suggest otherwise. They do, however, dispute plaintiff's characterization of the counterclaims against him in this action as an adverse employment action. The Court agrees. While I can conceive of cases in which being sued would qualify as an adverse employment action, in this case the counterclaims have merit; I can see nothing in Title VII or any other anti-discrimination statute that should prevent an employer from bringing a legitimate claim against a current or former employee simply because that employee has complained about what the employee believes to be discriminatory behavior. Schanfield also contends that his exclusion from meetings, his failure to receive English translations, and the fact that his work was overseen by Japanese Rotationals were adverse employment actions perpetrated against him to retaliate for his bringing the issue of discrimination to SCA's attention. As was discussed above, a jury will decide if those consequences were sufficiently adverse to support a retaliation claim.

The standard for retaliation claims under the NYCHRL differs slightly from the Title VII standard in that there is no requirement in the New York City Code that the employee suffer a *materially* adverse action as a result of retaliation. Instead, the NYCHRL makes clear that it is illegal for an employer to retaliate in "any manner." Selmanovic v. NYSE Group, Inc., No. 06-3046, 2007 WL 4563431, at *5 (S.D.N.Y. Dec.

21, 2007); Sorrenti v. City of N.Y., No. 113037-02, 2007 WL 2772308, at *4 (N.Y. Sup.

Ct. Aug.16, 2007) (unreported); Farrugia v. N. Shore Univ. Hosp., 820 N.Y.S.2d, 718,

727 (N.Y. Sup. Ct. 2006). Under this looser standard, the actions identified by plaintiff

(other than the commencement of meritorious counterclaims) qualify as adverse for

purposes of making out a *prima facie* case.

> ### (iii)    Is There a Causal Connection between the Protected Activity and the Adverse Employment Action?

In order to make out a claim for retaliation, a plaintiff must demonstrate some

causal nexus between the protected activity and the subsequent adverse employment

action. A causal nexus may be shown either (1) directly, through evidence of retaliatory

animus directed against the plaintiff by the defendant; or (2) indirectly, by showing that

the protected activity was followed closely by discriminatory treatment. See, e.g., Knight

v. City of N.Y., 303 F. Supp. 2d 485, 496 (S.D.N.Y. 2004).

Direct evidence giving rise to an inference of discrimination may include "a

showing that the employer criticized the plaintiff's performance in ethnically degrading

terms, made invidious comments about others in the employee's protected group, or

treated employees not in the protected group more favorably." Hunter v. St. Francis

Hosp., 281 F. Supp. 2d 534, 542 (E.D.N.Y. 2003) (citing Chambers v. TRM Copy Ctrs.

Corp., 43 F.3d 29, 37 (2d Cir.1994)).

In order for a court to "accept mere temporal proximity between an employer's

knowledge of protected activity and an adverse employment action as sufficient evidence

of causality to establish a prima facie case," the temporal proximity must be "very close."

Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (citation omitted) (citing

cases finding temporal proximity of three months and more to be insufficient).

Since Schanfield presented his final risk assessment less than two months before he was terminated, the Court finds that Schanfield has made out a *prima facie* case of retaliatory discharge.

> (iv)    *There Is a Disputed Issue of Fact Concerning the Ultimate Issue of Pretext*

Under <u>McDonnell Douglas</u>, once the plaintiff has established a *prima facie* case of retaliation, the burden of production shifts to the defendant to proffer a legitimate, non-discriminatory business rationale to justify its adverse employment action. <u>Bush</u>, 452 F. Supp. 2d at 418.

Defendants offer legitimate, non-discriminatory reasons for Schanfield's termination—namely, Schanfield's personality clashes with management and dissatisfaction with Schanfield's work product. This is sufficient to carry Defendants' burden at this stage.

On the "ultimate issue" of pretext, <u>Shafrir</u>, 998 F. Supp. at 360 (S.D.N.Y. 1998), Schanfield again points to Matsumoto's statement at the April 23, 2007 meeting to the effect that, "We are a Japanese company and we will do as we please," as well as the close temporal proximity between his final risk report and his termination. The same set of evidence is often proffered both as suggesting an inference of discrimination and on the issue of pretext. <u>See, e.g.</u>, <u>id.</u> Reading the record in the light most favorable, this is sufficient to raise a triable issue of fact for the jury on Schanfield's retaliation claim under Title VII, § 1981 and NYSHRL.

**F.    Schanfield's Individual Claims Against the Individual Defendants Matsumoto and Tsukada**

Schanfield seeks to hold Matsumoto and Tsukada individually liable for discrimination and retaliation against him under § 1981, NYSHRL § 296 and N.Y.C. Admin. Code § 8-107.

Under § 1981, personal liability of a defendant may not be predicated solely on a position of seniority.  See Black v. Coughlin, 76 F.3d 72, 74 (2d Cir.1996).  It must be shown that the defendant had personal involvement in the allegedly discriminatory conduct in order for personal liability to attach.  See, e.g., Bazile v. N.Y. City Hous. Auth., No. 00-7215, 2002 WL 171690, at * 16 (S.D.N.Y. Feb. 1, 2002).

Similarly, under the NYSHRL a supervisor can be held individually liable if he "'actually participates in the conduct giving rise to [the] discrimination.'" Feingold, 366 F.3d at 157 (citing Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir.1995), *abrogated on other grounds by* Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753 (1998)).  In addition, the NYSHRL provides a broader base of liability, making it an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so."  N.Y. Exec. Law § 296(6).  "The Second Circuit has interpreted this language to mean that 'a defendant who actually participates in the conduct giving rise to a discrimination claim may be held personally liable' as an aider and abettor under the NYSHRL, even if that defendant has neither an ownership interest nor the power to hire and fire."  Perks v. Town of Huntington, 251 F. Supp. 2d 1143, 1160 (E.D.N.Y. 2003) (citing Tomka, 66 F.3d at 1317).

An individual defendant may also be held personally liable under the NYCHRL if he participates in the conduct giving rise to the discrimination claim. Sowemimo v. D.A.O.R. Sec., Inc., 43 F. Supp. 2d 477, 490 (S.D.N.Y. 1999).

A claim for aider and abettor liability is also cognizable under the NYCHRL and is susceptible to the same standard as under the NYSHRL, as language of the two laws is "virtually identical." Dunson v. Tri-Maintenance & Contractors, Inc., 171 F. Supp. 2d 103, 113-14 (E.D.N.Y. 2001); see also Kato v. Ishihara, 239 F. Supp. 2d 359, 365 (S.D.N.Y. 2002); Lamberson v. Six West Retail Acquisition, Inc., 122 F. Supp. 2d 502, 513 (S.D.N.Y. 2000).

"However, liability under the [NY]HRL and the NYCHRL must first be established as to the employer/principal before an individual may be considered an aider and abettor." Sowemimo v. D.A.O.R. Sec., Inc., 43 F. Supp. 2d 477, 490 (S.D.N.Y. 1999)

As discussed *supra*, Schanfield has raised a triable issue of fact on his retaliation claim and also on his discrimination claim to the extent he refers to various aspects of his employment as hostile. He has also presented evidence that raises a triable issue of fact on whether Matsumoto and Tsukada were personally involved in the decision to fire plaintiff. Matsumoto testified that he made the decision to fire plaintiff following his March 30, 2007 risk report. And despite Tsukada's testimony that he did not participate in the decision to fire Schanfield, e-mail records show that Matsumoto sought Tsukada's feedback about Schanfield's performance close to the time of his firing.

Thus, Defendants' motion for summary judgment dismissing Schanfield's claims against the individual defendants for discriminatory and retaliatory discharge and for aiding and abetting is denied.

### III. Plaintiff's Motion for Summary Judgment Dismissing SCA's Counterclaims Asserted Against Him Is Denied and the Court *Sua Sponte* Grants Summary Judgment to SCA on the Counterclaims

As discussed above, SCA has asserted three counterclaims against plaintiff in this action: (i) breach of contract; (ii) breach of loyalty/fiduciary duty; and (iii) misappropriation of trade secrets.

### A. Breach of Contract

To establish a breach of contract under New York law a plaintiff must prove the following elements: (i) the existence of a contract; (ii) breach by the other party; and (iii) damages suffered as a result of the breach. See, e.g., First Investors Corp. v. Liberty Mut. Ins. Corp., 152 F.3d 162 (2d Cir.1998). Summary judgment is appropriate "[w]here the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning." Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp., 84 F.3d 91, 98 (2d Cir. 1996) ( quoting Rothenberg v. Lincoln Farm Camp, Inc., 755 F.2d 1017, 1019 (2d Cir. 1985); citing State v. Peerless Ins. Co., 108 A.D.2d 385, 390, 489 N.Y.S.2d 213 (1st Dep't 1985), aff'd, 67 N.Y.2d 845, 501 N.Y.S.2d 651, 492 N.E.2d 779 (1986)).

SCA's action for breach of contract arises out of SCA's Offer Letter to Schanfield. The relevant language provides,

> Given the nature of your position, you will have access to certain confidential or proprietary information held or received by SCA (including but not limited to business plans, services or servicing methods, strategies, technical data, trade secrets, software marketing and financial information of SCA or SCA's current and/or prospective business clients (collectively, the

> "Information") which may be disclosed to you in writing during
> the court of your employment with SCA.
>
> You agree that, except to the extent that such information is in the
> public domain or as may be required by a lawful court order to (i)
> keep all information confidential; (ii) not disclose or communicate
> same to any other person or entity; (iii) not use the Information for
> any purpose whatsoever other than performing your duties as an
> employee of SCA and (iv) to return all information at the end of
> your employment with SCA.

(Offer Letter 4-5, attached as Ex. A to Paice Reply Aff.)  Schanfield countersigned this

letter before beginning employment at SCA.

Schanfield admits that he sent SCA documents to his own personal e-mail

account.  (Pl. Dep. Tr. at 588.)  He also admits that he e-mailed SCA documents

containing sensitive risk analysis to colleagues in the audit profession, who were not

employed at and had no connection to SCA.  (Id. at 588-89.)  Additionally, Schanfield

admits he showed a risk assessment document to an SCA employee who SCA contends

was not authorized to receive it. (Id.)

Plaintiff nevertheless brazenly asserts that he is entitled to summary judgment on

SCA's breach of contract claim because:  (i) the language of the contract is vague and

overbroad, and therefore unenforceable due to ambiguity; (ii) even if it is an enforceable

contract, Schanfield's actions did not breach its terms because Schanfield was allowed to

send documents to himself under the contract, and when he sent documents to third

parties not associated with SCA, he did so for the purpose of performing his job at SCA;

and (iii) SCA has not made a showing of damages.

None of these arguments is persuasive.  In fact, SCA is entitled to summary

judgment against plaintiff on this claim because plaintiff admits he breached the contract,

which is not ambiguous.

## 1. The Offer Letter Is Not Ambiguous

The threshold inquiry as to whether a contract is ambiguous "is the exclusive province of the court." Sutton v. E. Riv. Sav. Bank, 55 N.Y.2d 550, 554 (1982). "When construing the provisions of a contract, ascertaining the intent of the parties is paramount," Schmidt v. Magnetic Head Corp., 468 N.Y.S.2d 649, 654 (2d Dep't 1983) (citing Brown Bros. Elec. Contrs. v. Beam Constr. Corp., 41 N.Y.2d 550, 555 (1977)), and "due consideration must be given to the purpose of the parties in entering into the contract." Id. (citing Matter of Cromwell Towers Redev. Co. v City of Yonkers, 41 N.Y.2d 1, 6 (1976)). "[T]he aim is a practical interpretation of the expressions of the parties to the end that there be a realization of [their] reasonable expectations." Sutton, 55 N.Y.2d at 554.

Reading the Offer Letter signed by Schanfield, the Court does not find any ambiguity as to the confidentiality obligations assumed by Schanfield. It is clear that at the time of the signing of the Offer Letter the parties expected that Schanfield would, by the nature of his job, be privy to SCA's confidential, proprietary documents and information—information that plaintiff admits would be damaging to SCA if it were publicly disclosed. (Pl. Dep. Tr. at 582-83.) SCA intended to preserve the confidentiality of information accessed by Schanfield during his employment at SCA and prevent its dissemination by prohibiting plaintiff from its unauthorized use, disclosure, or retention at the end of Schanfield's employment. Plaintiff, through his signature, manifested his agreement to accept the confidentiality obligations as a condition of his employment at SCA. There is nothing ambiguous about it.

### 2.    Plaintiff Breached the Offer Letter

Plaintiff also argues that even if the Offer Letter created a binding contract, and even though he did distribute confidential documents to third parties, he did not commit a breach. He maintains that he: (1) took the documents from SCA so that he could work from home; (2) turned the documents over to his attorneys who, in turn, "produced" them to SCA through discovery in this action; and (3) only sent e-mails to individuals soliciting their advice and opinions in order to better perform his job at SCA. (Pl. Mem. at 8-10.)

To begin with, it is not SCA's contention that plaintiff's e-mailing of documents to his personal e-mail address breached the terms of the confidentiality agreement. SCA does, however, take issue with his disclosure of confidential SCA documents to third parties and his retention of SCA documents prior to his termination—both of which SCA claims were facilitated by plaintiff first e-mailing the documents to his personal e-mail address.

To the extent that plaintiff contends that he was permitted under the terms of the Offer Letter to send the confidential documents to third-party strangers because he was doing so to benefit SCA, the argument is patently ridiculous. The language of the Offer Letter clearly does not contemplate Schanfield disclosing sensitive, risk information to third-party strangers without authorization even if the intent is to gain beneficial insight for SCA. Furthermore, even plaintiff's own e-mails belies this contention. (Paice Aff. Exs. A-E.) Many of the e-mails transmitting confidential SCA materials are derisive of SCA. For instance, in an April 2, 2007 e-mail to Nancy Bakeman, a person not associated with SCA, plaintiff wrote, "I had 435 risks in my risk assessment—here are

the top 10% of those issues—it is a difficult process here to get this implemented.  In addition my audit plan calls for 750 days between now and year end—understanding of risk and controls is not good.  Oh well!" (Id. Ex. C.)  On April 24, 2007, Schanfield wrote an e-mail to third party Adaze Nwachuku, in which he described the risk assessment he created, and wrote, "Several heads need to be broken here.  Such stupidity on many situations."  (Id. Ex. M.)

Finally, plaintiff's argument that he did not breach his covenant to return all SCA confidential documents to SCA, because he "produced" them through discovery in this action does not provide a defense to SCA's claim.  He stole the documents and transmitted the confidential material to third parties.  That act breached the contract.  Plaintiff is liable for whatever damages can be proved as a result.

Furthermore, Schanfield was required "to return all information at the end of [his] employment with SCA."  He did not do so at the time his employment ended.  Indeed, at the time his employment ended Schanfield did not even tell his employer that he had purloined documents and shared confidential information with outsiders.  Plaintiff did not "give back" the stolen information until he responded to document requests in this lawsuit.  His breaches occurred months prior to any Federal Rule of Civil Procedure 34 request, and responding to such requests does not cure the breach—especially that aspect of the breach that involved sharing information about the employer with third parties.

I am not persuaded by the case on which plaintiff relies, Albertini v. Summit Tech. Servs., Inc., 287 F. Supp. 2d 92 (D. Mass. 2003).  In Albertini, the court found no breach by plaintiff when plaintiff retained confidential documents after his termination, but returned them immediately upon his former employer's request.  Id. at 97. There is no

suggestion in Albertini that the employee in that case had already transmitted confidential information to outsiders at the time he returned the documents. In this case, however, Schanfield failed to return the documents *for nearly two years* after his termination and after repeated requests from SCA's counsel (Paice Aff. 23-28) and the information had already been revealed to outsiders when copies of some of it were "produced" to SCA.

### 3. It Is Appropriate to Grant Summary Judgment to the Non-Moving Counterclaim Defendant

It is well-accepted that the Court is permitted to search the record and grant summary judgment to a non-moving party if warranted. See, e.g., Coach Leatherware Co., Inc. v. AnnTaylor, Inc., 933 F.2d 162 (2d Cir. 1991). "Where it appears clearly upon the record that all of the evidentiary materials that a party might submit in response to a motion for summary judgment are before the court, a *sua sponte* grant of summary judgment against that party may be appropriate if those materials show that no material dispute of fact exists and that the other party is entitled to judgment as a matter of law." Ramsey v. Coughlin, 94 F.3d 71, 74 (2d Cir. 1996). "The record must, therefore, reflect the losing party's inability to enhance the evidence supporting its position and the winning party's entitlement to judgment." Id. In this Circuit, the court can *sua sponte* enter summary judgment against the moving party without notice. Id. (citing Abrams v. Occidental Petroleum Corp., 450 F.2d 157, 165-66 (2d Cir.1971), *aff'd*, 411 U.S. 582 (1973)); Local 33, Int'l Hod Carriers Bldg. & Common Laborers' Union of Am. v. Mason Tenders Dist. Council of Greater N.Y., 291 F.2d 496, 505 (2d Cir.1961).

The factual record on Schanfield's breach of contract claim is fully developed and there is no disputed issue concerning Schanfield's breach—indeed, Schanfield admits

to the activity that breached the agreement—so I am awarding summary judgment to SCA.

The fact that Schanfield has not offered evidence about its damages does not negate plaintiff's liability for breach of contract.

In New York, "It is a well-settled tenet of contract law that even if the breach of contract caused no loss or if the amount of the loss cannot be proven with sufficient certainty, the injured party is entitled to recover as nominal damages a small sum fixed without regard to the amount of the loss, if any." Medinol Ltd. v. Boston Sci. Corp., 346 F. Supp. 2d 575, 599 (S.D.N.Y. 2004) (quoting ESPN, Inc. v. Office of the Comm'r of Baseball, 76 F. Supp. 2d 416, 421 (S.D.N.Y. 1999)).

Furthermore, in addition to non-specified damages, SCA has asked the Court for specific performance—i.e., a permanent injunction ordering the relinquishment of all SCA documents to SCA, and prohibiting Schanfield from making further disclosures—as a remedy for the breach of the Offer Letter. Specific performance is an appropriate remedy in a breach of contract claim. See La Mirada Prods. Co. v. Wassall PLA, 823 F. Supp. 138, 141 (S.D.N.Y. 1993); Conn. Nat'l Bank v. Trans World Airlines, Inc., 762 F. Supp 76, 79-80 (S.D.N.Y. 1991).

SCA has chosen to prove damages at trial. It may offer evidence of any actual damages sustained. If none is proved plaintiff will be liable for nominal damages. The Court orders that plaintiff and his counsel immediately turn over the originals and all copies in their possession of any purloined document and identify each and every person to whom SCA documents were sent or with whom information was shared.

### B.    Breach of Duty of Loyalty[11]

In order to make out a claim of breach of the duty of loyalty in New York—

sometimes referred to as the "faithless servant doctrine"—the employer plaintiff must

show (1) that the employee's disloyal activity was related to "the performance of his

duties," Phansalkar v. Anderson Weinroth & Co., L.P., 344 F.3d 184, 200 (2d Cir. 2003);

and (2) that the disloyalty "permeated the employee's service in its most material and

substantial part," id. at 203.

Schanfield argues that SCA cannot make out a claim under the faithless servant

doctrine because here the complained-of activities did not impede plaintiff's ability to

perform his duties at SCA.

Again, plaintiff's argument is not persuasive.

"The duty of an employee not to use or divulge confidential knowledge acquired

during his employment is implicit in the employer-employee relation, is an absolute, and

not a relative duty." Kaufman v, Int'l Bus. Machs. Corp., 470 N.Y.S.2d 720, 723 (N.Y.

App. Div. 3d Dep't 1983) (internal citations omitted). It is a well-recognized rule of

agency law that an agent has a duty of loyalty to his principal. Restatement 2d of Agency

§ 387. This duty requires an employee to act "solely for the benefit of the [employer] in

all matters connected with the [employment]." Id.; Herrerra v. Clipper Group., L.P., No.

97-560, 1998 WL 229499, at *2 n.2 (S.D.N.Y. May 6, 1998). In particular, an employee

is "prohibited from acting in any manner inconsistent with [his] agency or trust and is at

all times bound to exercise the utmost good faith and loyalty in the performance of [his]

---

[11] SCA styles this claim as "Breach of Fiduciary Duty (Duty of Loyalty)." It is clear from their opposition papers, however, that the claim that it is asserting is breach of duty of loyalty.

duties." Id. at *6. This prohibition extends to the exploitation of an employer's confidential information for the employee's or a third party's benefit. Restatement 2d of Agency § 396; Paz Sys., Inc. v. Dakota Group Corp., 514 F. Supp. 2d 402, 410 (E.D.N.Y. 2007).

Though the parties disagree about all the parameters of Schanfield's responsibilities, it is undisputed that as SCA's CIA, Schanfield was generally charged with identifying and addressing business risks and weaknesses in SCA's business model. Schanfield claims that his transmission of confidential SCA documents identifying critical areas of weakness in SCA's business was consistent with the performance of his job duties. This argument is ludicrous. Schanfield's dissemination of sensitive SCA material undercuts the very goal of what Schanfield was hired to do as an auditor—to improve SCA's business and reduce risks!

Plaintiff's motion for summary judgment on SCA's claim for breach of the duty of loyalty is denied. As no issue of fact exists regarding Schanfield's breach of the duty of loyalty, so summary judgment is granted to SCA on this claim as well.

### C.    Misappropriation of Trade Secrets

In order to set forth a claim for misappropriation of trade secrets, a plaintiff must demonstrate (1) that it possessed a trade secret; and (2) that the defendant used that trade secret in breach of an agreement, confidence, or duty, or as the result of discovery of the secret by improper means. In re InSITE Servs. Corp., LLC, 287 B.R. 79, 88 (S.D.N.Y. 2002) (citing Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc., 920 F.2d 171, 172 (2d Cir. 1990)).

"[A] trade secret is 'any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it.'" Softel, Inc. v. Dragon Med. & Scientific Comm'ns, Inc., 118 F.3d 955, 968 (2d Cir. 1997) (quoting Restatement of Torts § 757 cmt. b (1939)), *cert. denied*, 523 U.S. 1020 (1998).

SCA alleges that the documents Schanfield disclosed to third parties contained information considered to be trade secrets. Plaintiff does not argue that SCA's characterization of the information in the documents as trade secrets is fallacious. Instead, he argues that he is entitled to summary judgment on this claim because SCA has failed to make a showing of pecuniary damages stemming from the misappropriation of SCA documents.

But a plaintiff need not demonstrate pecuniary damages to prevail on a claim for misappropriation of trade secrets. Injunctive relief to prevent future misuse of trade secrets may also be a proper remedy in the trade secrets context. See A.F.A. Tours, Inc. v. Whitchurch, 937 F.2d 82, 87 (2d Cir. 1991) ("in appropriate circumstances, the owner of trade secrets may obtain an injunction against their use or disclosure by another in breach of his confidential relationship with the owner"). Indeed, the Second Circuit has noted that, "Where the plaintiff seeks injunctive relief, the value of his claim is generally assessed with reference to the right he seeks to protect and measured by the extent of the impairment to be prevented by the injunction. In calculating that impairment, the court

may look not only at past losses but also at potential harm." Id. (internal citations omitted).[12]

Therefore, SCA's failure to demonstrate that it has suffered pecuniary damage – measured either by its losses, Timely Products Corp. v. Arron, 523 F. 2d 288, 304 (2d Cir. 1975), or the profits unjustly received by defendant, Electro-Miniatures Corp. v. Wendon Co., 771 F. 2d 23, 27 (2d Cir. 1985) – does not necessarily entitle plaintiff to summary judgment.

In fact, SCA is clearly and indisputably entitled to summary judgment on certain issues relating to this counterclaim. Information about SCA's strategic weaknesses certainly qualifies as a trade secret; it could provide a competitor with useful information that would give him an advantage over SCA. Schanfield disclosed that secret in breach of both an agreement and a duty.

Whether SCA can prove any damages on this counterclaim (which in many ways conflates with the other two counterclaims) seems dubious, and the fact that Schanfield no longer works for SCA may well render injunctive relief inappropriate. On the other hand, Schanfield admits the confidential nature of the information he provided to outsiders, and his failure to turn over the documents containing that information for a

---

[12] The cases cited by plaintiff do not suggest otherwise. See Action House, Inc. v. Koolik, 54 F.3d 1009 (2d Cir. 1995) (discussing the propriety of awarding punitive damages in corporate funds embezzlement case where no actual damages were proved at trial); Nakano v. Jamie Saddock, Inc., No. 98-0515, 1999 WL 1225259 (S.D.N.Y. Dec. 20, 1999) (examining plaintiff's calculation of damages in the context of fraud, misappropriation of corporate assets and conversion resulting in an alleged loss of the plaintiff's capital investment); Commercial Union Assurance Co., plc. v. Milken, 17 F.3d 608 (2d Cir. 1994) (involving damages for violations of securities law and civil RICO); VT Microsys., Inc. v. Autodesk, Inc., 138 F.3d 449 (2d Cir. 1998) (considering the proper measure of damages under the California Trade Secrets Act).

substantial period of time renders suspect his claim that he has now fully complied with his obligations. The issue of remedy will go to trial, but not the issue of Schanfield's culpability. As to that, SCA is plainly entitled to summary judgment.

### III.     Plaintiff's Motion for Class Certification Is Denied

Schanfield brought this lawsuit as a putative class action on behalf of all non-Japanese/non-Asian current and former management-level employees of SCA who have been employed by SCA at any time between October 1, 2004 to the present. He asserts class claims under Title VII and Section 1981 against SCA for race and national origin discrimination and for retaliation.

### A.     Standard for Class Certification

The Supreme Court has held that district courts must conduct a "rigorous analysis" into whether the prerequisites of Federal Rule of Civil Procedure 23 are met before certifying a class. Gen. Tel. Co. v. Falcon, 457 U.S. 147, 161 (1982); see also Caridad v. Metro North Commuter R.R., 191 F.3d 283, 291 (2d Cir. 1991), *overruled on other grounds*; In re Initial Pub. Offering Sec. Litig., 471 F.3d 24, 42 (2d Cir. 2006) [hereinafter, In re IPO]. Recently, the Second Circuit clarified what a "rigorous analysis" entails:

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met;
>
> (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met;
>
> (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement;

(4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and

(5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.

In re IPO, 471 F.3d at 41.

The "prerequisites" for determining a motion for class certification are well settled and require little discussion. The basic criteria for the certification of a class action under Rule 23(a) are:

(1) the class is so numerous that joinder of all members is impracticable,

(2) there are questions of law or fact common to the class,

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 132-33 (2d Cir. 2001), overruled on other grounds; In re IPO, 471 F.3d at 42; Shankaroff v. Advest, Inc., 112 F.R.D. 190, 193 (S.D.N.Y. 1986).

One of the three elements of Rule 23(b) must also be satisfied. See Visa Check, 280 F.3d at 133; Bresson v. Thomson McKinnon Sec., 118 F.R.D. 339, 344-45 (S.D.N.Y. 1988). In this case, the plaintiff seeks certification pursuant to Rule 23(b)(2) or (b)(3), which is appropriate when:

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to any other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(2)-(3).

### B.    Schanfield's Motion for Class Certification

In view of the foregoing decision, which has resulted in the dismissal of the vast majority of Schanfield's own claims, we need not linger long over his motion for class certification.

Plaintiff's brief in support of his class certification motion argues as follows: "The claims of Plaintiff are typical of the claims of the proposed class. Plaintiffs and all the class members are non-Japanese/non-Asian management level employees subject to disparate treatment by virtue of the discriminatory rotational/national staff system which gives Japanes/Asian rotational staff preferential treatment in all facets of employment. This preferential treatment resulted in Sojitz: (i) failing to hire and/or promote non-Japanese/non-Asian executives and managers, (ii) denying non-Japanese/non-Asian employees equal access to managerial opportunities, (iii) compensating non-Japanese/Non-Asian management employees less than Japanese/Asian rotational employees; and (iv) subjecting non-Japanese/non-Asian employees to stricter discipline than Japanese/Asian rotational staff." But these are the very claims that have been dismissed, either because Sojitz has a treaty-protected right to fill the senior management positions that plaintiff contends were denied to him with parent company employees; or because they are really claims for discrimination based on citizenship rather than race or national origin, or because the National and Rotational employees cannot be considered

similarly situated in all material respects where matters such as pay or discipline are concerned.

Schanfield's only live claims at this point are a claim that he was excluded from certain meetings and was otherwise mistreated by a supervisor (which is generously being termed a hostile work environment claim, although it is in reality a retaliation-type claim) and retaliatory termination. Schanfield does not argue that these claims are susceptible of class treatment, and he offers no evidence that these claims are anything other than unique to him. Indeed, Schanfield does not identify a single member of his proposed class who could bring a retaliation claim against SCA. The questions that are individual to Schanfield in connection with these claims vastly predominate over any "common issue" that might be identified (and since Schanfield ignores these claims in his brief, or mischaracterizes them as "discipline," he has failed to identify what common issue they present). The common issue that plaintiff identified in his complaint – discrimination against non-Japanese (i.e., National) employees at SCA, a self-described "Japanese company" – does not "occupy essentially the same degree of centrality to the named Plaintiffs' claim as to that of other members of the proposed class," Krueger v. New York Tel. Co., 163 F.R.D. 433, 442 (S.D.N.Y. 1995); see also In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 145, 166-67 (2d Cir. 1987), because plaintiff's claims are essentially that he was retaliated against in various ways as a result of his speaking up against what he perceived as unwarranted disparities between the treatment of National and Rotational employees.

Ultimately, plaintiff's own description of his claims proves that his "class claims" are really predicated on either race or national origin discrimination. The class plaintiff

really seeks to certify is a class of National employees at the managerial level, whose goal is to overturn the treaty-protected system whereby Sojitz is permitted to bring in managerial level employees from Japan to occupy the most senior positions at SCA, and to allow those employees to continue to be employed by, evaluated by, paid by and disciplined by the Japanese parent company. No such class can be certified.

Additionally, plaintiff has not convinced the Court that the class is sufficiently numerous to be certified. The Court agrees with Defendants that the potential class is no more than 37 in number; while plaintiff identifies 46 National employees, if his claims are of race and national origin discrimination, then it stands to reason that Japanese-Americans and Asian-Americans ought to be excluded from the class. But if National employees who are of the same race and/or national origin as Rotational employees are excluded from the class, there are fewer than 40 members of the class – and 40 is generally accepted in this Circuit as being sufficiently numerous. Consolidated Rail Corp. v. Town of Hyde Park, 47 F. 3d 473, 483 (2d Cir. 1995).

The motion for class certification is denied.

## CONCLUSION

The parties will be notified of a trial date for the few issues that remain open in this case. As soon as they are notified, they will have ten days to submit *in limine* motions. *In limine* motions that seek to reargue points decided in this opinion will be summarily denied. Each side will have ten days to respond to any *in limine* motions made by the other; no reply papers will be accepted. The Court will deliver its decision on the *in limine* motions at or before the final pre-trial conference.

At the final pre-trial conference, the parties MUST appear by trial counsel. Trial counsel must be ready to argue objections to any proposed exhibit offered by the other side; exhibits will be admitted or not admitted at the final pre-trial conference. Trial counsel must also commit to which witnesses he/she will call at trial; the Court will take steps to insure that the trial of this very narrow case does not consume more than four trial days.

Finally, the Court notes that the parties submitted their motion papers under seal, allegedly because they contained confidential information. As almost always happens in these actions, the parties presented the Court early on with a protective order to protect against the dissemination of confidential information, and a very great deal of information that probably does not qualify as truly confidential has no doubt been made subject to that order. I can see absolutely nothing in this opinion that qualifies as confidential. It is my intent to file this opinion publicly unless, within three days, I receive from a party a letter (1) identifying what in the opinion constitutes confidential information, and (2) explaining with specificity why that information is really confidential. The Court reserves the right to conclude that the supposedly "confidential" material is in fact not deserving of protection, and to file the opinion publicly if there is no adequate showing of a need to file under seal.

This constitutes the decision and order of the Court.

Dated: September 29, 2009

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

83